DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON (CA Bar No. 217022)
Trial Attorney
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:     (202) 307-6422
Fax:               (202) 307-0054
E-mail: Amy.T.Matchison@usdoj.gov
           Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil Number: |
| Petitioner, | |
| v. | **DECLARATION OF KAREN CINCOTTA IN SUPPORT OF PETITION TO ENFORCE INTERNAL REVENUE SERVICE SUMMONS** |
| PAYWARD VENTURES INC., d/b/a KRAKEN OR KRAKEN.COM, OR ITS PREDECESSORS, SUBSIDIARIES, DIVISIONS, OR AFFILIATES, | |
| Respondent. | |

I, Karen Cincotta, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a duly commissioned Internal Revenue Agent ("Revenue Agent") assigned as a Supervisory Revenue Agent in the Internal Revenue Service's ("IRS") Offshore Compliance Initiative ("OCI").  My post of duty is in Maitland, Florida.

2.      The IRS is conducting an investigation to determine the identity and correct federal income tax liability of U.S. persons who conducted transactions in cryptocurrency for the years ended December 31, 2016, 2017, 2018, 2019, and 2020.

3.      Payward Ventures, Inc., ("Kraken") is a United States corporation with its principal place of business in San Francisco, California.

4.      In furtherance of the investigation for the years ended December 31, 2016, 2017, 2018, 2019, and 2020, in accordance with 26 U.S.C. § 7602, on May 11, 2021, a summons was issued directing Payward Ventures Inc. & Subsidiaries to produce for examination books, records, papers, and other data as described in the summons.  A copy of the summons is attached as Exhibit A.

5.      In furtherance of the investigation, in accordance with 26 U.S.C. § 7609(f), and pursuant to this Court's order, an attested copy of the summons was served on Payward Ventures, Inc.  Pursuant to the agreement of the parties, David Kirk, a Law Enforcement Production Supervisor at Payward Ventures, Inc., accepted service of the summons by e-fax on May 11, 2021.

6.      The summons seeks information regarding unknown U.S. taxpayers who directly or indirectly held or had control over any combination of user accounts at Payward Ventures, Inc. and Subsidiaries with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year during January 1, 2016, through December 31, 2020.

I.      **BACKGROUND**

     A.      **Cryptocurrency in General**

7.      Cryptocurrency is a particular type of virtual currency as the IRS has used that term in Notice 2014-21.  Cryptocurrency, however, can be further divided into two general categories – crypto-coins and crypto-tokens – although the two are often referred to generally as cryptocurrency.

8.      As of January 7, 2022, cryptocurrency tracking website www.coinmarketcap.com indicated that more than 16,520 separate cryptocurrencies existed.  The most widely known cryptocurrency, and largest by capitalization, is bitcoin.  Given bitcoin's prominence in the cryptocurrency ecosystem, other cryptocurrencies are often generically referred to as alternative coins or "altcoins" for short.  A few examples of altcoins are Ethereum, Litecoin, XRP, and stellar.

9.     In general, cryptocurrency is based on distributed ledger (blockchain[1]) technology.[2]  In a distributed ledger technology system, a user creates a cryptocurrency wallet to engage in cryptocurrency transactions.  A wallet is a computer file that contains information (software and protocols) used in transferring units of a cryptocurrency.  When the wallet is downloaded or purchased (as in the case of a hardware wallet), the user prompts software in the wallet to generate a private key.  The private key is then used to generate a public key, which, in turn, is used to generate an address.  The private key, public key, and address are linked, but the encryption protocols employed to create the public key and address are only one-way, which prevents the reverse engineering of the private key from the address or public key.[3]

10.     A wallet may hold any number of private/public key pairs.  Addresses and public keys are shared with other users to conduct cryptocurrency transactions.  Private keys, which are used as the last piece in forming the digital signature to conduct a transaction, generally should not be shared.  Sharing of a private key would permit another individual to engage in transactions on the original user's behalf.[4]

11.     The method described above for transacting in cryptocurrency is generally the same regardless of whether it is a crypto-coin or crypto-token.  There is a difference, however, in how those two assets are created and how transactions for each are validated and tracked.

---

[1] While distributed ledger technology is commonly referred to as a "blockchain" this is not entirely accurate.  There are some types of distributed ledgers that do not use "blocks."  *See, e.g.*, https://www.iota.org/get-started/what-is-iota https://perma.cc/PN63-XNKZ (discussing IOTA distributed ledger's use of a "tangle" chain rather than conventional "block" chain).

[2] *See* Financial Action Task Force Report, *Virtual Currencies Key Definitions and Potential AML/CFT Risks,* June 2014, http://www.fatf-gafi.org/publications/methodsandtrends/documents/virtual-currency-definitions-aml-cft-risk.html [https://perma.cc/3W7X-R6TD]; *see also generally* Bitcoin, https://en.bitcoin.it/wiki/Main_Page [https://perma.cc/DZ44-XBZV].

[3] *See* https://www.mycryptopedia.com/public-key-private-key-explained/ https://perma.cc/QQE2-PG6F *see also* David W. Perkins, Cong. Research Serv., IF10824, *Financial Innovation: "Cryptocurrencies,"* (February 2018) https://crsreports.congress.gov/product/pdf/IF/IF10824 [https://perma.cc/6JAD-VSM7].
[4] *See* Coinbase, https://support.coinbase.com/customer/en/portal/articles/2275614-is-a-wallet-address-safe-to-display-publicly-?b_id=13521 [https://perma.cc/N8E7-5NFU].

12.     Crypto-coins are created as a component of the distributed ledger itself.  As such, crypto-coin transactions are confirmed by computer nodes participating in the maintenance of the distributed ledger and those transactions are then recorded in blocks that make up the distributed ledger's blockchain (assuming the crypto-coin uses a blockchain-type distributed ledger).

13.     Generally, all transactions on a crypto-coin blockchain can be viewed by the public on any computer connected to the Internet.[5]  However, the blockchain transactional history generally only reveals the date, time, units, address, wallet ID (to which the address belongs to), and transaction ID associated with a transaction.  The blockchain does not identify the actual identities of the address and wallet owners.

14.     Separately, crypto-tokens are not an inherent part of a distributed ledger.  Tokens, rather, are created through computer scripts or programs such as smart contracts or decentralized applications ("DApps") that are hosted by or built off a distributed ledger.  For example, the Ethereum blockchain is a distributed ledger platform that uses the crypto-coin ether.  *See generally* Ethereum, https://ethereum.org/learn/ [https://perma.cc/MN7S-9ZW8].  The Ethereum blockchain, however, is also designed to host crypto-tokens created through smart contracts or DApps built off of the Ethereum blockchain.  *Id.*  The crypto-coin ether is designed to function as the "gas" (compensation) for running the smart contracts and DApps on the Ethereum platform.  *Id.*

15.     As with crypto-coins, crypto-tokens can be transferred using a cryptocurrency wallet.

16.     The peer-to-peer nature of cryptocurrencies, compounded by the pseudo-anonymous nature of publicly-available-transactional information, makes the examination of an individual's cryptocurrency transactions for tax purposes – particularly, the receipt of income or investment gains – more difficult than examinations involving traditional transactions conducted through regular banking or financial institutions.

---

[5] Not all crypto-coins operate this way.  Some are designed specifically to protect all transactional information or at least to provide users the option to do so.  *See e.g.*, https://web.getmonero.org/get-started/what-is-monero/ [https://perma.cc/46KZ-NDJ4]; https://docs.dash.org/en/stable/introduction/features.html#privatesend [https://perma.cc/T6X7-5GH4].

17.     To buy cryptocurrency (coins or tokens), a user may transfer traditional (fiat) currency to someone who already has cryptocurrency and wishes to exchange it for traditional currency.  This exchange can occur directly with anyone holding cryptocurrency, but also can be handled through businesses known as digital currency exchanges.  Such businesses (like Kraken discussed below), trade between cryptocurrencies and traditional currencies or sometimes just between different cryptocurrencies (coins and/or tokens).

18.     A digital currency exchange functions much like a traditional currency exchange, except it deals with the conversion of cryptocurrency for traditional currency or vice versa, as well as the exchange of one cryptocurrency for another cryptocurrency.  Digital currency exchanges may also provide wallet services.  These hosted wallet services allow a user to quickly authorize cryptocurrency transactions with another user through a user account held at the exchange.  Hosted wallet accounts are accessible through a computer or mobile device like a smartphone.[6]

19.     Digital currency exchanges are generally regulated as "money transmitters" (a type of money services business) under Title 31 of the United States Code ("U.S.C.").  *See generally* FinCEN Guidance No. FIN-2013-G001: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013) https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf [https://perma.cc/E9C8-YH3C]; FinCEN Guidance No. FIN-2019-G001: Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies (May 9, 2019) https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf [https://perma.cc/6BVK-AJVP].

20.     As a money transmitter, digital currency exchanges are required to obtain and maintain certain customer identification information and transactional data for the purpose of combating illicit activity such as money laundering, tax evasion, and terrorism financing.  *See* 31 U.S.C. § 5311; 31 C.F.R. § 1010.100(ff)(5), § 1022.210; FinCEN Guidance No. FIN-2019-A003: Advisory on Illicit

---

[6] *See* Edward V. Murphy, M. Maureen Murphy, Michael V. Seitzinger, Cong. Research Serv., R43339, *Bitcoin: Questions, Answers, and Analysis of Legal Issues* (October 2015) https://crsreports.congress.gov/product/pdf/R/R43339 [https://perma.cc/V5QH-VFWW].

Activity Involving Convertible Virtual Currency (May 9, 2019),

https://www.fincen.gov/sites/default/files/advisory/2019-05-
10/FinCEN%20Advisory%20CVC%20FINAL%20508.pdf [https://perma.cc/3MCL-5YQ9].

21.     With respect to cryptocurrencies, digital currency exchanges (such as Kraken discussed below), provide valuable information about an individual customer's cryptocurrency transactions that can be used in conjunction with other publicly available blockchain information to adequately examine whether an individual has complied with internal revenue laws.

22.     As detailed below, the IRS is seeking enforcement of the John Doe summons to Kraken to obtain customer and transactional information belonging to members of the John Doe class that can be used to conduct examinations of persons that may not have complied with the internal revenue laws.

**B.      Taxation of Virtual Currency**

23.     Virtual currency, including cryptocurrency, is treated as property for tax purposes.  *See generally* Notice 2014-21.  The following examples provide an overview of how tax principles applicable to transactions in property apply to transactions in virtual currency:

- Wages, salary, or other income paid to an employee with virtual currency is reportable by the employee as ordinary income and subject to employment taxes paid by the employer.

- Virtual currency received by a self-employed individual in exchange for goods or services is reportable as ordinary income and is subject to self-employment tax. This would include a person who "mines" virtual currency as a trade or business.

- Virtual currency received in exchange for goods or services by a business is reportable as ordinary income.

- Gain or loss on the exchange of virtual currency for other property is generally reportable as a capital gain if the virtual currency was held as a capital asset and

as ordinary income if it is property held for sale to customers in a trade or business.[7]

- Gain on the sale of property held as a capital asset in exchange for virtual currency is reportable as a capital gain.

- Payments made in virtual currency are subject to information reporting requirements to the same extent as payments made in fiat currency or instruments denominated in fiat currency.

24. A taxpayer's gain or loss upon the disposition of virtual currency will generally be the difference between adjusted basis in the virtual currency and the amount received in exchange for the virtual currency, which should be reported on the tax return. *See* 26 U.S.C. § 1001; IRS *Frequently Asked Questions on Virtual Currency Transactions*, *supra*, Q7. Basis, for virtual currency purposes, is generally determined by the cost or amount spent to acquire cryptocurrency, adjusted for fees, commissions, and other acquisitions costs. *See* 26 U.S.C. § 1012; IRS *Frequently Asked Questions on Virtual Currency Transactions*, *supra,* Q8.

25. Users of digital currency exchanges, such as Kraken, may engage in taxable transactions through the receipt of cryptocurrency into the user's digital currency exchange account as payment for goods or services, or through the buying and selling of cryptocurrency through the user's digital currency exchange account.

**C.    The IRS's Experience with Tax Non-Compliance**

26. In 2013, at the request of the Senate Finance Committee, the Government Accountability Office ("GAO") completed a study of the use of virtual currency. Through interviews with industry

---

[7] Upon the sale or exchange of virtual currency, a taxpayer must recognize any capital gain or loss on the sale, subject to any limitations on the deductibility of capital losses. *See* IRS *Frequently Asked Questions on Virtual Currency Transactions*, Q 4, https://www.irs.gov/individuals/international-taxpayers/frequently-asked-questions-on-virtual-currency-transactions [https://perma.cc/3N6B-TYSN]. Capital gains or losses from the disposition of virtual currency must be reported in accordance with IRS forms and instructions, including on Schedule D, Capital Gains and Losses, and Form 8949, Sales and Other Dispositions of Capital Assets. *See* IRS *Frequently Asked Questions on Virtual Currency Transactions*, Q 43, https://www.irs.gov/individuals/international-taxpayers/frequently-asked-questions-on-virtual-currency-transactions [https://perma.cc/BBZ5-LTB6]; *see also* 26 U.S.C. §§ 1(h); 1211(b); 1222(6)-(7), (10)-(11). Schedule D and Form 8949 each require taxpayers to report capital gains and losses. *See generally* Form 8949; Instructions for Form 8949; Schedule D, Instructions for Schedule D.

representatives, tax professionals, IRS officials, and academics, GAO identified several tax compliance risks associated with virtual currencies, ranging from lack of knowledge of tax requirements and uncertainty over how to report virtual currency transactions to deliberate underreporting of income and tax evasion.  *See* U.S. Gov't Accountability Office, GAO-13-516, *Virtual Economies and Currencies: Additional IRS Guidance Could Reduce Tax Compliance Risks* (2013) https://www.gao.gov/products/GAO-13-516 [https://perma.cc/H83E-BFSD].

27.     In September 2016, the Treasury Inspector General for Tax Administration ("TIGTA") issued a report explaining that taxpayers' use of virtual currencies, including cryptocurrencies, had expanded significantly in recent years.  *See As the Use of Virtual Currencies in Taxable Transactions Becomes More Common, Additional Actions Are Needed to Ensure Taxpayer Compliance*, Reference Number 2016-30-083 (Sept. 21, 2016) https://www.treasury.gov/tigta/auditreports/2016reports/201630083fr.pdf [https://perma.cc/5BW9-YXWT].  The report reflects TIGTA's independent determination that while there are legitimate reasons to use virtual currency – lower transaction fees and faster transfers of funds compared to traditional currencies – some virtual currencies are also popular because the identities of the parties involved are generally anonymous, leading to a greater possibility of their use in illegal transactions.

28.     Since 2005, the IRS's Electronic Payment Systems Initiative ("EPSI") has focused on developing projects, methodologies, and techniques for identifying U.S. taxpayers who use electronic funds transfer and payment systems for tax avoidance purposes.  In September 2013, OCI expanded the scope of the EPSI to address U.S. taxpayers who use virtual currencies for tax avoidance purposes, recognizing that some U.S. taxpayers use such currencies to expatriate and repatriate funds to and from offshore accounts.

29.     In furtherance of the EPSI, the IRS is conducting an investigation to identify tax noncompliance related to the use of virtual currency.  In December 2013, the IRS established a Virtual Currency Issue Team ("VCIT"), which has since evolved into the Digital Asset Initiative/Committee. The VCIT was established to study the issue and then consider the compliance impact related to virtual currencies.  The VCIT developed a three-pronged approach involving first learning about virtual

currency, next educating the examination workforce regarding the issue, and then developing examination techniques to identify and address issues during an examination.  This "John Doe" summons is one of the tools being used in the investigation.

30.     As described above, both GAO and TIGTA have raised concerns about tax compliance issues relating to virtual currency and the IRS has initiated specific programs and campaigns to address compliance issues through both taxpayer education as well as enforcement.  *See* U.S. Gov't Accountability Office, GAO-13-516, *Virtual Economies and Currencies: Additional IRS Guidance Could Reduce Tax Compliance Risks* (2013) https://www.gao.gov/products/GAO-13-516 [https://perma.cc/H83E-BFSD]; *As the Use of Virtual Currencies in Taxable Transactions Becomes More Common, Additional Actions Are Needed to Ensure Taxpayer Compliance*, Reference Number 2016-30-083 (Sept. 21, 2016) https://www.treasury.gov/tigta/auditreports/2016reports/201630083fr.pdf [https://perma.cc/5BW9-YXWT]; IRS Announces the Identification and Selection of Five Large Business and International Compliance Campaigns, https://www.irs.gov/businesses/irs-announces-the-identification-and-selection-of-five-large-business-and-international-compliance-campaigns https://perma.cc/KU4F-VKMQ.

31.     Some taxpayers may deliberately use cryptocurrencies to evade taxes.  Certain taxpayers have openly acknowledged their plans to violate internal revenue laws by intentionally not reporting income from the use of cryptocurrency.  See *36% of Bitcoin Investors Plan to Commit Tax Fraud This Year*, The Motley Fool (January 7, 2018) https://www.fool.com/taxes/2018/01/07/36-of-bitcoin-investors-plan-to-commit-tax-fraud-t.aspx [https://perma.cc/4K92-R3XJ] (referencing a cryptocurrency user poll conducted by www.lendedu.com, https://www.lendedu.com/blog/investing-in-bitcoin [https://perma.cc/4QWZ-AUNM].

32.     Since transactions can be difficult to trace and many cryptocurrencies inherently have a pseudo-anonymous aspect, taxpayers may use them to hide taxable income.

33.     In the experience of the IRS, tax noncompliance increases when there is no third-party information reporting.  Taxpayers are less likely to report and pay taxes on income that is not independently reported to the IRS by a third party.  IRS "tax gap" studies consistently show that tax

compliance is far higher when reported income amounts are subject to information reporting by third parties.  The most recent such study, published on September 26, 2019, based on 2011-2013 data, concluded that the overall rate of underreporting of income that was not subject to third-party information reporting was 55 percent, compared to 5 percent for amounts subject to substantial information reporting but no withholding, and 1 percent for amounts subject to substantial information reporting and withholding.  *See IRS Publication 1415 (Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2011-2013*, (September 2019) http://www.irs.gov/pub/irs-pdf/p1415.pdf [https://perma.cc/2XM5-PDNH].  Where there is no third-party information reporting of cryptocurrency transactions for tax purposes, as is the case with Kraken, the likelihood of underreporting is significant.

34.     On November 30, 2016, the District Court for the Northern District of California authorized the IRS to serve a John Doe summons to Coinbase, Inc., a U.S. based digital currency exchange, to identify U.S. taxpayers who, at any time during the period from January 1, 2013 through December 31, 2015, conducted transactions in a convertible virtual currency as defined in IRS Notice 2014-21.  *See United States v. John Doe*, No. 3:16-cv-06658-JSC (N.D. Cal. Nov. 30, 2016) (Order (Doc. 7)).  Coinbase was served with the summons on December 8, 2016.  Coinbase did not comply with the summons.

35.     On March 16, 2017, a petition to enforce the John Doe summons was filed against Coinbase in the District Court for the Northern District of California.  On November 29, 2017, the court granted the petition to enforce a narrowed John Doe summons.  *See United States v. Coinbase, Inc.*, No. 17-cv-01431-JSC (N.D. Cal. Nov. 29, 2017) (Judgment (Doc. 77)).  Coinbase was ordered to produce documents for accounts with at least the equivalent of $20,000 in any one transaction type (buy, sell, send, or receive) in any one year for the 2013 through 2015 tax years.  Coinbase subsequently notified a group of approximately 13,000 customers that it was required to disclose the information described in the enforcement order.  Coinbase, https://help.coinbase.com/en/coinbase/taxes-reports-and-financial-services/taxes/irs-notification (September 21, 2020, 4:17 PM) [https://perma.cc/GL68-BSLM].

36.     On July 26, 2019, the IRS announced that it began sending letters to virtual currency owners, advising them to pay back taxes and file amended returns.  By the end of August 2019, the IRS

had issued more than 10,000 letters to taxpayers who owned virtual currency.  Following the issuance of the letters, additional taxpayers filed amended returns reporting virtual currency transactions that were not previously reported.  During the summons enforcement litigation against Coinbase, the IRS determined that for 2013-2015, only 800 to 900 taxpayers per year filed tax returns with a property description related to bitcoin or virtual currency even though Coinbase alone had serviced more than 5.9 million customers and handled more than $6 billion in transactions during that time.  *United States v. Coinbase, Inc., et al.*, 120 A.F.T.R.2d 2017-6671, 2017 WL 5890052, *4 (N.D. Cal. Nov. 28, 2017).

37.     The IRS has determined that post-Coinbase the number of taxpayers filing tax returns with a property description related to bitcoin has increased.  The IRS found that the number of taxpayers who filed a return reporting bitcoin increased over time: 4,164 taxpayers in 2016, 88,040 for 2017, 93,848 in 2018, 102,278 in 2019, 253,265 in 2020, and 842,888 in 2021.  While these numbers reflect a positive increase in reporting, these numbers still fall far short of what would be expected given the number of users, transactions, and value that the virtual currency exchanges publicize occur on an annual basis.

38.     As explained in paragraphs 23-25 above, cryptocurrency is treated as property for federal tax purposes.  When reporting gains and losses from the sale of cryptocurrency, a taxpayer may use different methods for calculating that gain or loss.  A taxpayer may use the specific identification method to pair the sale of a specific unit of cryptocurrency against a specific acquisition or the so-called "first-in-first-out" accounting method that simply pairs the sale of a unit of cryptocurrency against the oldest-acquired unit chronologically.  *See* 26 U.S.C. § 1001; IRS *Frequently Asked Questions on Virtual Currency Transactions*, *supra*, Q39-Q41.

39.     Although these approaches provide a taxpayer with flexibility in how they calculate gains or losses on the sale of cryptocurrency units, they do not allow the IRS to make a "taxable gain" determination by simply reviewing an account holder's transaction information in isolation.  Also, taxpayers are not required to report on their tax return which exchange certain taxable transactions occurred on.  The IRS has conducted multiple examinations involving taxpayers with transactions occurring at three or more distinct cryptocurrency exchanges and, at times, upwards of ten.

40.     Accordingly, the IRS must first positively identify an account holder and then determine whether that individual filed a tax return for the relevant tax year, whether that return reported cryptocurrency transactions, and, if so, whether what was reported, or the approach taken in reporting the information, complies with the internal revenue laws.

41.     One key to determining whether there has been tax compliance is establishing, without question, the account holder's identity within the IRS's own computer systems.  This means linking a particular account holder to a particular name and taxpayer identification number within the IRS's internal databases.  This is because the IRS cannot begin an examination of a taxpayer without first positively identifying that taxpayer.  To do so, the IRS employs several methods, including matching identifying information from external sources with IRS internal sources and databases.

42.     Basic information such as name, address, date of birth, and taxpayer ID number goes a long way in establishing the identity of a taxpayer but, in my experience as a Revenue Agent, (particularly working in the offshore and electronic payments systems area and on other John Doe summonses) that information does not always go far enough.  It is not uncommon for taxpayers to use aliases, false addresses or post office boxes, fictitious entity names, or other means to disguise their true identities.  That makes basic information such as name, address, date of birth, and taxpayer ID number insufficient.  Also, that basic information is not always available because certain pieces are sometimes missing (such as date of birth where an entity name is used), incomplete, or have been falsified.

43.     In reviewing the information provided in response to the John Doe summons issued to Coinbase, the IRS ran into several problems when trying to positively identify the account holders.

44.     The information provided by Coinbase lacked taxpayer ID numbers for approximately 10% of the users (over 1,300 taxpayers).  There were also over 150 instances where the account data did not include a name and approximately 170 instances where the name was a pseudonym rather than an actual name.  There were over 500 instances where no date of birth information was provided and roughly 1,000 instances where no physical address information was provided.

45.     The IRS worked with Coinbase to attempt to obtain the missing information.  Coinbase was able to provide some of the missing information, reducing the unknown names to only a few.

Missing address information was reduced to approximately 650 instances and missing date of birth information was reduced to slightly below 500.  Coinbase was not able to provide any of the missing taxpayer ID numbers.

46.     During discussions with Coinbase, it explained that some of the account information may be missing because it had not necessarily been collected for some of the oldest accounts.  As discussed in paragraph 44 above, basic identity information such as name, taxpayer ID number, date of birth, and physical address was insufficient in these situations to positively identify the actual taxpayer account holder.

47.     The failure in these instances was almost entirely because the account information provided by Coinbase lacked a taxpayer ID number.  Where there was no taxpayer ID number and other information was also missing, it was nearly impossible for the IRS to positively identify the relevant taxpayer.

48.     Since Coinbase completed its production of information to the IRS in August 2018, the IRS has spent a significant amount of time and resources to identify approximately 535 additional taxpayers from this data, but more than 750 individual taxpayers are still unknown to the IRS.  The IRS continues to work on identifying additional taxpayers.

49.     The transaction information with respect to the more than 750 still unidentified taxpayers reveals that those taxpayers realized more than $100 million in gross proceeds from the sale of cryptocurrency during the years covered by the Coinbase John Does summons which the IRS has been unable to link to any identifiable taxpayers.

50.     The Court's partial enforcement of the summons in *Coinbase* that required Coinbase provide only basic information such as name, date of birth, taxpayer ID number, and physical address, prevented the IRS from having discussions with Coinbase about what other additional identifying information it had in its records that could be used to help the IRS positively identify the unidentifiable users, like telephone numbers or email addresses.

51.     Since Coinbase complied with the John Doe summons, the IRS has continued to reach out to taxpayers regarding their reporting requirements, conduct examinations, and make criminal

investigation referrals.  These compliance efforts are ongoing and will remain a priority.  The IRS has also received submissions through its voluntary disclosure practice reporting additional taxes or changes in tax attributes relating to failures to report income from virtual currency transactions.  Since issuing more than 10,000 Virtual Currency Compliance campaign letters to taxpayers in July and August 2019, the IRS has received amended returns reporting virtual currency transactions for tax years 2013 through 2019.  As a result of the letters, the IRS has made more than $17.6 million in assessments to date.  These assessments are the result of taxpayers filing amended returns that contain previously unreported virtual currency transactions.  Separately, based in part on third-party reporting, the IRS has contacted taxpayers who have not filed returns reporting virtual currency by sending notices related to virtual currency.  Those notices have already resulted in more than $92 million in assessments.  The IRS anticipates assessments will increase as it continues to pursue civil and criminal investigations.

52.     More recently based on internal and external data available to the IRS, letters were sent to taxpayers who conducted transactions with foreign virtual currency exchanges and may have failed to properly report such transactions and associated income.

53.     As detailed above, tax non-compliance remains an issue in the virtual currency space. The pseudo anonymity of the blockchain coupled with minimal third-party reporting make it difficult to identify individuals carrying out the transactions.

II.     **KRAKEN**

A.     **Organization and Structure**

54.     Payward Ventures, Inc., is a Delaware corporation incorporated on July 28, 2011.  It is the parent corporation for multiple subsidiaries located in both the United States and foreign jurisdictions.

55.     Payward Ventures, Inc., and Subsidiaries (collectively, "Kraken"), operate a digital currency exchange under the trade name Kraken through the website www.kraken.com [https://perma.cc/3A4V-8TWG].

56.     As indicated in its Terms of Service agreement covering the applicable years 2016 through 2020, Kraken provided users (customers) with the following services:

Kraken provides you with a simple and convenient way to trade legal tender (such as U.S. dollars and Euros) for digital assets (such as bitcoins and ripples) and vice versa, and to trade one type of digital asset for another type of digital asset. You may also use our Services to purchase and sell digital assets directly from and to us. Our services do not provide users with the ability to trade one form of legal tender for another form of legal tender. Additionally, the range of services available to you will depend in part upon the country or U.S. state from which you access Kraken.

Kraken Terms of Service, Summary (Sept. 27, 2016),

https://web.archive.org/web/20161015083855/https://www.kraken.com/en-us/legal

https://perma.cc/RM2D-NBBS; *see* Kraken Terms of Service, Summary (Dec. 13, 2019)

https://www.kraken.com/en-us/legal [https://perma.cc/QL4E-LBZK].

57.　　Kraken was founded in 2011 by Jesse Powell, who was the company's Chief Executive Officer until late 2022.

58.　　Kraken is one of the largest digital currency exchanges with over four million clients and over $140 billion in trading activity since 2011. It has been reported that as of the end of 2017, Kraken was registering up to 50,000 new users a day. Insider, https://www.businessinsider.com.au/coinbase-reportedly-made-more-than-1-billion-in-revenues-last-year-2018-1 [https://perma.cc/QL4E-LBZK].

59.　　Kraken is headquartered in the United States – San Francisco, California – and operates in over 190 countries worldwide, but does not provide services to residents of Afghanistan, Cuba, Guinea-Bissau, Iran, Iraq, North Korea, or Tajikistan. Kraken, https://support.kraken.com/hc/en-us/articles/360001368823-Geographic-Restrictions-Can-I-use-Kraken-if-I-m-from- [https://perma.cc/7AVX-EDQW]. Within the United States, Kraken does not operate or provide services to residents of Washington State and New York. *Id.*

60.　　Kraken users enter into an account services agreement with local subsidiaries of parent company Payward, Inc. Depending on geographical location, an individual user's contract is with the following subsidiaries of Payward:

- United States – Payward Ventures, Inc., 237 Kearny St., Suite 102, San Francisco, CA 94108;

- European Union – Payward Ltd., 6th Floor, One London Wall, London, EC2Y 5EB;

- Japan – Payward Asia, Nibancho 9-3, Chiyoda-ku, Tokyo 102-0084, Japan; and

- All other locations – Payward Pte. Ltd., 8 Tomasello Boulevard, #15-04, Suntec Tower Three, Singapore 038988.

Kraken Privacy Notice, https://www.kraken.com/en-us/legal/privacy [https://perma.cc/Z58T-VG7G].

61.    Kraken, through Payward Ventures, Inc., registered on November 6, 2018, as a money services business ("MSB") as required by 31 C.F.R. § 1022.380(a)-(f).  Kraken, https://support.kraken.com/hc/en-us/articles/360031282351-Is-Kraken-licensed-or-regulated- [https://perma.cc/8M7M-KSD7].  As an MSB, Kraken is required by the Bank Secrecy Act (Title 31, U.S. Code) to conduct basic customer risk assessments to determine the level of risk associated with the account and whether further due diligence is necessary.  *See* 31 U.S.C. § 5311; 31 C.F.R § 1010.100(ff)(5), § 1022.210; FinCEN Guidance No. FIN-2019-A003: Advisory on Illicit Activity Involving Convertible Virtual Currency (May 9, 2019) https://www.fincen.gov/sites/default/files/advisory/2019-05- 10/FinCEN%20Advisory%20CVC%20FINAL%20508.pdf [https://perma.cc/5958-EY2Z].

62.    Each MSB is required to retain the records described below with respect to any transmittal of funds in the amount of $3,000 or more.  *See* 31 C.F.R §§ 1010.100(ff)(5), 1010.410, 1022.210.  Such records are required to be retained by the MSB for 5 years.  31 C.F.R. § 1010.430(d).

63.    If the sender of the funds is an established customer of the MSB, the MSB must retain the following information:

- Name and address of the transmitter;

- Amount of the transmittal order;

- Execution date of the transmittal order;

- Any payment instructions received from the transmitter;

- The identity of the recipient's financial institution;

- As many of the following items as are received with the transmittal order: (i) name and address of the recipient, (ii) the account number of the recipient, and (iii) any other specific identifier of the recipient; and

- Any form relating to the transmittal of funds that is completed or signed by the person placing the transmittal order.

31 C.F.R. § 1010.410(e)(1)(i).

64.     If the sender of the funds is not an established customer of the MSB, the MSB must retain all the information specified in the preceding paragraph, plus:

- The type and number of the identification documents reviewed to verify the transmitter's identity, such as a driver's license, social security number or other tax identification number, or a passport or alien identification number; and

- A copy or record of the transmitter's method of payment.

31 C.F.R. § 1010.410(e)(2).

65.     If the recipient of the funds is an established customer of the MSB, the MSB must retain an original, microfilm, other copy, or electronic record of the transmittal order.  31 C.F.R. § 1010.410(e)(1)(iii).

66.     If the recipient of the funds is not an established customer of the MSB, the MSB must retain the following information:

- The information described in paragraphs 63-64, above;

- An original, microfilm, other copy, or electronic record of the transmittal order;

- If the MSB knows that the person receiving the proceeds is not the ultimate recipient, the ultimate recipient's name, address, and taxpayer identification number, alien identification number, or passport number (along with the country of issuance); and

- If the proceeds are delivered other than in person, a copy of the check or other instrument used to pay the transmittal, or the information contained on the check

1     or other instrument, as well as the name and address of the person to whom it was

2     sent.

3   31 C.F.R. § 1010.410(e)(3).

4      67.     In addition, each MSB must develop, implement, and maintain an effective anti-money

5   laundering program.  31 C.F.R. § 1022.210(a).  At a minimum, the program must include provisions for

6   verifying customer identification, filing reports, creating and retaining records, and responding to law

7   enforcement requests.  31 C.F.R. § 1022.210(d)(1)(i).

8      **B.     Business Operations**

9      68.     During the applicable years 2016 through 2020, Kraken described its cryptocurrency

10  trading services for users as: "a platform that matches your trades with open orders from other users of

11  our service at your direction."  Kraken Terms of Service, (Sept. 27, 2016),

12  https://web.archive.org/web/20161015083855/https://www.kraken.com/en-us/legal

13  https://perma.cc/RM2D-NBBS; Kraken Terms of Service (Dec. 13, 2019) https://www.kraken.com/en-

14  us/legal [https://perma.cc/Z4SZ-5N84].

15     69.     Unlike other digital currency exchange platforms, Kraken does not provide

16  cryptocurrency "wallet" services.  "Kraken is an exchange service, not a wallet service.  We provide

17  clients the ability to deposit funds to our corporate wallet for safekeeping while the funds are being

18  exchanged or used for trading, but we do not provide a personal wallet service."

19  Kraken,https://support.kraken.com/hc/en-us/articles/115006441267-Kraken-is-not-a-wallet-service

20  [https://perma.cc/TA9T-NL6F].

21     70.     As of May 4, 2022, Kraken supports trading for 159 different cryptocurrencies.

22  https://support.kraken.com/hc/en-us/articles/360000678446-Cryptocurrencies-available-on-Kraken

23  [https://perma.cc/L45Y-Z96U].

24     71.     To use Kraken, a user creates an account by accessing Kraken's website at

25  www.kraken.com and clicking on the "Create Account" button in the upper-right corner.  From there,

26  the user is asked to submit a new username and password on the signup form.  *See*

27

1   https://support.kraken.com/hc/en-us/articles/201352206-Verification-level-requirements

2   [https://perma.cc/KY9A-Z5ME].

3   72.   To be eligible to register a Kraken account and use Kraken services, a user must:

4   • Be 18 years or older of age;

5   • Reside in a supported area (as mentioned in paragraph 60, above); and

6   • Provide certain identification verification documents based on each different account

7   level: starter, intermediate, or pro.

8   *Id.*

9   73.   According to its terms of service during the years covered by the summons, Kraken had

10   three account verification levels—starter, intermediate, and pro.  *See* Verification level requirements –

11   Kraken (archive.org) (Nov. 28, 2020) [https://perma.cc/FRW4-5SXL]).

12   74.   For all three levels available prior to 2021, verification requirements include:

13   • two-factor authentication for login;

14   • email address;

15   • full name;

16   • date of birth;

17   • phone number; and

18   • physical address.

19   *Id.*

20   75.   In addition, valid ID, proof of residence, occupation, and a taxpayer ID number (for U.S.

21   clients) are required for intermediate-level and pro-level accounts.  An identification confirmation photo

22   may also be required as part of either intermediate-level or pro-level account verification.  No taxpayer

23   ID number is required for starter-level accounts.  *Id.*

24   76.   A Know-Your-Customer ("KYC") application is required for pro-level account

25   individuals, corporations, and institutions.  A pro-level account is the highest-level account for high-

26   volume traders and high net worth individuals.  KYC questionnaires for individuals include, but are not

27   limited to, email address, tell us about yourself questions, public account ID, purpose of account,

country of residence, deposit/withdrawal information, employment, net worth, primary source of wealth, and expected trading activities.  KYC questionnaires for entities include, but are not limited to, legal name, business address, country, website, contact information, industry, goods and services, government-issued business registration or tax identification number, account accessor information, purpose of account, net worth, deposit/withdrawal information, trading activities, and source of funds. *Id.*

77.     None of the account levels place any restrictions on trading volume or value.  This means that an individual with a starter account can trade cryptocurrency in unlimited amounts (and generate significant amounts of taxable gain) without needing to provide a taxpayer ID number.  All three account levels permit the user to trade on margin, although limits are placed based on account level, and all three account levels permit the user to earn additional cryptocurrency by participating in the running and maintenance of blockchain.  The intermediate and pro levels also allow users access to additional trading options such as futures trading and over-the-counter trading.

78.     Deposits into and withdrawals out of a Kraken trading account can be made in-kind (i.e., in a particular cryptocurrency offered for trading on Kraken's platform).  Deposit and withdrawal limits (daily and monthly) are based on a user's account-verification level.  https://support.kraken.com/hc/en-us/articles/360001449826-Deposit-and-withdrawal-limits-by-verification-level [https://perma.cc/F5X3-EUDK].

79.     Deposits and withdrawals can also be made in certain fiat currencies (U.S. dollars (USD), Euros (EUR), British Pound Sterling (GBP), Japanese Yen (JPY), Swiss Franc (CHF), and Canadian dollars (CAD)) if a user has either an intermediate-level or pro-level account.  Fiat currencies are generally deposited via electronic transfer.  *Id.*

80.     Kraken does not currently accept cash, debit cards, credit cards, PayPal, or similar services.  Deposits via cash or debit card (in-person) are only possible in Canadian Dollars.  Kraken's reason for this limitation is that accepting cash makes it difficult to comply with financial regulations, and the near-instant and practically irreversible nature of cryptocurrency transactions means the risk of fraudulent transactions is too high.  https://support.kraken.com/hc/en-us/articles/360000381846-Fiat-

currency-deposit-options-fees-minimums-and-processing-times- [https://perma.cc/8QD5-Q4U].

Likewise, Kraken does not accept fiat currency deposits from, or withdrawals to, third-party payment processors ("TPPPs") for regulatory compliance reasons.  Kraken states that it is too difficult to verify that a transaction came from, or is destined for, an account associated with the Kraken user.

https://support.kraken.com/hc/en-us/articles/360000382423 [https://perma.cc/87N8-ZRN8].

81.     The ability to deposit or withdraw cryptocurrency units sets it apart from traditional accounts holding financial investments.  A cryptocurrency user can easily move (by deposit or withdrawal) cryptocurrency units from one exchange platform to another one, or to a personal user wallet.  As outlined above, this makes it more difficult for the IRS to make an initial determination whether a user is complying with the internal revenue laws.

82.     Unlike traditional investment accounts where an account holder is buying and selling securities entirely within that account, cryptocurrency exchanges generally permit users to deposit and withdraw the cryptocurrency units themselves which allows users to shift property among multiple accounts for profit-maximization or other reasons.

83.     The need to identify the existence of other accounts owned by a user and to trace the movement of cryptocurrency to those accounts makes calculating a taxpayer's gain for tax compliance purposes extremely difficult.  Therefore, the IRS is seeking information about the existence of these accounts and about such movements so that it can piece together activity and compare it to what was reported on a tax return.

84.     The oldest information the IRS has relating to Kraken's account verification requirements is from August 2019.  Based on the IRS's experience with Coinbase, over time cryptocurrency exchanges have changed what information they require for account verification.  For example, there was a period in which Coinbase did not collect taxpayer ID information.

85.     Kraken has required a taxpayer ID number for verification of intermediate and pro level accounts since at least August 2019, but it is not clear when that policy was initiated.  Based on the IRS's experience with Coinbase, it is concerned that user account information cannot be adequately linked to an actual taxpayer because of missing or incorrect information—particularly the lack of a

taxpayer ID number.  Therefore, the IRS is seeking additional information beyond the "basic

information" of name, date of birth, taxpayer ID number, and physical address.

86.     Also, additional information helps the IRS once an identification link is made because it

can assist in determining whether that individual is compliant with the internal revenue laws.  For

example, the IRS has investigated taxpayers engaging in cryptocurrency transactions where the reported

volume of cryptocurrency trading and gains did not align with the taxpayer's sources of income needed

to conduct the trades.  The IRS was able to use this discrepancy to start an examination which led to the

discovery that the taxpayer had unreported income from other sources that was being used to acquire the

cryptocurrency

## III.    THE SUMMONS

87.     The summons, attached as Exhibit A, seeks records that may reveal the identity and

transaction activity of unknown U.S. Kraken users, who had control over any combination of accounts

with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in

any one year from January 1, 2016, through December 31, 2020.  The information requested is narrowly

tailored and may be relevant to assist the IRS with identifying and investigating U.S. taxpayers with

accounts at Kraken that have failed to comply with the internal revenue laws.  The requests are directed

at two broad categories:  user identity information and transaction activity.

88.     The IRS expects the summoned records will produce leads to help it identify U.S.

taxpayers that have transacted in cryptocurrency at the specified floor level through Kraken at any time

during the period specified in the John Doe summons and who may have failed to report such

transactions in compliance with internal revenue laws.  The floor transactional level and specified tax

period for the John Doe summons are described in paragraph 6 above.

89.     The summons contains five requests directed at two broad categories:  user identity

information and transaction activity.  As discussed in detail below, Kraken has not complied with any of

the requests.  The IRS seeks enforcement for all five requests.

90.     Requests one through three are directed at identifying the John Doe class members so that

transactional data can be associated with a particular person.  Unlike traditional financial accounts,

Kraken accounts can be opened with limited personal-identifying information.  Unlike traditional bank accounts, there are no signature cards or written account applications.  As a result, linking a particular account to an actual person for purposes of examining such taxpayer's compliance with the internal revenue laws requires access to whatever identifying information Kraken obtained from the user during the opening of the account or during its subsequent usage/dealings.

91.     Requests four and five are directed at obtaining transactional information so the IRS can determine whether a particular taxpayer complied fully with internal revenue laws.

92.     Addressing the requests specifically, summons request number 1 reflected on Exhibit A seeks account registration records for each account owned or controlled by the user.  The IRS is requesting information for accounts owned *or* controlled by the user because it is not uncommon for individuals to disguise account ownership through a nominee or an alias.

93.     If the IRS only receives the "name" listed on the account, that name may be fictitious or belong to a fictitious entity which would result in the IRS being unable to connect the nominal account name with an actual taxpayer.

94.     Kraken does not request taxpayer ID number information for starter level accounts. Based on the IRS's experience with data produced by Coinbase, accounts lacking a taxpayer ID number are more likely to use fictitious identification information.  Since Kraken does not request taxpayer ID numbers for all accounts, it is therefore expected that Kraken starter account users are more likely to use pseudonyms and other fictitious information than were Coinbase users, who were required to provide a taxpayer ID.

95.     The IRS's experience in investigating tax evasion and avoidance indicates that, when less identifying information is gathered, particularly a taxpayer ID number, the risk of individuals providing false or fictitious information is even greater and taxpayers who create false identities are more likely to evade their taxes.  This phenomenon is like the increased evasion of taxes that occurs when there is a lack of information return reporting.

96.     Based on the IRS's experience, it must draft its requests for information in a manner that ensures it captures the information it needs even when it is not clear, as with Kraken, how the

summoned party categorizes or defines that information.  Therefore, the summons specifically identifies the following four categories of information: (1) complete user profile, user preferences, and account application; (2) history of changes to the user profile; (3) complete user history; and (4) complete user payment methods, including any other information relating to funding sources.  The IRS is not seeking private personal information such as password, pins, private keys, security settings, or account recovery information.

97.    The IRS has identified "user profile," "user preferences," and "account application" as three categories relied upon by entities to store or manage personal information that likely contains basic personal information about the user.

98.    Cryptocurrency exchanges do not maintain a particular "account application" document because information is generally entered by the applicant through a web-based portal with a series of data fields rather than a traditional "application" that would be completed on paper.  The IRS's request for information within these categories is designed to ensure it receives identifying information regardless of what it is called or how it is stored.

99.    The IRS does not know how Kraken categorizes its information, but to clarify, the IRS is seeking the following basic account user information:

- Name;
- Taxpayer ID number;
- Date of birth;
- Physical address;
- Telephone number; and
- Email address

100.    The requested information includes the same basic information approved by the Court in *Coinbase* with the addition of telephone numbers and email addresses.  These two additional pieces of information are fundamental to the IRS's ability to identify taxpayers from the John Doe class.

101.    Based on Kraken's account verification requirements, the information identified in request 1 will likely include users' telephone numbers and email addresses.

102.     The IRS needs a user's telephone number and email address as they have become a more fundamental aspect of a person's identity.  Kraken, itself, acknowledges this in its support articles.  It only allows an email address to be associated with a single account and recommends that account holders use an email address that they will always have access to so that account access is not lost.  *See* Email address change – Kraken [https://perma.cc/WG32-JFCD].

103.     The IRS's internal systems track a taxpayer's physical address, telephone number, and email address when reported by the taxpayer when filing their income tax returns.

104.     In situations where the IRS does not receive a taxpayer ID number or the person's name and taxpayer ID number do not initially match with the IRS's internal information, additional data points such as date of birth, physical address, telephone number, and email address can assist the IRS in linking the user account information to a specific taxpayer.

105.     Generally, the IRS tries to have three specific data points that match to positively link information to a taxpayer.  Being able to reconcile multiple different pieces of identifying information against the IRS's internal records is necessary when verifying an account user's identity.

106.     Based on my experience, telephone and email information is relied upon more heavily in the cryptocurrency space than names or physical addresses.

107.     For example, in response to individual-person summonses issued by the IRS, other cryptocurrency exchanges have requested that the IRS provide it with identifiers, including both telephone numbers and email addresses for the subject individual, so that it can use them to search its system.  The IRS has information that not all cryptocurrency exchanges can search their respective systems using a taxpayer ID number.

108.     Internally, the IRS is also in possession of cryptocurrency platform data received from other sources relating to foreign-based cryptocurrency exchanges.  This data lacks a taxpayer ID number.  Because of how foreign-based cryptocurrency exchanges track user information, this data is best searched using telephone numbers, email addresses, and internet protocol addresses (discussed below).

109.    Kraken permits its users to update their basic account information at any time.  This includes personal identifying information such as name, date of birth, physical address, telephone number, and email address.

110.    Based on my experience as a Revenue Agent, I expect that the user account information that is maintained in Kraken's records at the time Kraken responds to the summons may not reflect the name, date of birth, physical address, telephone number, or email address information that was provided when the account was created and may not match what the IRS has in its databases because the information may have been changed.  The summons requests a complete list of how this information may have changed to help the IRS successfully link a user's account information to an individual taxpayer.

111.    The summons request for complete user history is directed at identifying internet protocol ("IP") addresses used to access the account.  This information is helpful when initially confirming a user's identity and making an initial determination regarding whether the identified user is in tax compliance.

112.    In situations where the IRS has had difficulty adequately confirming a taxpayer's identity, it has been able to employ IP address information as an additional data point to confirm that the IRS has connected information to the proper taxpayer.  IP address information indicates the geographical location where a device accesses the internet (generally through an internet service provider).  The geographical location of an IP address is publicly available so the IRS can use IP address information to search publicly available records to determine a location.

113.    For example, a taxpayer accessing his Kraken account from San Francisco, California will have an IP address indicating that the access was made from San Francisco, California.

114.    Based on my review of Kraken's account verification requirements, it is my understanding that IP address information is actively being collected and monitored by cryptocurrency exchanges such as Kraken.

115.    Cryptocurrency exchanges use IP address information internally to determine from where an individual is attempting to access their platform so they can block access from jurisdictions where

they do not operate.  It is my understanding that Kraken employs this same process to monitor and block users from jurisdictions where it does not operate such as Washington State and New York.

116.    Using this information, the IRS will be able to confirm a user's identity in situations where the user's identity is not certain based on the other personal information by confirming that the account was accessed from IP address locations that coincide with the taxpayer's known physical address.

117.    Conversely, where the IP address information does not match, the IRS will be able to conduct additional due diligence to determine the proper account owner or whether there was an incidence of identity theft.

118.    Aside from its utility in confirming an individual's identity, the IRS will be able to use this information to make a determination regarding a user's tax compliance.  The IRS is in possession of data relating to foreign cryptocurrency exchanges.  That data lacks a taxpayer ID number, but does include information such as telephone number, email address, and IP address.  Being able to match the IP address information of a Kraken user to IP address information (and other data points contained in the IRS's information) will permit the IRS to link substantive transactional information from multiple sources for a single individual taxpayer and make a more accurate initial determination regarding that individual's tax compliance.

119.    In my experience as a Revenue Agent, it is important for the IRS to receive this information at the same time it receives the other identity information because it helps identify users and can be searched against existing data in the IRS's possession to determine whether a user is in tax compliance.

120.    In my experience as a Revenue Agent, I have been involved in tax examinations where the financial status of the taxpayer is difficult to determine.  This is more common in cryptocurrency examinations because users of cryptocurrency tend to be younger taxpayers that often have non-traditional income sources.

121.    Kraken permits users to fund their accounts with either fiat currency or with cryptocurrency.  Understanding how the user's account was funded and where it was funded from can

provide valuable insight for the IRS when determining whether an individual is in compliance with the internal revenue laws.

122. In my experience, information on how a user funds their cryptocurrency account can also be used to uncover related taxpayers or nominee situations. For example, the IRS conducted examinations of multiple seemingly unrelated taxpayers. Upon receiving summons information from cryptocurrency exchanges, the IRS was able to identify cross-linked bank accounts—that is, bank accounts of one taxpayer linked to another taxpayer's cryptocurrency exchange account and vice versa. Learning this information changed how the IRS approached the separate examinations and changed how the IRS approached any tax adjustments in the examinations.

123. Knowing the source of funds when initially reviewing a taxpayer's account information can provide important insight into determining whether an individual is in tax compliance. A taxpayer with minimal reported income and numerous linked funding sources is more likely to not be complying with the internal revenue laws.

124. Also, a taxpayer with funding sources that are not in his own name is more likely to not be complying with the internal revenue laws.

125. Finally, identifying alternate taxpayers through cross-linked accounts is best done at the outset. Waiting to identify such information through follow-up summonses harms the IRS's ability to examine alternate taxpayers effectively because the statutory period for assessing taxes under 26 U.S.C. § 6501(a) will have dwindled or expired by the time the IRS learns of the other taxpayers involved in the activity.

126. Summons request number 2 reflected on Exhibit A seeks, "any other records of Know-Your-Customer due diligence" performed by Kraken with respect to a user.

127. With respect to the individual KYC questionnaire, the summons only requests the responses to the employment, net worth, and source of wealth questions.

128. Given that the KYC questionnaire is only required for pro level accounts, I expect that these responses will only be provided for a limited number of account holders. However, pro level account holders are permitted the largest movement of funds as well as access to Kraken's "dark

pool"—a discrete market where the order books are secret, making it easier to buy or sell larger unit volumes without influencing the market.

129.     Given the likely larger movement of funds and higher dollar values, and the overall increase in fair market value of bitcoin during the summoned period, it is almost certain that these pro level account individuals will have experienced a taxable gain.  Having additional information such as employment, net worth, and source of wealth will help the IRS determine whether they are in tax compliance.

130.     Employment information can be matched against Forms W-2 issued by the identified employer to both confirm the user's identity and identify the user's income level.  Net worth and source of wealth questions can help the IRS understand whether the identified taxpayer has a level of wealth commensurate with his earnings or possibly unreported income.

131.     With respect to the business KYC questionnaire, all the information obtained by the questionnaire is the same basic information requested for individual users.  Each of the pieces of information identified in the questionnaire, if not already provided as part of the user profile information identified in summons request number 1, is necessary to properly identify the business taxpayer that controls the account as well as the actual individuals (contacts) that have access to the account.

132.     Summons request number 3 reflected on Exhibit A seeks all exception reports produced by Kraken's anti-money laundering ("AML") system and all records of investigation of such exceptions.

133.     Exception reports identify questionable transactions engaged in by a user that warranted additional research and investigation by the money services business.  Based on my experience, reviewing these reports allows the IRS to leverage the industry expertise of the business involved (here, a cryptocurrency exchange) regarding what type of activity is abnormal or suspicious and allows the IRS to combine that expertise with other information available to the IRS to determine whether the subject taxpayer is complying with the internal revenue laws.

134.     Moreover, investigative information compiled by the cryptocurrency exchange as part of its review of the AML exception report often contains information provided by the user explaining the

nature of the questionable activity. That information can also assist the IRS in determining whether a taxpayer is complying with the internal revenue laws.

135. For example, in response to an investigation regarding large dollar, voluminous, or frequent transactions, a user may have provided an explanation regarding the source of funds or specific purpose for the activity that is reasonable and comports to what was reported by the user on his tax return. In this situation, the IRS may be able to avoid unnecessarily examining an individual based on questionable activity.

136. Summons request number 4 reflected on Exhibit A seeks all records of activity in the user's account.

137. Based on my review of the type of activity permitted on Kraken's platform, Kraken should have transactional information that is necessary to determine whether a user is compliant with the internal revenue laws.

138. The IRS needs, and Kraken should have, purchase and sale information for the subject user accounts. This includes transactions where cryptocurrency units were purchased or sold for fiat currencies or exchanged for other cryptocurrencies. The sale of cryptocurrency for cash or exchange of cryptocurrency for other cryptocurrency is a taxable disposition. The purchase of cryptocurrency is not inherently taxable, but the purchase price (plus any fees paid) establishes the cost basis in that property, which is used to determine the amount of taxable gain or loss generated upon the sale of that same unit. The same is also true in situations where cryptocurrency is exchanged for other cryptocurrency rather than fiat currency.

139. These types of transactions are reportable on an individual's income tax return and relate directly to an individual's proper tax reporting.

140. Where a user engages in "margin" activity, that is the borrowing (or lending) of fiat currency or cryptocurrency to effectuate other trading activity, those transactions have tax implications.

141. The IRS needs information relating to the deposit and withdrawal of cryptocurrency units out of the user's account.

142.     The existence of deposits and withdrawals of cryptocurrency is a clear indicator that the user is holding cryptocurrency in other places such as other cryptocurrency platforms or personal user wallets.  The IRS needs to know this information to identify what other places the user is holding cryptocurrency so it can gather as much information as possible to make a determination regarding the user's tax compliance.

143.     Additionally, the deposit or withdrawal of units from an account may be taxable transactions themselves.  The deposit (receipt) of cryptocurrency into an account may represent compensation or a similar payment to the user that represents taxable income.  Conversely, the withdrawal (sending) of units from the account may represent a taxable disposition if the units are going to a third-party.

144.     To determine the proper tax characterization of the transactions and whether a user is in tax compliance, the IRS needs this transactional information, including the date and time of the transaction, cryptocurrency involved, amount of cryptocurrency involved, U.S. dollar value, transaction hash (ID), and blockchain addresses.

145.     The IRS needs records relating to other taxable events that may have occurred within the account.  This includes the receipt of additional units of cryptocurrency as the result of a chainsplitting hard fork, which represents taxable income, staking, or other situations where a user may receive units of cryptocurrency gratuitously through promotional events.

146.     Because all these situations result in taxable income to the user, the IRS needs the transactional information relating to these events so it can properly determine whether a user is in tax compliance.

147.     Summons request number 5 reflected on Exhibit A seeks all records of account funding transactions relating to the deposit, withdrawal, or transfer of fiat currency.  The IRS uses this information to understand how a user is funding his or her purchases of cryptocurrency and where money may be getting sent after units are sold.  This information is evaluated against other information in the IRS's possession and reported on the user's tax returns to make the most-informed decision the IRS can on whether an individual is complying with the internal revenue laws.

## IV.     KRAKEN HAS NOT COMPLIED WITH THE SUMMONS

148.     Despite discussions between the parties, Kraken has failed to comply with the summons and has not produced the books, records, papers, and other data demanded in the summons.

149.     Kraken's failure to comply with the summons continues to this date.

150.     The books, records, papers, and other data requested in the summons are not already in the possession of the IRS.

151.     All administrative steps as required by the Internal Revenue Code for issuance and service of the summons have been followed.

152.     The identities of the John Does are unknown.  Accordingly, the IRS does not know whether there is any "Justice Department referral," as that term is described in Section 7602(d)(2) of the Internal Revenue Code, in effect with respect to any unknown John Does for the years ended December 2016, 2017, 2018, 2019, and 2020.

153.     The IRS is not seeking records for certain identified persons who are known to the IRS but who would have been otherwise included in the summons because they were Kraken users during the relevant period.  A list of these individuals will be provided to Kraken.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 31st day of January 2023, in Maitland, Florida.


KAREN CINCOTTA
Supervisory Internal Revenue Agent
Internal Revenue Service