GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 Marshall Street
Redwood City, CA  94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

AMANDA H. RUSSO (SBN 319617)
*ARusso@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Floor
Los Angeles, CA  90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Respondent
PAYWARD VENTURES, INC., d/b/a
KRAKEN OR KRAKEN.COM

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>PAYWARD VENTURES, INC., d/b/a KRAKEN OR KRAKEN.COM, OR ITS PREDECESSORS, SUBSIDIARIES, DIVISIONS, OR AFFILIATES,<br><br>　　　　　Respondent. | Case No. 3:23-MC-80029-JCS<br><br>**RESPONDENT PAYWARD VENTURES, INC.'S OPPOSITION TO PETITION TO ENFORCE INTERNAL REVENUE SERVICE SUMMONS**<br><br>Date:　　　May 19, 2023<br>Time:　　　9:30 a.m.<br>Courtroom: F (15th Floor)<br>Judge:　　　Hon. Joseph C. Spero |

1

**TABLE OF CONTENTS**

2

**Page**

3 INTRODUCTION ....................................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ................................................... 2

4

I.   Overview of Kraken and Its Operations ...................................................... 2

5

II.   Kraken's Storage of Relevant Data ............................................................. 2

6 III.   The IRS Sought an *Ex Parte* Order to Serve a Sweeping John Doe Summons, but This Court Determined the Summons Was Too Broad and Must be Narrowed ......... 3

7

IV.   After Issuance of a "Narrowed" Summons, Kraken Tries to Negotiate Scope ........... 4

8 LEGAL STANDARD ................................................................................................. 5

9 ARGUMENT .............................................................................................................. 6

I.   THE IRS FAILS TO SHOW WHY ITS OVERREACHING AND BURDENSOME REQUESTS SHOULD BE ENFORCED ....................................... 6

10

A.   The Summons' Definition of User Makes It Broader Than Necessary to Achieve the Government's Investigative Purpose. ............................ 7

11

12 B.   The IRS's Request No. 1 for User Identity Information Goes Beyond *Coinbase* And Is Irrelevant, Overbroad, and Burdensome .............................. 11

13 C.   The IRS's Request No. 2 for KYC Data Goes Beyond *Coinbase*, Is Irrelevant to Any IRS Purpose, and Is Unduly Burdensome ............................ 17

14

D.   Request No. 3 for Exception Reports and Investigation Records Similarly Goes Beyond Coinbase, Is Irrelevant to the IRS's Purposes, and Unduly Burdensome .................................................................... 19

15

16 E.   Request No. 4 for Account Activity Is Overbroad and Unduly Burdensome .. 22

F.   The IRS's Request No. 5 for Account Funding Records Is Irrelevant, Broader Than Necessary for Its Purposes, and Burdensome ......................... 23

17

18 II.   THE PETITION SHOULD BE DENIED IN ITS ENTIRETY ................................ 24

19 CONCLUSION ........................................................................................................... 25

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*David H. Tedder & Assocs., Inc. v. U.S.*,
    77 F.3d 1166 (9th Cir. 1996)............................................................................18

*In re John Does*,
    No. CV-N-88-319-ECR, 1990 WL 264130 (D. Nev. Oct. 1, 1990) ........................................10

*In re Tax Liabilities of John Does*,
    688 F.2d 144 (2d Cir. 1982)..............................................................................9

*Standing Akimbo, LLC v. U.S.*,
    955 F.3d 1146 (10th Cir. 2020)..........................................................................17

*U.S. v. Bisceglia*,
    420 U.S. 141 (1975)................................................................................1, 5, 7

*U.S. v. Coinbase, Inc.*,
    No. 17-cv-1431, 2017 WL 5890052 (N.D. Cal. Nov. 28, 2017) .................................... *passim*

*U.S. v. Coopers & Lybrand*,
    550 F.2d 615 (10th Cir. 1977).................................................................6, 16, 18, 21

*U.S. v. Davey*,
    543 F.2d 996 (2d Cir. 1976)...........................................................................15, 17

*U.S. v. Goldman*,
    453 F. Supp. 508 (C.D. Cal. 1978).......................................................................9

*U.S. v. Goldman*,
    637 F.2d 664 (9th Cir. 1980)............................................................................18

*U.S. v. LaSalle Nat'l Bank*,
    437 U.S. 298 (1978)....................................................................................5

*U.S. v. Matras*,
    487 F.2d 1271 (8th Cir. 1973)..........................................................................20

*U.S. v. Monumental Life Ins. Co.*,
    440 F.3d 729 (6th Cir. 2006).................................................................... *passim*

*U.S. v. Powell*,
    379 U.S. 48 (1964)..................................................................................5, 6

*U.S. v. Theodore*,
    479 F.2d 749 (4th Cir. 1973)............................................................................6

*Zietzke v. U.S.*,
   No. 19-CV-03761-HSG(SK), 2020 WL 264394 (N.D. Cal. Jan. 17, 2020) .................13, 22, 23

**Statutes**

26 U.S.C. § 7602 ....................................................................................................................1, 5, 6

26 U.S.C. § 7609(f) ........................................................................................................... *passim*

26 U.S.C. § 6501(a) ....................................................................................................................15

**Other Authorities**

EU General Data Protection Regulation .......................................................................................10

**INTRODUCTION**

More than five years ago, this Court admonished the IRS for trying to obtain too much information through a "John Doe" summons issued under 26 U.S.C. § 7602.  The Court drastically narrowed the scope of that summons and permitted the IRS to seek only basic personal information and transaction records for Coinbase's users.  *U.S. v. Coinbase, Inc.*, No. 17-cv-1431, 2017 WL 5890052 (N.D. Cal. Nov. 28, 2017).  Now, the IRS asks this Court to ignore *Coinbase* and permit it to obtain from Payward Ventures, Inc. ("Kraken") even more categories of information than before, for the sake of convenience.  It also asks this Court to impose upon Kraken, a third party, the massive burden of producing all this information—no matter how difficult to retrieve or unnecessary to its investigation—for nearly ███ *users*.  Kraken opposes this request.

The IRS previously asked Coinbase, another digital asset exchange, to produce a wide swath of information about thousands of its users, so that the IRS could investigate its hunch that some users might have underreported their taxes.  The Court let the IRS move forward with a summons, but only after eliminating or significantly narrowing several of its overreaching requests that were not tailored to its investigative purpose.  The IRS tried to justify its expansive summons by arguing that it would save the Government a second trip to the courthouse to obtain additional information.  But this Court found that justification insufficient, even under the deferential standards of § 7602, especially given the substantial burdens imposed on Coinbase and concerns that came with a massive production of potentially irrelevant information.  The Court's bottom-line holding was that the IRS could not seek an expansive number of documents about thousands of users, on the *possibility* that some of them might not have been paying taxes.  The Court permitted the IRS to obtain only basic information that might help it identify potentially reportable gains.

Rather than abide by *Coinbase*'s ground rules, the IRS doubles down, making even more expansive requests and relying on a thinner rationale.  Not only does it ask for several of the same categories of information that were rejected in *Coinbase*, it wants more—and for a much bigger universe of users.  Such a Summons is far "broader than necessary to achieve" the IRS's purpose of investigating potentially underreported taxable gains.  *U.S. v. Bisceglia*, 420 U.S. 141 (1975).

Section 7602 allows the IRS to either go a mile wide and an inch deep (collecting basic

1   information on many users), or an inch wide and a mile deep (collecting lots of information about

2   a small subset of users).  It certainly does not permit a summons to go a mile wide *and* a mile deep,

3   seeking nearly everything under the sun for nearly ▉▉▉▉ users.  Kraken should not be required to

4   undertake the enormous burdens imposed by the IRS's unjustified treasure hunt.  This Court should

5   deny the Petition in its entirety.

**BACKGROUND AND PROCEDURAL HISTORY**

7   **I.     Overview of Kraken and Its Operations**

8           Kraken is a U.S.-based online cryptocurrency exchange platform founded in 2011.  Decl.

9   of Todd Siemers ("Siemers Decl.") ¶ 4.  Kraken offers its services to both U.S. and international

10   users in more than 190 countries.  *Id.* ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

11   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

12   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

13   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

14   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

15   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

16   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

17   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

18   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

19   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

20   **II.     Kraken's Storage of Relevant Data**

21           The IRS seeks a variety of categories of data from Kraken.  While easy to ask for this

22   information, much of it is not easy to get.  Some data sought by the IRS is ▉▉▉▉▉▉▉▉▉

23   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

24   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

25   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

26           ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

27   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

28   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19   **III.    The IRS Sought an *Ex Parte* Order to Serve a Sweeping John Doe Summons, but This

20        Court Determined the Summons Was Too Broad and Must be Narrowed**

21        More than two years ago, the Government filed an *ex parte* petition for leave to serve a John

22   Doe Summons on Kraken.  *See* Mar. 30, 2021 *Ex Parte* Petition for Leave to Serve "John Doe"

23   Summons, *In Re Tax Liability of John Does* ("*Kraken I*"), No. 21-cv-02201-JCS, ECF No. 1; *see*

24   *also* Decl. of Karen Cincotta ("First Cincotta Decl.") at ¶ 80, *Kraken I*, ECF No. 1-2.  While the

25   Government argued that the summons was narrowly tailored, this Court held otherwise.   It

26   expressed concern that the IRS requests were too broad and found IRS Agent Karen Cincotta's

27   supporting declaration insufficient (i.e., based on "conclusory assertions") to support that breadth.

28   *See Kraken I*, 2021 WL 1222862, at *1 (N.D. Cal. Mar. 31, 2021).  The Court noted that the IRS's

1    prior attempt to obtain "similarly broad categories of information" from Coinbase had been rejected

2    and ordered the IRS to show cause why its petition should not be denied for failing to meet 26

3    U.S.C. § 7609(f)'s "narrowly tailored" requirement. *Id.* at *1-2.

4    **IV.    After Issuance of a "Narrowed" Summons, Kraken Tries to Negotiate Scope**

5         Following the Court's Order, the IRS filed a purported "narrowed" Summons, relying on a

6    second declaration by Ms. Cincotta ("Second Cincotta Decl."). *See* Govt.'s Response to Order to

7    Show Cause, *Kraken I*, ECF No. 8. But, in reality, little had changed; it removed only one request

8    and made slight changes to two others.[1]   The Court allowed the IRS to serve this summons, but

9    recognized there may be "further disputes as to the scope of the summons [which] would benefit

10   from adversarial briefing." *Kraken I*, 2021 WL 2314968 at *1 (N.D. Cal. May 5, 2021).

11        After serving the Summons on Kraken, the two sides had a number of discussions regarding

12   its scope. *See* Fondo Decl. ¶ 4-5. Kraken expended significant time and resources to provide

13   information to the IRS about its platform and raised concerns about the overbreadth of the requests.

14   *Id.* Kraken emphasized its concern that the requests far exceeded what was ordered in *Coinbase*.[2]

15   *Id.* ¶ 6.[3]  It also noted the considerable burdens associated with fulfilling the requests, especially

16   since the information is not easily retrieved, and concerns about protecting user privacy. *Id.* After

17   months of negotiation, the parties reached an impasse. *Id.* ¶ 7. Over a year after the parties' last

18   discussion, the IRS initiated the instant proceeding on February 3, 2023, without notice. *Id.* ¶ 8.

19        The points of contention regarding the Summons' scope are as follows:

| Summons Provision | Issue |
|---|---|
| **Definition of "User":** "[E]ach Kraken user for which your records show any United States-based address, telephone number, email domain, internet protocol address, or associated bank or financial account information, produce the following records, for any combination of accounts with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the | Kraken objects to this definition because it expands the scope of covered users far beyond what was sought in *Coinbase*, which encompassed those with "at least the equivalent of $20,000 *in any one transaction type* (buy, sell, send, or receive) in any one year . . . ." *Coinbase* at *6 (emphasis added). |

_____

[1] *Compare* Ex. A to First Cincotta Decl., *Kraken I*, ECF No. 1-3, *with* Ex. B to Second Cincotta Decl., *Kraken I*, ECF No. 8-2.
[2] While *Coinbase* is not binding on this Court, it is highly instructive given the factual similarities to this case and the District Court's consideration of nearly identical (but even narrower) requests.
[3] *See* Ex. A to Fondo Decl. for a comparison of IRS requests in *Coinbase* with requests to Kraken.

OPPOSITION TO PETITION TO ENFORCE IRS SUMMONS          Case No. 3:23-MC-80029-JCS

| | |
|---|---|
| period January 1, 2016 through December 31, 2020 unless otherwise stated[.]" | |
| **Request No. 1:** "Account registration records," including "User profile, User preferences, or account application information," including: name (and pseudonym, user ID), date of birth, taxpayer ID, physical address, telephone number, email address; history of all changes to personal information since the inception of the account; complete user IP address history; and complete user payment methods regardless of date | Kraken opposes the request for "User profile, User preferences, or account application information" beyond a user's name, date of birth, taxpayer ID (where available), address, telephone number (where available), and email address. Kraken also opposes the request for a history of all changes to personal information since the inception of a user account; complete user IP address history; and complete user payment methods regardless of date. |
| **Request No. 2:** Know-Your-Customer due diligence questionnaire information | Kraken opposes this request in its entirety. |
| **Request No. 3:** AML exception reports and all investigation records of exceptions | Kraken opposes this request in its entirety. |
| **Request No. 4:** All records of activity in User accounts | Kraken opposes this request to the extent it seeks records beyond transactional ledgers reflecting user deposit, withdrawal, trade, and transfer activity during the relevant timeframe. In particular, it opposes the request for transaction hash (ID) and blockchain addresses, as these data are not maintained in Kraken's transaction ledgers. |
| **Request No. 5:** All account funding records, and "any and all invoices billing statements, receipts, or other documents memorializing and describing such transactions." | Kraken opposes this request to the extent it seeks records beyond transactional ledgers reflecting user deposit, withdrawal, trade, and transfer activity during the relevant timeframe. |

## **LEGAL STANDARD**

The IRS has no inherent authority to pry unfettered into the affairs of U.S. taxpayers. *U.S. v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 n.18 (1978). It may issue a John Doe summons under 26 U.S.C. § 7602, but only when a "legitimate investigative purpose" exists. *Bisceglia*, 420 U.S. at 146. That means the summons cannot be used to "conduct 'fishing expeditions' into the private affairs" of taxpayers. *Id.* at 150-51. A summons is enforceable only when the IRS demonstrates that (i) its investigation is conducted for "a legitimate purpose"; (ii) "the inquiry may be relevant to the purpose"; (iii) "the information sought is not already" possessed by the IRS; and (iv) it has followed the required "administrative steps." *U.S. v. Powell*, 379 U.S. 48, 57-58 (1964). Critically here, "[a] summons will be deemed unreasonable and unenforceable if it is overbroad and

disproportionate to the ends sought." *U.S. v. Coopers & Lybrand*, 550 F.2d 615, 621 (10th Cir. 1977).  Indeed, the statute itself requires that the information requested be "narrowly tailored" to pertain to a taxpayer's noncompliance with tax laws.  *See* 26 U.S.C. § 7609(f).  As a result, a summons must be "no broader than necessary to achieve its purpose." *Coinbase* at *6 (quoting *Bisceglia*, 420 U.S. at 151).  Even if the Government facially meets its burden, that only gives rise to a rebuttable presumption of good faith; a summons may still be defeated if it is in bad faith or an abuse of process.  *Powell*, 379 U.S. at 58.  Judicial protection "against the sweeping or irrelevant order is particularly appropriate" where a summons is directed to a third party.  *U.S. v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973); *see also U.S. v. Monumental Life Ins. Co*., 440 F.3d 729, 735 (6th Cir. 2006) ("[A] third party to the IRS's investigation . . . deserves greater protection against a burdensome summons.").  And "where, as here, the Government seeks records for thousands of account holders through a John Doe summons, the courts must ensure that the Government is not collecting thousands and thousands of personal records unnecessarily." *Coinbase* at *7.

## ARGUMENT

## I.   THE IRS FAILS TO SHOW WHY ITS OVERREACHING AND BURDENSOME REQUESTS SHOULD BE ENFORCED

One judge of this Court has already admonished the IRS for stretching too far with a similar John Doe summons to a cryptocurrency exchange—yet the scope of that summons, which the Court ultimately narrowed, pales in comparison to the breadth of what the IRS seeks here.  In *Coinbase*, the Court allowed the Government to obtain, as to 14,000 users, basic "identity and transaction records … to investigate whether the holder had taxable gains that were not properly declared." *Id.* at *6.  It rebuffed the IRS's ask for "account opening records, copies of passport or driver's licenses, all wallet addresses, all public keys for all accounts/wallets/vaults, records of Know-Your-Customer diligence, agreements or instructions granting a third-party access, control, or transaction approval authority, and correspondence between Coinbase and the account holder." *Id.*  The need for that information was far too speculative even under § 7602, as the IRS could not establish a particularized need.  *See id.*  Only *if* the IRS determined a user had a potentially taxable gain, and, *if* there was doubt as to user identity, would additional documents be relevant.  *See id.*

1    The IRS requests here are much broader; but, as in *Coinbase*, the IRS has utterly failed to

2    establish why the expanded universe of documents it seeks is remotely relevant, particularly at this

3    stage.  The IRS seeks almost every document that Kraken may have for nearly ▮▮▮▮ users, more

4    than four times the number in *Coinbase*, without establishing whether any of them may even

5    *potentially* have a tax liability, all so the IRS can skip the step of later asking for more information

6    as to a very small subset of users.  Moreover, the IRS's requests would impose a burden on Kraken

7    that is exponentially greater than Coinbase's—not just because of the number of users, but the

8    wider, yet needless, universe of documents that the IRS seeks here.  Whether the IRS likes it or not,

9    the burden on the respondent is important in determining whether a summons is "no broader than

10   necessary to achieve its purpose."  *Bisceglia*, 420 U.S. at 151; *see also Coinbase*, at *6 (rejecting

11   burdensome requests because the information sought was "broader than necessary").

12       As *Coinbase* explains, the Government's desire to "not need to return to court to ask for

13   [documents] if and when needed" is not a good enough justification to saddle Kraken with an

14   incredibly onerous set of requests or to invade the personal and financial privacy of tens of

15   thousands of users.  *Id.* at *7.  To the contrary, the issuance of follow-up summonses specific to

16   taxpayers of particular interest is "a process preferable to a John Doe summons." *Id.*

17

18   **A.    The Summons' Definition of User Makes It Broader Than Necessary to Achieve the Government's Investigative Purpose.**

19       The problems with the Summons start with its definition of "User," which, in relevant part,

20   is: "each Kraken user . . . with at least the equivalent of $20,000 *in value of transactions (regardless*

21   *of type)* in cryptocurrency in any one year for the period January 1, 2016 through December 31,

22   2020[.]" Ex. A to Third Cincotta Decl. (emphasis added).  This definition—far broader than the

23   one in *Coinbase*, could not even *potentially* inform the Government's investigation of taxpayers,

24   as it (1) improperly blends together all transactions, (2) embraces users who may have had no

25   taxable gain, and (3) extends so far as to cover non-U.S. individuals.  Even if the IRS could

26   somehow overcome these hurdles, the incredible burden created by this expansive definition of

27   User demonstrates that the Summons is far broader than necessary.

28

1          **1.**    **The Definition of "User" Exceeds the Definition Used in *Coinbase*,**

2                **Which the Court Barely Approved**

3        Without any explanation, the Summons demands a materially broader search for "Users"

4   than the Court allowed in *Coinbase*.  There, the Court approved a narrowed summons that limited

5   the covered "Users" to those "with at least the equivalent of $20,000 in *any one transaction type*

6   (buy, sell, send, or receive) in any one year … [but] does not include users … who only bought and

7   held bitcoin during the [at-issue] period…" *Id.* at *2, *5. Here, however, the IRS expands the scope

8   of covered users far beyond that definition.  Now, it expands a "User" to be based on (a) an

9   *aggregate* threshold of at least $20,000 in cryptocurrency transactions "*regardless of type*" for any

10  one year between 2016 and 2020, and (b) does not exclude users who only bought and held

11  cryptocurrency.  In other words, a "User" includes anyone who engaged in *any* cryptocurrency

12  transaction (whether buying, sending, selling, receiving, depositing, withdrawing, transferring, etc.)

13  where the *combined value* of those transactions was $20,000 or more in any one year. ██████████

14  ████████████████████████████████████████████████████████████████████

15  ████████████████████████

16       The $20,000-per-transaction-type definition of User in *Coinbase* already pushed that

17  summons to its limits, with the Court expressing concern that this meant the potential collection of

18  "thousands and thousands of personal records unnecessarily." *Coinbase* at *7.  The definition of

19  "User" here far exceeds the breaking point.  Consider how many users—who may transact in small

20  amounts and have no taxable gain whatsoever—might be swept in by this capacious definition.

21  Say a Kraken user buys $10,000 in Bitcoin.  The user then decides to split up his holdings, so he

22  sells $5,000 in Bitcoin and buys $5,000 of Ether.  That user would be swept into this Summons,

23  while excluded from the *Coinbase* summons—which already captured a significant (but much

24  lower) number of users that gave the Court pause.  The IRS provides no justification whatsoever—

25  not in any of its *three* supporting declarations—for its expansion of "User" here.

26         **2.**    **The Expansive Definition of "User" Encompasses Non-Taxable Events**

27       The term "User" also does not exclude those who engaged in only non-taxable events.  The

28  narrowed *Coinbase* Summons expressly excluded users "*who only bought and held bitcoin during*

*the [subject time] period[.]" Id.* at *2 (emphasis added). This makes sense since this would not give rise to a taxable event. There is no legitimate basis for the IRS's purported "need" to investigate users who only make *deposits* or *purchases* (buy-hold crypto) or *withdrawals*. But there is no similar exclusion here, and the IRS provides no explanation for that. While it concedes that "[t]he purchase of cryptocurrency is not inherently taxable," it claims to need "purchase price information" to *calculate* a taxable gain. Third Cincotta Decl. ¶ 138. Though that may be true, *Coinbase* makes clear that the documents the IRS may obtain are only ones that might help discern a potentially unreported taxable gain—users who simply purchased does not help achieve that.

The same is true with deposit and withdrawal activity. A deposit alone shows nothing and would encompass all the people who buy and simply hold cryptocurrency. The IRS vaguely asserts that deposits and withdrawals are a "clear indicator that the user is holding cryptocurrency in other places," and thus "needs" this information "so it can gather as much information as possible" to determine a user's tax compliance. *Id.* ¶¶ 142. But that is no different than the type of fishing expeditions that are not allowed under § 7609(f). *See generally* In *re Tax Liabilities of John Does*, 688 F.2d 144, 149 (2d Cir. 1982) (Sections 7609(f) and (h) provide a prior restraint on the IRS's power to serve John Doe summonses, mainly "to preclude the IRS from using such summonses to engage in possible 'fishing expeditions.'").

The IRS also argues that deposits or withdrawals "*may be* taxable transactions themselves." *Id.* ¶ 143 (emphasis added). It speculates that a deposit could reflect compensation or a similar taxable income payment, such as for goods and services, and that a withdrawal could represent a "taxable disposition" if sent to a third party. *Id.* But this is yet another example of a "conclusory" assertion that cannot justify enforcement of this more expansive Summons. *U.S. v. Goldman*, 453 F. Supp. 508, 512 (C.D. Cal. 1978) ("Mere idle hope or generalized speculation is not enough."). And, again, it fails to explain why that information is necessary to identify taxpayers at *this* stage.

### 3.      The Broad Reach of the Term "User" Raises Foreign Privacy Concerns

Given Kraken's worldwide operations, the overbreadth of the Summons' definition of "User" also leads to the potential collection of data for users with no nexus to the U.S.—whom the IRS has no interest in auditing—and creates a significant concern about Kraken's ability to comply

with foreign privacy laws.  Here, a covered "User" is any user that Kraken's "records show has "any United States-based address, telephone number, email domain,[4] internet protocol address, or associated bank or financial account information."  Ex. A to Third Cincotta Decl. at 7.  Given *how* "User" is defined, it is possible that certain non-U.S. citizens who at some point during the five-year timeframe either lived in the U.S., had a U.S. phone number, or simply used a computer in the U.S. would get swept up in the search.  This would not be the "narrowly tailored" Summons that federal law requires.  Further, that this request would likely require collection from EU users impairs Kraken's ability to comply with the EU General Data Protection Regulation ("GDPR").  The GDPR generally prohibits the disclosure of personal data to non-EU countries unless formally recognized by the European Commission as having adequate levels of data protection, which the U.S. currently is not.  Regulation (EU) 2016/679, Article 3 at 45-49.

### 4.  The Expansive Definition of "User" Imposes a Significant Burden on Kraken and Privacy Concerns for its Users

"Whether or not a request is burdensome is a test of whether such a summons would be enforced and even though information sought by a summons is relevant and material, it may still be so burdensome to produce that enforcement could be denied." *In re John Does*, No. CV-N-88-319-ECR, 1990 WL 264130, at *5 (D. Nev. Oct. 1, 1990).  As currently defined, the term "User" captures ████████████████—more than four times the users in *Coinbase*.  Siemers Decl. ¶ 10.  And, as explained above, the Summons seeks documents that were not sought in *Coinbase*.  That means Kraken must account for both more users *and* more documents per user if the Summons were enforced in its entirety.  Indeed, Kraken estimates that full compliance could take months or even years.  *Id.*  This burden is unjustified, particularly given that the IRS is unlikely to actually audit all of these "additional" Users or any significant portion of them.[5]

Further, given the sweeping reach of the term "User," the IRS seeks wide swaths of information, which improperly invades the privacy of Kraken's users.  This presents significant

---

[4] The request to identify U.S. Users by "email domain" also is vague; email domains are not readily distinguishable by country.  The IRS does not explain how Kraken would do this.

[5] If the transaction value threshold was increased to $50,000 or $100,000, the number of accounts would be reduced to ████████ respectively—still double or triple *Coinbase*, but much more reasonable figures.  Siemers Decl. ¶ 10.

risks to Kraken and its users.  Transferring troves of sensitive personal and financial data (the vast majority of which will be irrelevant) to the IRS increases the risk of loss or theft.  Unfortunately, this happens, even to the government.[6]  The slight value in additional users covered by this broad definition is outweighed by the privacy risks here.

**B.    The IRS's Request No. 1 for User Identity Information Goes Beyond *Coinbase* And Is Irrelevant, Overbroad, and Burdensome**

Request No. 1 should be rejected insofar as it exceeds the scope of *Coinbase*, is irrelevant, not narrowly tailored, and unduly burdensome.  Under the guise of "necessity," the request seeks far more than permitted in *Coinbase*, including: user "pseudonym" or "user ID"; telephone number; email address; "[h]istory of all changes to the personal information identified above since the inception of the account"; "[c]omplete User history for internet protocol addresses used to access the account"; and "[c]omplete User payment methods (e.g., linked bank or credit card accounts) regardless of date."  Ex. A to Third Cincotta Decl.  But the IRS needs only basic user information to determine a taxpayer's identity:  name, birthdate, taxpayer ID, and address.[7]

**1.    Request No. 1 Exceeds *Coinbase* and Is an Abuse of Process**

The IRS's expansive request for user information disregards the unambiguous holding in Coinbase:  the IRS can obtain basic information needed to identify individuals with potentially unreported gains, and then follow up on that with narrow requests covering that limited group.  Instead, the IRS renews its failed arguments from *Coinbase*.

In *Coinbase*, the summons at issue included a similarly broad request for: "[a]ccount/wallet/vault registration records for each account/wallet/vault owned or controlled by the user . . . limited to name, address, tax identification number, date of birth, account opening records, copies of passport or driver's license, all wallet addresses, and all public keys for all

---

[6]  A Treasury Inspector General report found that the IRS did not meet all of the security requirements for its cloud-based systems and failed to timely implement mitigation and corrective actions to mitigate security risks.  *See The Enterprise Case Management System Did Not Consistently Meet Cloud Security Requirements* TREASURY INSPECTOR GEN. FOR TAX ADMIN. (Mar. 27, 2023), *https://www.oversight.gov/sites/default/files/oig-reports/TIGTA/202320018fr.pdf* (attached as Ex. B to Fondo Decl.).

[7]  Should the Court deny its opposition to the Summons in its entirety (§ II, *infra*), Kraken does not raise a burden argument as to the request for basic user information (name, address, birthdate, and, where available, taxpayer ID), or for email addresses and, where available, phone numbers as further data references, subject to the appropriate limiting of a "User" to conform to *Coinbase*.

accounts/wallets/vaults." *Coinbase* at *2. The IRS, as it does here, claimed that it "need[ed] these records to verify an account holder's identity" and to determine if the holder had others make transactions on their behalf. *Id.* at *6. The Court disagreed. It expressly identified limited personal identification measures that it deemed necessary to determine if a taxable gain was reported: "name, date of birth, taxpayer identification and address." *Id.* The Court found this more than sufficient to assist in identifying taxpayers. It was not enough that the IRS asserted a need for additional records to "verify" a user's identity. *Id.* Further identity information would only become necessary if the IRS determined there was a potential taxable gain and still has doubt as to a taxpayer's identity. If not, "these additional records will not shed any light on a legitimate investigation." *Id.*

Ignoring the Court's admonition in *Coinbase*, the IRS nonetheless seeks to enforce its expansive Summons, requesting extraneous identity information. Specifically, it seeks any user pseudonym[8] or user ID, historical personal information changes, IP addresses, and user payment methods. These categories exceed the basic user information *Coinbase* held was relevant for IRS's initial investigative purposes. And the IRS provides no legitimate explanation for why its claimed need for this additional information would be any greater or different here than in *Coinbase*. If "more detailed records" are needed, the IRS can seek information directly from the taxpayer or from Kraken. Production of such information at this point would serve only to provide unfettered access to the private financial and personal information of thousands of otherwise law-abiding users that the IRS has no interest in auditing. Accordingly, Request No. 1 should be rejected insofar as it exceeds *Coinbase*.

### 2. Requests for Historical User Information Changes, IP Addresses, and Payment Methods Are Overbroad and Irrelevant

The IRS's requests for historical user information in Request No. 1(b)-(d) are unreasonable and unenforceable as they are overbroad and disproportionate to the end sought here.

Here, the requests for historical user information changes, payment methods, and IP addresses are overbroad; each of these sub-requests is indefinite as to time and unbounded by the purported time and value limitations set forth in the definition of "User." For instance, Request

---

[8] The request for "pseudonyms" is also vague, and it is unclear what is actually requested.

No. 1(b) seeks the history of all changes to personal information "since the inception of the account." Similarly, Request No. 1(c) seeks "[c]omplete User history" for IP addresses, and Request No. 1(d) seeks User payment methods "regardless of date." Other courts have held similar requests that were unlimited in time and not directly related to the tax years in dispute to be irrelevant and overbroad. *See, e.g.*, *Zietzke v. U.S.*, No. 19-CV-03761-HSG(SK), 2020 WL 264394, at *9 (N.D. Cal. Jan. 17, 2020), *report and recommendation adopted*, 2020 WL 6585882 (N.D. Cal. Nov. 10, 2020) (request was overbroad and irrelevant to investigation purpose without date range limitation); *see also Monumental Life Ins. Co.*, 440 F.3d at 736 (generally agreeing with magistrate judge's conclusion that request seeking information "during the period beginning July 1, 1991 through September 30, 1999 [was] particularly irrelevant because the IRS was only investigating [defendant's] tax liability between 1994 and 1997") (internal quotations omitted). For this reason alone, the requests are broader than necessary to achieve any IRS investigatory purpose.

Moreover, the requests for additional information beyond basic identity information simply boil down to "nice to haves." The IRS only suggests that it *may not* be able to verify the identity of a taxpayer without identity information beyond name, date of birth, address, and taxpayer identification. In doing so, it relies on two *speculative* and *conclusory assumptions* about why basic information "does not always go far enough" in establishing taxpayer identity. *First*, Ms. Cincotta asserts, without providing any factual basis, that "[i]t is not uncommon for taxpayers to use aliases, false addresses or post office boxes, fictitious entity names, or other means to disguise their true identities." Third Cincotta Decl. ¶ 42; *see also* ¶¶ 92-95. Based on that unsupported assertion, she concludes "[t]hat makes basic information such as name, address, date of birth, and taxpayer ID number insufficient." *Id.* But this puts the cart before the horse. The IRS provides no other discussion or evidence on this point—much less any legitimate bases to suggest *Kraken's* users have supplied false information or how expanding the request solves that problem. The IRS appears to simply ask the Court to take its conclusions at face value. In any event, for Intermediate and Pro level accounts, users are required to provide verification information to confirm identity and address. So, the fear that those users are somehow falsifying information to disguise account ownership is baseless. Even if some small subset of users provided fictious information, that does

1   not justify the production of all this additional information, as to all ███ users.  Ultimately, the

2   IRS is entitled to additional identity information only "*if* there is potentially a taxable gain and *if*

3   there is some doubt as to the taxpayer's identity."  *Coinbase* at *6.  The IRS has made no such

4   determination yet.

5        *Second*, Ms. Cincotta speculates that an issue *may* arise with *missing* user data, solely based

6   on the IRS's experience with Coinbase.  Indeed, her declaration dedicates a number of paragraphs

7   to what basic information was missing in Coinbase's data and how that impacted the IRS's

8   investigation.   Third Cincotta Decl. ¶¶ 43-51.   But this merely assumes—without reasonable

9   basis—that Kraken's data will suffer from the same deficiencies or create the same difficulties for

10  the IRS.  That assumption should be rejected.  During the timeframe of the information requested

11  in Coinbase, Coinbase indicated to the IRS that certain account information for its oldest accounts

12  may be missing because it did not necessarily collect all of that information at that time.  *Id.* ¶ 46.

13  Not so for Kraken.  ████████████████████████████

14  ██████████████████████████████████████████████████████████

15  ███████████████████████████████████████████.[9]

16       Even given Coinbase's purported missing user data, additional follow-up information in

17  that case was only needed for a very small percentage of its users (~10%).  And after the follow-

18  up, only 5% of users were still not identifiable.  Since Kraken ████████████████

19  ████████████████████████████████████████████████,

20  the number of unknown but knowable taxpayers almost certainly would be less than 5%.  The IRS

21  nonetheless asks for the production of additional data for tens of thousands of users—which is

22  wholly unnecessary to identify the very small number of users for whom it might be needed.

23       Ultimately, the IRS fails to justify a need for further identity information when all of the

24  basic identity data *is* provided.  It does not come close to providing a sufficient explanation as to

25  how the other requested identity information (historical user profile changes, IP address, or user

26  payment methods) would even assist the IRS in identifying taxpayers when certain information is

27

28  [9] Ms. Cincotta asserts that identification difficulties occurred mostly when taxpayer ID was
    missing.  *Id.* ¶ 47.  But she then qualifies that assertion by suggesting that issues arose when a
    taxpayer ID was missing and "*other* information was also missing."  *Id.* (emphasis added).

1    missing.  For example, assume the IRS had a user's name, address, and birthdate, but was missing

2    a taxpayer ID—being able to track an IP address to a general geographic area will not enhance its

3    ability to identify a user, and there is a particular privacy interest in information that is *not*

4    voluntarily disclosed and would provides one's location information.  While perhaps convenient to

5    confirm identity, it is not needed to identify a user in the first place.  *See generally U.S. v. Davey*,

6    543 F.2d 996, 1000 (2d Cir. 1976) ("[I]f the subject matter of requested records is not otherwise

7    relevant, convenience will not make it so.").  This is even more true with the suggestion of the use

8    of false identifying information—nothing suggests that users seeking to hide their identity are likely

9    to be identified through the IRS's additional information requests.

10    Its other suggestions as to why this information may be helpful are unavailing.  First, the

11    IRS suggests that IP address information is a good way to search data from other exchanges and

12    link transactional records from foreign exchanges to determine compliance.  *Id.*  ¶¶ 108, 112, 118.

13    This is far beyond the basic identity information the Court in Coinbase determined was needed for

14    the sole purpose of identifying taxpayers.  And it is unreasonable to insinuate that the IRS plans to

15    go through IP address histories for almost ███ users and cross compare those with IP addresses

16    used in transaction records from other exchanges.  Second, the only asserted basis for changes to

17    user information is that Kraken's data may not match IRS's data for taxpayers.  *Id.* ¶ 110.  But this

18    only speculates there *may be* some discrepancy and does not account for the existence of multiple

19    user data points that could be used for identification.  Third, the IRS asserts account funding sources

20    can provide insight into tax compliance, as it permits identification of cross-linked bank accounts.

21    *Id.* ¶ 121-22.  But the IRS assumes without basis that a user with lots of linked accounts and no tax

22    reporting is somehow unlikely to be compliant.  And this information too is unnecessary to

23    determine identity or a potentially taxable gain in the first instance.  The IRS speculates this could

24    also point them to *alternative* taxpayers associated with the accounts.  But that would exceed the

25    scope of IRS's investigative purpose here.  And the IRS cannot legitimately claim to need this

26    information *now* due to statute of limitations concerns under 26 U.S.C. § 6501(a) (*Id.* ¶ 125), when

27    it waited over a year since its last discussion with Kraken to enforce its Summons.

28    The IRS fails to show why this request for additional user information is not premature and

1   broader than necessary, and simply suggests it would be convenient to have.  That is insufficient:

2   "mere convenience does not make an item producible[.]"  *Coopers & Lybrand*, 550 F.2d at 621.

3            **3.        Request No. 1(b)-(d) Would Be Unduly Burdensome**

4            Request No. 1(b)-(d) also seeks irrelevant user data that would impose undue burden on

5   Kraken. ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████

7            More specifically, with respect to historical changes to user information, Kraken ████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████  █████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  █████████████████████████████████████████

16           Similarly, Kraken ██████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23           The same is true of IP addresses, ███████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26  █████████████████████████  ███████████████████████████████

27  ████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████

1    ███████████████████████████████████████████████████████

2    ██████████████████████████████████████████████████

3       Moreover, Kraken further opposes these requests as they require Kraken to develop queries

4    or tools to generate the requested information—which does not otherwise exist in the format

5    requested.  The IRS cannot compel the preparation or production of records that do not already

6    exist.  *See Standing Akimbo, LLC v. U.S.*, 955 F.3d 1146, 1164 (10th Cir. 2020); *Davey*, 543 F.2d

7    at 1000 ("7602 does not require preparation or production of records not yet in existence").

8       **C.    The IRS's Request No. 2 for KYC Data Goes Beyond *Coinbase*, Is Irrelevant to**

9       **Any IRS Purpose, and Is Unduly Burdensome**

10               **1.    Request No. 2 Exceeds *Coinbase* and Is an Abuse of Process**

11       Request No. 2 for KYC Questionnaire information should be denied because it was already

12    expressly rejected in *Coinbase*.  Specifically, this request seeks information from User-completed

13    KYC Questionnaires relating to "employment, net worth, and source of wealth for individual

14    Users" and "for business Users, . . . legal name, business address, country, website, contact

15    information, industry, goods and services, government-issued business registration or tax-

16    identification number, and source of funds[.]"  Ex. A to Third Cincotta Decl.  In considering a

17    similar request, *Coinbase* rejected the argument that this data is relevant at this stage.  The Court

18    cautioned that "[e]specially where, as here, the Government seeks records for thousands of account

19    holders through a John Doe summons, the courts must ensure that the Government is not collecting

20    thousands and thousands of personal records unnecessarily."  *Coinbase* at *7.  Accordingly, it held

21    that KYC records were "broader than necessary" to determine identity and unreported taxable

22    gains.  The same is true here.  "[F]or many or even most of the account holders [KYC diligence

23    and other records] may never be relevant."  *Id.*  And, as discussed below, the IRS fails to establish

24    any need for this information *now*.  Its attempt to revive this request is plainly an abuse of process.

25       Again, the IRS had little issue identifying 90% of taxpayers in *Coinbase* without this

26    information, and with less identifying data than Kraken maintains.  If the IRS "later determines that

27    it needs more detailed records on a taxpayer," it may issue a second summons to the taxpayer or

28    Kraken with *notice*—an approach *Coinbase* acknowledged was preferable to a John Doe Summons

in any event. *Id.* *7.  While the IRS may not *prefer* to go through that additional effort for whatever relatively small number of users may require it, this is not about the IRS's convenience (or laziness). As in *Coinbase*, the IRS's desire to avoid returning to court does not justify overreaching requests and is concerning in the precedent it could set as to the IRS, and even other regulatory agencies.

### 2.    Request for KYC Information Is Irrelevant and Overbroad

The IRS fails to show why its request for KYC Questionnaire information is relevant and not broader than necessary.  The IRS must show it has a "realistic expectation rather than an idle hope that something may be discovered." *U.S. v. Goldman*, 637 F.2d 664, 667 (9th Cir. 1980); *see also David H. Tedder & Assocs., Inc. v. U.S.*, 77 F.3d 1166, 1168–69 (9th Cir. 1996).  It has not.

Contrary to the IRS's assertion, KYC data beyond basic user profile information is not necessary to its purposes and is premature at this stage.  While it claims that KYC data would be helpful in identifying certain "large[] movement" or high volume users, that argument is speculative and jumps the gun.  As explained above, the IRS must first ask for only the information needed to identify potential taxable gains before asking for more.  *Coinbase* at *6.  The IRS has flunked step one.  And it fails to establish what this extra information could do that the basic user information and transactional data could not.  Administrative convenience, to which the IRS alludes as justification (Third Cincotta Decl. ¶¶ 129-30), is insufficient here.  *See, e.g.*, *Coopers & Lybrand*, 550 F.2d at 621.  This is a clear example of government overreach.

By requesting KYC information now, the IRS seeks to solve a problem that does not yet and may never exist.  This highly personal information will not reveal potential tax liabilities for the IRS to go after.  Take, for example, its request for "employment, net worth and source of wealth" data.  Third Cincotta Decl. ¶ 127.  This has no bearing on potential tax liabilities from cryptocurrency transactions.  Nor would net worth and source of wealth shed light on any particular tax year in dispute.  And the IRS makes no effort to explain how it would.  Instead, the only potential use of this information would be to help *confirm* already known data or once there are doubts as to who exactly is responsible for a potential tax liability.[10]  At this juncture, there is no basis to seek

---

[10] Any argument that this information is necessary to initially identify a taxpayer is undercut by the IRS's own declaration.  It acknowledges that only Pro accounts require a KYC Questionnaire, yet it does not claim to need this information to identify users at other account levels where it is absent.

this information for thousands of users, including those whose identities and tax liabilities may never be in question.  The IRS merely *hopes* to discover details about these users that *may* help its investigation.  This is not the "narrowly tailored" request 26 U.S.C. § 7609(f) requires.

### 3.     Request No. 2 Would Impose a Significant Burden

Request No. 2 would impose a significant burden on Kraken. ██████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████ While the IRS indicates the request is limited to the users' "responses to the employment, net worth and source of wealth questions" (Third Cincotta Decl. ¶ 127), that assertion fails to appreciate that ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████ This burden far outweighs any claimed benefit to IRS—*particularly* since this data is of no relevance to taxpayer identification in the first instance.

### D.     Request No. 3 for Exception Reports and Investigation Records Similarly Goes Beyond *Coinbase*, Is Irrelevant to the IRS's Purposes, and Unduly Burdensome

### 1.     AML Records Go Farther Than What *Coinbase* Permitted

Request No. 3 for AML "exception reports" and "investigation records" goes far beyond what was permitted in *Coinbase*.  Tellingly, the IRS made the exact same request in its initial summons in *Coinbase*. *Id.* at *1.  But its subsequently narrowed summons, which was ultimately considered in *Coinbase*, did not include that request.  By voluntarily removing this request, the IRS tacitly acknowledged that AML records were not needed for its investigative purpose.  *Coinbase* effectively confirmed that: only requests for basic user information and certain transactional data were relevant, particularly in light of the large number of users covered in the summons.  *Id.* at *6. AML data falls within neither bucket.  And, again, before the IRS can seek additional information

1  outside of those buckets, it must determine that a user has a potentially reportable taxable gain.  The

2  IRS again fails to satisfy this crucial first step.  Yet, it seeks to try again—without explanation as

3  to why it *now* needs this information.  This effort to evade *Coinbase* should be denied.

4          **2.**      **The IRS Fails to Show How AML Exception Reports and Investigation**

5                   **Records Are Relevant to Any Investigative Need and Overbroad**

6        The IRS fails to—and cannot—establish that its request for AML exception reports and

7  investigation records is relevant and narrowly tailored to its investigation, particularly at this stage.

8        Ms. Cincotta first nebulously claims that exception reports would "allow[] the IRS to

9  leverage the industry expertise" of Kraken as to what activities are "abnormal or suspicious"—

10  which she asserts can be combined with (unspecified) "other information available to the IRS" to

11  determine taxpayer compliance.  Third Cincotta Decl. ¶¶ 132-35.  This is nothing more than

12  conclusory rhetoric.  First, the purpose of a John Doe Summons is not to allow the IRS to use

13  private business expertise and funds to expand its reach.  Second, the IRS fails to explain how the

14  existence of an "exception report" or investigation records would even indicate a purpose to escape

15  any tax liability.  The IRS appears to simply *assume*, without basis, that users associated with AML

16  records may not be paying their taxes. ████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████  The

20  existence of AML records for a user does not *per se* suggest any actual or potential failure to comply

21  with tax reporting obligations.  And the Government's conclusory and generalized statements do

22  not make it so.  *See Monumental Life Ins., Co.*, 440 F.3d. at 736 ("mere assertion of relevance" in

23  close cases "will not necessarily satisfy the government's burden" (quoting *Goldman*, 637 F.2d at

24  667)).  What the IRS really appears to do is ask Kraken to conduct its investigation for it.  Not only

25  is it engaged in a fishing expedition, but it wants Kraken to do the fishing.  That is not what a John

26  Doe summons is for; a third party should be required only to produce what is relevant and necessary

27  to the IRS investigation, not to be conscripted into the IRS's service.  *See U.S. v. Matras*, 487 F.2d

28  1271, 1275 (8th Cir. 1973) ("[T]he government should not, for the mere sake of its convenience,

1   impose unnecessary burdens on a taxpayer in conducting an audit or investigation for tax liability,

2   particularly where, as here, there is no indication of a purpose to escape any tax liability.").

3       The only other claimed basis the IRS provides is the conclusory assertion that AML

4   investigative information typically "contains information provided by the user explaining the nature

5   of the questionable activity." Third Cincotta Decl. at ¶ 134. Ms. Cincotta vaguely claims that user

6   explanations for certain transactions could hypothetically check out to be reasonable or consistent

7   with the user's tax returns—in which case the IRS could "avoid unnecessarily examining" that user.

8   *Id.* ¶ 135. But this reasoning is speculative and premature. One must necessarily assume the IRS

9   has already identified a user and potentially taxable gains. Regardless, the purported need for user-

10   provided explanations effectively recasts a request for user correspondence that *Coinbase* expressly

11   rejected. *Id.* at *6 (user correspondence "is not even potentially relevant" without a taxable gain).

12       Moreover, the request for AML records is also manifestly overbroad and far reaching

13   because it is not confined to any relevant time period and is unbounded by any transaction type or

14   amount, like with the KYC data. Consequently, even assuming some minimal benefit is afforded

15   by the time and value limitations in the definition of User" to other requests—that is absent here.

16       Ultimately, this request for AML records—regardless of how immaterial, irrelevant or

17   inconsequential the information to its investigation—simply constitutes a "fishing expedition" and

18   an ill-advised expansion of the IRS's investigative powers. The John Doe Summons should not be

19   used to simply rubberstamp its scorched-earth investigative tactics. *See Coopers & Lybrand*, 550

20   F.2d at 619 ("IRS does not, as it appears to assume on this appeal, have carte blanche discovery.").

21           **3.**     **Complying with Request No. 3 Would Be Unduly Burdensome**

22       The significant burden imposed by this request further counsels against enforcement. ■

23   ████████████████████████████████████████

24   ████████████████████████████████████████

25   ████████████████████████████████████████

26   ████████████████████████████████████████

27   ████████████████████████████████████████

28   ████████████████████████████████

**E.      Request No. 4 for Account Activity Is Overbroad and Unduly Burdensome**

Request No. 4 for all records of user account activity cannot be enforced unless substantially narrowed as it is overbroad and not narrowly tailored to IRS's investigative purpose.  Specifically, it seeks all transactional activity in a user's account *irrespective of time* and encompasses certain information (such as transaction hash and blockchain addresses) that have no bearing on a taxable gain.  Not only is it broader than necessary, but it would be unduly burdensome given its breadth.[11]

*First*, Request No. 4 is overbroad with respect to time as it seeks transactional data that falls outside of the relevant timeframe of the Summons.  As noted above, a "User" is limited to those who conducted transactions through Kraken between January 1, 2016 and December 31, 2020.  Request No. 4 is not so confined.  Instead, it effectively demands production of all transactional records for covered "Users" that Kraken has *ever* had.  This is far too broad.  Here, the IRS's alleged purpose is to investigate the failure to pay taxes on cryptocurrency transactions by Kraken users between 2016-2020.  Transactional information before and after that time frame is necessarily irrelevant unless it has some bearing on determining tax implications of relevant years.  *See, e.g.*, *Zietzke*, 2020 WL 264394, at *9; *Monumental Life Ins. Co.*, 440 F.3d at 736.  The IRS fails to show otherwise.  Given the absence of a date range limitation, this request is overboard.

*Second*, Request No. 4(c) for records reflecting "transaction hash (ID)" and "blockchain addresses" is irrelevant to and overbroad for the IRS's purposes.  The IRS did not ask for transaction hashes in *Coinbase* and does not justify the need for that information here.  As for blockchain addresses, the IRS similarly sought "[a]ll wallet addresses" as part of its requested user identity information in *Coinbase*, but this was rejected.  *Id.* at *7.  The Court expressly held it to be irrelevant and broader than necessary for the IRS's purposes.  *Id.* at *6.  The Court should hold similarly here.

*Third*, complying with the IRS's fulsome request for transactional information would impose a significant burden on Kraken if not substantially narrowed.  As noted above, if left unconstrained by date, Kraken would be forced to produce voluminous transaction records that are irrelevant to any investigation into the relevant tax years.  Indeed, because it is unlimited in time,

---

[11] Should the court reject Kraken's opposition to the Summons in its entirety (§ II, *infra*), Kraken does not raise a burden argument as to the production of its transactional ledgers for identified users, reflecting deposit, withdrawal, and transfer activity, subject to the appropriate narrowing of the scope of a "User," the time frame, and transactional activities at issue (as discussed herein).

Kraken would be required to collect and produce records since an account's inception all the way through the present.  Moreover, a number of sub-requests ██████████████████████████ ████████████████████████████████  With respect to 4(b) and 4(d), ████████████████████████████████████████  With respect to 4(c), "transaction hash (ID)" and "blockchain addresses" for transfers ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████  Complying with these requests would be unduly burdensome.

### F.    The IRS's Request No. 5 for Account Funding Records Is Irrelevant, Broader Than Necessary for Its Purposes, and Burdensome

The final request seeks "all records of account funding," as well as "invoices, billing statements, receipts, or other documents memorializing and describing such transactions."  To be sure, ████████████████████████████████████████████████████  However, insofar as this request seeks records ████████████████ it as overbroad, irrelevant, and would impose an unnecessary burden.

*First*, the request is overbroad as it is unlimited in time and not confined by the time period set forth in the "User" definition.  As with the other indefinite requests, the lack of any date limitations should preclude enforcement.  Without being tied to information relevant to the tax years in dispute, the request is broader than necessary for the IRS's investigation.  *See, e.g.*, *Zietzke*, 2020 WL 264394, at *9; *Monumental Life Ins. Co.*, 440 F.3d at 736.

1   *Second*, account funding records, associated invoices and the like are irrelevant and broader

2   than necessary.   Basic transactional data should be enough to establish whether a potentially

3   reportable gain exists and who is responsible for that gain.  *See Coinbase* at \*7.  The John Doe

4   Summons does not permit the IRS to seek broad swaths of records about all users simply because

5   it wants to make the "most informed" decision on compliance as to some.  Regardless, the detailed

6   records sought here will only substantiate what is already reflected in Kraken's transactional

7   ledgers.  If anything, the IRS's desire to reverse engineer transactions to determine gain and liability

8   will only make its job harder—while Kraken pays the price of that redundant exercise.

9   *Third*, the breadth of the request would impose an unnecessary burden on Kraken.  Kraken

20   This burden is unjustified.[12]

21   ## II.   THE PETITION SHOULD BE DENIED IN ITS ENTIRETY

22   As shown above, the Summons requests are all riddled with the same problems:  they

23   demand information the IRS is not authorized to obtain, are premature, violate user privacy, and

24   will saddle Kraken with an enormous burden, for very little benefit.  Under *Coinbase* and well-

25   established principles governing § 7609(f), these far reaching requests should not be enforced.

26   While the Court could hack away at the IRS's improper Summons and leave it bearing a

27   thousand cuts, this Court should exercise its discretion to deny the IRS's Petition in its entirety.  If

28

---

[12] *See supra* note 11.

*Coinbase* reaffirms any principle, it is that the IRS cannot issue a summons that goes a mile wide and a mile deep in the first instance.  The Summons here plainly demonstrates the IRS's continued failure to recognize that principle.

Indeed, the IRS's purported need is far weaker than its asserted need in *Coinbase*, and certainly does not support the capacious requests made in the Summons.  The IRS still relies on the same general premise that cryptocurrency transactions are underreported.  But its basis for that assertion lies in articles and reports from more than a decade ago (2011 to 2013), and an informal, scientifically unreliable user survey conducted post-2016 from the Motley Fool.  Third Cincotta Decl. ¶¶ 33, 37.  To the contrary, the IRS's own data show that we are no longer in an era where only 800 to 900 returns are reporting cryptocurrency-related gains. *See id.* ¶¶ 37 (842,888 taxpayers reported Bitcoin on their returns).  Undoubtedly, the IRS will assert in its reply that if the Summons is overbroad, the Court, at most, should simply narrow the scope of the Summons rather than reject it.  But while the Court may narrow the Summons in its discretion, this approach should not be permitted.  Given the stunning overbreadth of the Summons and the poor foundation to support it, and the IRS's apparent failure to respect the lessons taught by *Coinbase*, this Court should deny the Petition in its entirety, rather than trying to remedy the numerous faults with the Summons.

## CONCLUSION

For the foregoing reasons, Kraken respectfully requests that the Court deny the IRS's Petition to Enforce its Summons.

Respectfully submitted,

Dated: April 21, 2023

By: */s/ Grant P. Fondo*
GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
AMANDA H. RUSSO (SBN 319617)
*ARusso@goodwinlaw.com*
**GOODWIN PROCTER** LLP

Attorneys for Respondent
PAYWARD VENTURES, INC., d/b/a
KRAKEN OR KRAKEN.COM