Pages 1-69

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Joseph C. Spero,
United States Chief Magistrate Judge

UNITED STATES OF AMERICA,   )
                          )
      Plaintiff,    )
                          )
    vs.            )   **Case No. 3:23-MC-80029-JCS**
                          )
PAYWARD VENTURES, INC.,   )
                          )
      Defendants.   )
_____)

San Francisco, California
Friday, June 9, 2023

**TRANSCRIPT OF REMOTE PROCEEDINGS**
**HEARING ON PETITION TO ENFORCE SUMMONS**
**AND ORDER TO SHOW CAUSE**

**APPEARANCES ON THE NEXT PAGE.**

TRANSCRIPTION SERVICE BY:

Dipti Patel, CET-997
Liberty Transcripts
7306 Danwood Drive
Austin, Texas 78759
(847) 848-4907

2

**APPEARANCES VIA ZOOM VIDEOCONFERENCE:**

For the Plaintiff:
>                         UNITED STATES DEPARTMENT OF JUSTICE
>                         1275 1st Street NE, Room 9110
>                         Washington, D.C. 20002
>                   **BY: AMY MATCHISON, ATTORNEY AT LAW**

For the Defendants:
>                         GOODWIN & PROCTER LLP
>                         601 Marshall Street
>                         Redwood City, California 94063
>                   **BY: GRANT P. FONDO, ATTORNEY AT LAW**

>                         GOODWIN & PROCTER LLP
>                         601 South Figueroa Street, Suite 4100
>                         Los Angeles, California 90017
>                   **BY: AMANDA RUSSO, ATTORNEY AT LAW**

3

| | |
|---|---|
| 1 | **<u>Friday - June 9, 2023</u>**                     **<u>9:43 a.m.</u>** |

1      **<u>Friday - June 9, 2023</u>**                     **<u>9:43 a.m.</u>**

2                  **<u>P R O C E E D I N G S</u>**

3                      ---oOo---

4      **THE CLERK:**  The next matter we're calling is 23-MC-80029,

5 United States of America versus Payward Ventures.  Counsel,

6 could you please raise your hands?  Judge, I have one more,

7 Ms. Russo.  There we go.

8      Good morning.  Appearances, please, first starting with

9 the Government, and then the defendant.

10      **MS. MATCHISON:**  Good morning, Your Honor.  Amy Matchison

11 for the United States.

12      **THE COURT:**  Good morning.

13      **MR. FONDO:**  Good morning, Your Honor.  Grant Fondo for

14 Payward.

15      **THE COURT:**  Good morning.

16      **MS. RUSSO:**  Good morning, Your Honor.  Amanda Russo for

17 Payward Ventures, as well.

18      **THE COURT:**  Good morning.  Good morning, and thank you

19 all for the briefing in this case.  I think the next time I do

20 it, I'll change the order of the briefing.  But I think we got

21 to the place where we can have a good discussion about it.

22      As you'll see from my questions, I'm puzzled about pieces

23 of this, and this application, and fairly clear on others.

24 But to start with something elementary because I think I need

25 to do it as a predicate is the motion to seal, motions to

4

1   seal, Dockets 29 and 26.

2        The only support I have for the motion to seal is a

3   conclusory declaration by Counsel that there's an increased

4   security risk in Counsel's understanding.  I will note that in

5   the Coinbase case, there was no motion to seal.  I'm inclined

6   to deny the motion to seal unless there's -- unless you can

7   convince me that there's a really good reason why the things

8   that you want sealed are sealed.

9        At this stage in the case, it has to be a compelling

10  reason because this is a dispositive motion.  And it just

11  seemed to me, in just looking through it, I didn't really

12  understand what the compelling reason was looking through it

13  just from what I know about the procedures of these companies.

14       But I wanted to give you a chance now to try to convince

15  me that there was a good reason to seal.  And so you can, if

16  you would like to.

17       **MS. RUSSO:**  Your Honor, this is Amanda Russo on behalf of

18  Payward Ventures.  The one thing we would highlight for the

19  Court is the fact that cyber security risk has been viewed in

20  this court and other courts as a compelling reason justifying

21  sealing.

22       And particularly in cases like this involving

23  cryptocurrency, exchanges or companies, there's an increased

24  risk or more significant consequences that might result from a

25  cyber security risk.  In this case, you know, you're not just

1    inviting cyber securities to steal personal information or

2    credit card numbers or Social Security numbers, but rather

3    there's an added risk and a more significant risk that those

4    cyber security hackers could in fact actually transfer assets,

5    additional assets to themselves or others.

6        So for that reason, we would just -- we wanted to flag

7    that further reason and stress the importance of the sealing

8    of this information relating to the IT capabilities and

9    functionality.

10   **THE COURT:**  So that's not an adequate reason by itself.

11   It is the first line in a three-page explanation of the

12   details of why there is a particular risk in this case because

13   what you're saying is any case, all information in any case

14   regarding a cryptocurrency exchange has to be put under seal,

15   all of it because it's the cryptocurrency exchange, all

16   information regarding Bank of America, any time I have a Bank

17   of America case.

18       The question is whether or not there are particular

19   things that are being disclosed in this case that present a

20   compelling reason to seal.  And so it is the same as the

21   declaration.

22       So unless you can come up with an explanation of why

23   particular things, not any time we deal with a cryptocurrency

24   exchange, any time we deal with taxes, any time we deal with

25   something that can be transferred.  You know, it's not

6

1    adequate.  So I don't know exactly how you want to proceed on

2    that.  But if that's the entirety of the explanation, I would

3    deny the motion to seal.

4        **MS. RUSSO:**  Understood, Your Honor.  And in this case,

5    we're specifically seeking to seal very limited actually

6    information relating to their IT processes.  And the storage

7    of that information within Kraken's systems, and Kraken's

8    ability to actually analyze and pull that information.

9        So for instance, whether or not data's encrypted or not

10   encrypted in a certain scenario, whether or not they're

11   capable of searching for various pieces of data within their

12   systems which indicates to a third party potentially where

13   those data are located within Kraken's internal systems.

14       And so here, we're just focused on the IT processes and

15   capabilities within Kraken which are proprietary to Kraken and

16   confidential and not shared publicly with the outside.

17       **THE COURT:**  Okay.  That's not adequate on its face.

18   You're going to need to do more.  I'll give you an opportunity

19   to do more if you want.  And you will have to go line by line,

20   entry by entry through everything you want redacted from the

21   public record to say why that particular information will

22   result in a particular increased cybersecurity risk.

23       And it's got to be -- and it can't be your declaration or

24   your argument.  It has to be an internal security person who

25   knows the systems and is an expert on it, or your external

7

1      expert or whatever it is.  It's got to be an expert describing

2      exactly what the language is in the brief and tracing why it

3      presents a security risk.

4          And I know that, you know, why in the Coinbase matter

5      didn't you move to seal anything there?  I mean that, I think,

6      was this firm's case.  But as I recall, why didn't you move to

7      seal anything in the Coinbase matter?  It was the same issue?

8          **MR. FONDO:**  Your Honor, this is Grant Fondo for Payward

9      Ventures.  I'm happy to address that if you --

10         **THE COURT:**  Yeah, would you?

11         **MR. FONDO:**  Yeah.  So one is I don't have a definitive

12     answer.  It was a long time ago.  And, you know, every client

13     is different, the information that's being provided is

14     different.

15         So what I would say is I understand Your Honor's concern

16     or question as to why wasn't it sealed then.  But it's a

17     different time, different client, different -- some different

18     information being provided.

19         **THE COURT:**  Okay.  Well, it's -- I'm --

20         **MR. FONDO:**  Maybe (indiscernible), but --

21         **THE COURT:**  Sure.  No, go ahead.  I mean, maybe, maybe

22     not.  I don't know.  But I'll give you an opportunity to

23     supplement.  When did you want to provide the supplemental

24     affidavit about this interest?

25         **MS. RUSSO:**  Would a week from today, Your Honor, work?

1    **THE COURT:** Sure. Yeah. Okay. And that was the easy

2    questions. So this is really a question for Kraken again. So

3    the registration and verification requirements when somebody

4    signs up for an account, are those the same for the express

5    account as the starter account, because I didn't see

6    particular references to the express account which seems to be

7    an, and I don't know the differences, but a slightly different

8    level of account than the starter account.

9    **MR. FONDO:** Sure, Your Honor. So one, the differences in

10   the accounts are based on jurisdictional issues more than

11   certain practical issues. As to the starter account, all of

12   them that they have starter or express have the email, full

13   name, date of birth, phone number, physical address,

14   generally.

15   The express, and some of this varies depending on

16   the time period. But the express also does have occupational

17   information and Social Security IDs as well, more recently.

18   **THE COURT:** When was that? So through the entire period,

19   they have that basic information you talk about, name,

20   address, email address, that sort of thing. At some point,

21   you're saying express added a Social Security and occupation.

22   **MR. FONDO:** Correct.

23   **THE COURT:** And when was that?

24   **MR. FONDO:** I'm not certain as to the exact time, Your

25   Honor.

9

1          **THE COURT:**  But during the summons period, later in the

2     summons period?  Is that what you're saying?

3          **MR. FONDO:**  That's my rough understanding.  Correct, Your

4     Honor.

5          **THE COURT:**  Okay.  And so for -- but as I understand it,

6     for the entire summons period, Kraken collected taxpayer IDs

7     for all of the intermediate and the Pro accounts.  Is that --

8          **MR. FONDO:**  Just since --

9          **THE COURT:**  Go ahead.

10          **MR. FONDO:**  Sorry.  Yeah, since 2019 they did.

11          **THE COURT:**  So only since -- remind me when the summons

12     period begins.

13          **MR. FONDO:**  2016 through 2021.

14          **THE COURT:**  Okay.  So you don't have taxpayer ID, is it

15     January 1, 2019, or what period?  Do you know when?

16          **MR. FONDO:**  I'm not certain within the year 2019.

17          **THE COURT:**  Okay.  Okay, because that will have

18     implications for what we're going to talk about later.  I

19     found the Coinbase decision interesting.  You know, I respect

20     that judge in particular a lot.

21          But it's a particular decision at a particular time in a

22     particular context.  And so I'm not -- I don't feel bound by

23     it.  As I understand it, in terms of the Powell (phonetic)

24     factors, and I don't think anyone disputes this but speak up

25     if you do, there are really only two factors at issue, the

1    legitimate purpose and the relevancy factors.

2         I sweep into those the issue of whether it's a narrowly-

3    tailored under that section, statute that applies to John Doe

4    summonses.  But, and the first thing I wanted to talk to you

5    about is one that I'm, I think, legitimately confused about.

6    And I think its, I don't know if it falls under legitimate

7    purpose or falls under relevancy.

8         But the issue, and I'll just ramble on for a little bit

9    and then you can respond, is this.  What is necessary in the

10   context of a group John Doe summons, which is this, you know,

11   seeking information on a group of taxpayers from a provider.

12   What is necessary to show that there is a non-speculative

13   basis for believing that the information sought will shed

14   light on whether there's a failure to comply with the law.

15        And you know, there's so many parts to that.  What is the

16   particular -- what does the showing have to be in terms of the

17   kind of particular failure to comply with the law.  Does the

18   showing have to be as to the group?  It's on the first one,

19   question about the showing about a particular in the Coinbase,

20   United States kind of lasered in on a particular failure to

21   pay tax on gain.

22        And from that, one could -- and it presented specifically

23   evidence on the failure of people on the cryptocurrency

24   exchange to report capital gains based on purchase and sale of

25   the crypto assets.  And that led the judge to conclude, so in

1    terms of figuring out what is a reasonable, non-speculative

2    bases, and going from that to the scope.

3         So there was -- once there was a taxpayer ID and once all

4    the transactions were disclosed, United States had -- could

5    have enough information to laser in on particular taxpayers

6    and perhaps issue further subpoenas.  But that there was a

7    particular showing about the failure of this group to do -- to

8    report capital gains, and why there might be gains on these

9    transactions.

10        On the other hand, in this case the United States is

11   giving I think a much more general description, a laundry list

12   of potential.  I don't mean that necessarily as a criticism,

13   but a lot of potential violations without any particular

14   showing aimed at showing this group of taxpayers is likely to

15   commit those particular violations.

16        You know, it strikes me this is like -- one argument is

17   that doing a laundry list of violations without showing

18   anything in particular about this group of taxpayers as to

19   those particular violations other than saying well, this group

20   -- well, there's two things about it.  One is I'm not sure

21   whether it is adequate to show a realistic, non-speculative

22   basis with respect to a group to get all their personal

23   information to say that this group is more likely to commit

24   Internal Revenue code violations.  So that's a fundamental

25   question.

1    And the way I think about it, you know, because I'm old

2    and I'm trying to ground myself in something I'm much more

3    familiar with, is you know, if it's much more likely that the

4    taxpayers in a particular area code, particular zip code are

5    likely to commit tax violations, you could probably figure

6    that out.  You know, just go to a neighborhood, figure out the

7    wealth factor in the neighborhood, figure out how many people

8    actually filed tax returns in the neighborhood, and draw an

9    inference in relationship to the tax filing rates in other

10   neighborhoods as to whether a particular neighborhood is much

11   more likely to commit Internal Revenue code violations.

12   Or people using a particular bank, you could probably get

13   information that would say that taxpayers using a particular

14   bank are more likely to commit Internal Revenue code

15   violation.  And this is -- some of this information, because

16   it's not very particularized, is like that.  You know?

17   Few people declare cryptocurrency assets on their tax

18   returns.  I mean, that's the gist of the IRS's showing here.

19   And my fundamental question is whether that's adequate.  You

20   know, it is -- it strikes me as a little bit of saying well,

21   you know, the people live in this particular town aren't

22   filing their tax returns at the same rate, in fact a tenth of

23   the rate of some other town, but there's a lot of income in

24   that town.

25   So give us the information on everybody in that town.  I

1    want taxpayer IDs, I want to know whoever it is.  And so I'm

2    going to subpoena City Hall or subpoena a bank in that

3    neighborhood.

4        So I'm a little concerned that this is just, you know,

5    while there is the John Doe summons that Congress authorized,

6    and the Powell test in the context of a group is a different

7    animal.  And so my fundamental question that I want to talk to

8    you about is that one.

9        You know, and then if it's -- and another way of thinking

10   about it is if you can apply it to a group, what does it mean.

11   Does it mean that there's a -- if it's likely that someone in

12   the group committed a violation, I mean, you've got 59,000 or

13   56,000 taxpayers subject to the current subpoena.

14       It's nearly 100 percent likely that someone in that

15   56,000 committed an Internal Revenue code violation.  My guess

16   is if you subpoenaed 56,000 people anywhere, it's nearly 100

17   percent likely that there's an Internal Revenue code violation

18   in that 56,000.  I'd be very interested in what the overall

19   rate is of violation when you do these sorts of subpoenas.

20       But is that the test, that if there's anyone in the

21   group?  Or does it have to be something much more substantial

22   than that?

23       And then finally, in the course of answering this

24   question, I really would like to know from the service what is

25   the focus of this investigation.  What is the violation or

1    violations that they are really focusing on, and what is the

2    evidence that the group as a whole is likely to have committed

3    those violations.

4         So that's my -- it's the beginning of the relevancy, but

5    it's more, it's focused also on whether there's a legitimate

6    purpose because you know, but I'm wondering under either

7    standard why -- whether we're -- what's necessary to show that

8    there's a realistic, non-speculative basis for leaving the

9    information that will shed light on violations in the context

10   of a group summons like that.

11        It's not, I mean, I know people have enforced these.

12   Judge Corely did, others have.  Few of them have been

13   contested the way the ones, Coinbase and this one have.  But I

14   just, I haven't seen a satisfactory explanation for why it

15   actually works in this context.

16        So I think I'll start with the service on this question

17   because it's your burden, and I'm interested in what you think

18   about it.

19        **MS. MATCHISON:**  Thank you, Your Honor.  I think I'll

20   first start with, you know, John Doe summonses aren't a

21   frequent vehicle device seen by courts.  And so I'm going to

22   go ahead and take it apart a little bit.

23        So before the IRS can issue a John Doe summons, we have

24   to apply to a district court to review our ex-parte

25   application to make several determinations.  And there's

1    currently four.  There used to be three, but now there's four.

2        And those determinations are whether first, the summons

3    relates to the investigation of an ascertainable group or

4    class, meaning can we identify a class.  Second, that there is

5    a reasonable basis for believing that U.S. persons who

6    conducted such transactions failed or may have failed to

7    report income to the IRS.

8        The third is whether or not the information is readily

9    available to the IRS.  And a fourth one is the new requirement

10   that was added after Coinbase which is that the summons

11   requests need to be narrowly tailored.

12       And it seems to me some of your questions are hitting on

13   that second prong there, which is whether or not there's a

14   reasonable basis for believing that U.S. persons may have

15   failed to report income, essentially.  The first thing I will

16   say is this, is that the jurisprudence is clear that once the

17   Court has made a determination on the ex-parte application,

18   that those factors cannot later be challenged in an

19   enforcement proceeding.

20       **THE COURT:**  So I take you out on that.  In this case, I

21   reserved on that.  So whatever the jurisprudence is, I

22   specifically carved it out in my order.  Now, maybe that means

23   you have an improper order and we go back to square one, and

24   I'll reissue the summons after a contested proceeding.  In

25   fact, I was tempted to do that in the first instance.  But

1    instead, I just reserved on that.

2        So whatever the jurisprudence is, and I actually think

3    you're incorrect on the jurisprudence, but we don't need to

4    get into it, I reserved on that.  So I'm going to decide those

5    issues.

6        **MS. MATCHISON:**  Okay.

7        **THE COURT:**  So let's move on to what does it mean that

8    you have a reasonable basis in the group context.

9        **MS. MATCHISON:**  What it means, Your Honor, is that the

10   IRS has identified a compliance problem.  And certainly, the

11   IRS has not identified a compliance problem with every one of

12   the what we now know to be 50,000-some individuals that are in

13   the John Doe group.

14       But what the IRS has done is identified that in the area

15   of cryptocurrency, for various reasons, cryptocurrency is

16   being under reported to the IRS.  How did the IRS establish

17   this, how did they discover this?

18       Well, they did look at tax return information and they

19   determined that based upon what they saw in the market and

20   what the numbers were from the exchanges and what the numbers

21   were being touted in the press, that cryptocurrency activity

22   was being grossly under reported, or at least it seemed so.  I

23   know there's some list statistics, you've seen them in the

24   papers.

25       **THE COURT:**  So why is that enough?  Why is that enough?

1    My example of, you know, the people who live in a particular

2    wealthy community under report at rate that's a report or file

3    tax returns, it's a rate of ten percent of what you would

4    like.

5         Now, why isn't this, you know, those sort of overarching

6    things about an industry?  What does that got to do with this

7    is the particular, I mean, first of all, this isn't -- you

8    haven't subpoenaed the industry, nor could you.  This isn't a

9    subpoena to a particular group of taxpayers, number one.

10        And I'm not sure that just showing the industry under

11   reports at a particular rate means that is sufficient.  That's

12   question number one.  Number two is that why isn't this like

13   going after a town?  You know?  This particular group is in a

14   -- under reports because they are in a town that under

15   reports.

16        And so it is because the town under reports, we get

17   everybody in the town's individual private information, banks,

18   you know, all that sort of thing.  So you understand my point,

19   I'm sure.

20        **MS. MATCHISON:**  Yes, Your Honor.  And I would go back to

21   it's not just the tax return information.  The IRS has also

22   identified that in general, when there's no third-party

23   reporting requirement involved, that taxpayers under report.

24   And that's been seen over a various number of industries, not

25   just certainly this one.  But that's another piece of

1    information that the IRS brings in identifying this compliance

2    problem.

3         I think to your example of why not just, you know,

4    summons an entire townspeople, you know, everybody in a town

5    may not be engaged in the same financial activity that has

6    been identified as having suffering from a compliance problem.

7    And we're not saying everyone's trying to evade tax that's --

8         **THE COURT:**  Well, and so banks, I mean, you know, there's

9    going to be some group like what I'm talking about.  It may be

10   a town.  It may be that there's similar enough financial

11   activity within a town.

12        But everybody who banks within a particular bank and

13   withdraws and deposits money in a particular bank, and we know

14   that there's a compliance problem with people who actually put

15   their money in this particular bank.  Or I'm just wondering

16   why it is because all of your stats are very high level.  They

17   are industry level.  They're not this particular group of

18   Kraken customers.

19        **MS. MATCHISON:**  Sure.  I'll --

20        **THE COURT:**  It's just the industry.  And so if you have

21   an industry, what you're saying I guess is if you have an

22   industry where there's -- it looks like from 40,000 feet

23   there's a compliance problem, and you -- therefore you can get

24   the detailed information that you get in a John Doe summons

25   from anybody who participates in that industry, right?

1      **MS. MATCHISON:**  I mean, historically the John Doe

2  summonses have operated in that way.  I would add a couple of

3  other things, Your Honor.  John Doe --

4      **THE COURT:**  That's not my question.  My question is --

5  historically is historically.  Yes, I understand they've been

6  enforced that way.  What's the legal justification for

7  applying this, the test that is laid out by the Ninth Circuit

8  and by the statutes for that way of approaching it?  Because

9  you participate in an industry where there's under reporting,

10  we get all your stuff.

11      **MS. MATCHISON:**  I believe that's in the statute, Your

12  Honor.  That's the John Doe summons statute.  That's what

13  Congress has decided is the IRS's mechanism to deal with

14  problems like this.

15      **THE COURT:**  No, it's not.

16      **MS. MATCHISON:**  And I would add that --

17      **THE COURT:**  It's not.  It's not.  It's not because that's

18  too high-level.  Again, because you're ignoring the question

19  that you posed.  What in this context is necessary to show a

20  reasonable basis in the group context.  That's part number

21  two.  Why is it necessary.  Why is it just anybody who

22  participates in this industry?

23      **MS. MATCHISON:**  Your Honor, I have a few other things.

24  First, the banks are subject to reporting requirements.  So

25  the IRS does get information from banks.  IRS also does use

20

1    John Doe summonses to banks.

2        But I would like to go back to the regional basis.  First

3    of all, we have -- in addition to the tax return data and the

4    third-party reporting problems, we have the results from

5    Coinbase, the results from Coinbase that indicated that there

6    actually was under reporting, and that some people, for

7    various reasons, did fail to properly comply with the Internal

8    Revenue laws.

9        And then I think fourth is in the original ex-parte

10   application and supporting declaration, I believe there were

11   five examples specific to Kraken of Kraken users.  Now, I

12   understand 5 is not 50-some thousand.  But there were specific

13   examples of people who were using Kraken services who had

14   either failed to report income or failed to report

15   cryptocurrency gains, something along those lines.

16       And so certainly, Your Honor, there is not an individual

17   piece of information or knowledge on the part of the IRS about

18   all some 50,000 John Doe class members here.  However, all of

19   those -- all of that information about the compliance problem

20   that led the IRS to conclude there was in fact a compliance

21   problem as it relates to cryptocurrency came from all these

22   various factors.

23       **THE COURT:**  Okay.  So can you cite to me the five

24   examples?  I mean, I just need a record cite so I can look at

25   this.  And I'm not --

1      **MS. MATCHISON:**  That would have been in the ex-parte

2   action.

3      **THE COURT:**  Sure.  If you could just give me a docket

4   number.

5      **MS. MATCHISON:**  Yeah.  So it would be Docket I think it's

6   1-2.  Let me get to that.  Let me see if I can get those

7   paragraphs for you, Your Honor.

8      **THE COURT:**  Great.

9      **MS. MATCHISON:**  I believe it's Paragraphs 70 through 74.

10      **THE COURT:**  Whose declaration is this?

11      **MS. MATCHISON:**  This is, I'm sorry, it's the declaration

12   of Karen Cincotta in support of the ex-parte application.

13      **THE COURT:**  Okay.

14      **MS. MATCHISON:**  And there's also two additional examples

15   from criminal cases included at Exhibit, I'm sorry, included

16   at Paragraph 76 and 77.

17      **THE COURT:**  Criminal cases involving Kraken users?

18      **MS. MATCHISON:**  That's correct.

19      **THE COURT:**  Okay.  Well, let me get Kraken to respond to

20   what you said because we are talking about sort of basic level

21   stuff.

22      Why isn't it enough that we know there's a massive under

23   reporting problem of cryptocurrency transactions that the

24   experience when we actually go through, when the IRS actually

25   goes through with one of these demonstrates the truth of that

1    with respect to Coinbase, that there are some examples in

2    specific with respect to Kraken.  What, why isn't that enough,

3    and how could the IRS possibly get anything more than that

4    before issuing the summons?

5         **MR. FONDO:**  Your Honor, a couple points.  One is to your

6    point.  This is a vast net that connects 59,000 users.  So it

7    would not be surprising, I don't know what the national

8    statistics are failure to pay income tax, but it would not be

9    surprising that a percentage of those people do not pay taxes.

10        And I think that goes to the narrower point.  You can't

11   just bring in a big net and just grab everything because

12   there's going to be a few in there or a percentage in there.

13   Nor have they identified why Kraken is different than the

14   industry.  And in fact, there are different aspects of this

15   industry.  So there's not --

16        **THE COURT:**  Well, this is -- but you're under playing

17   what they say.  What they say is there's nearly 100 percent

18   non-reporting.  You know, out of millions and millions of

19   transactions, of taxpayers involved in these things, and

20   billions of dollars as an industry, the amount of reporting is

21   fewer than, you know, in some years it's been, pre-Coinbase,

22   fewer than 10,000 or fewer than 20,000 taxpayers, still under

23   a million taxpayers despite many, many, many, many millions of

24   dollars of transactions in these which resulted in something.

25        And no reporting, not even -- it's not a matter of

1    whether there's income.  It's a matter of whether there's

2    reporting even.  And so it's not -- you under play the

3    results.  It's dramatic.  It's not like some, you know, the

4    IRS can show that 28 percent or 42 percent of taxpayers don't

5    file tax returns.

6         This is, you know, in some years nearly 100 percent.  In

7    other years less than 100 percent, but dramatic.  So it's --

8    why isn't that a sufficient inference that it -- that most of

9    the group or a lot of the group, not just five examples, it's

10   a reasonable inference that this will bear on a potential

11   violation because they don't have to show a violation.  They

12   just have to show some non-speculative basis.  And why doesn't

13   that show a non-speculative basis.  That's the question.

14        **MR. FONDO:**  Your Honor, a couple points.  So one, those

15   numbers have changed over time.  So when the Coinbase decision

16   was being made, those numbers were much less.  They just,

17   according to the IRS's own numbers, the filing of tax returns

18   on crypto has increased over time.

19        **THE COURT:**  To what in terms of -- I mean, how many

20   people engage in buying and selling of crypto assets, I guess

21   selling is the key, in a given year?  How many people, 50

22   million, 100 million, 75 million?

23        **MR. FONDO:**  Yeah.  I don't --

24        **THE COURT:**  Certainly tens of millions.  Eight hundred

25   thousand declared at the highest number, or nine hundred

1     thousand declared something about crypto on their tax returns.

2     Isn't that still a very small percentage of the number of

3     people who actually engage in the industry from a U.S.

4     taxpayer's perspective, I suppose, in buying and selling of

5     crypto assets?

6          **MR. FONDO:**  So one, I would say that is a number that

7     goes across all aspects of buying and selling crypto.  It does

8     not go across as to exchanges.  So exchanges, people are going

9     -- because you can by and sell crypto assets without going

10    through an exchange.

11         **THE COURT:**  What percentage of crypto assets go through

12    exchanges --

13         **MR. FONDO:**  I don't know.

14         **THE COURT:**  -- in terms of buying and selling?  Well,

15    okay.  Is there any evidence that a significant portion don't

16    go through exchanges, because the instinct would be that most

17    of them would go through exchanges, in terms of numbers of

18    transactions, at least.

19         **MR. FONDO:**  So I would do two things.  One, number of

20    transactions and volume because obviously the industry has

21    certain players that are much higher in volume and take up a

22    large volume.  So, Your Honor, I honestly don't know, and I

23    wouldn't want to speculate.

24         I would say this is an industry where one of the

25    government, meaning other branches of the government,

1    concluded -- are concerned that there are private transactions

2    that are not going on exchanges.  I don't have an estimate for

3    Your Honor as to what percentage go through exchanges or go

4    through -- versus private transactions that are not on one of

5    the major exchanges.

6         **THE COURT:**  Okay.  But we do know that there are, you

7    know, quite literally hundreds of millions of transactions

8    each year that go through exchanges, right?

9         **MR. FONDO:**  Correct.  But again, one person can do a, you

10   know, 100,000 transactions if it's a hedge fund or a day

11   trader, things like that.

12        **THE COURT:**  So do you have evidence that it is a

13   materially smaller number of individual taxpayers who are

14   engaging these traders, these exchanges, purchase and selling

15   of cryptocurrency, such that if the 800 or 900,000 taxpayers

16   who actually declared it on their tax returns is significant?

17   Do you have any evidence about what you're saying?

18        **MR. FONDO:**  No.  I do not have the percentages, Your

19   Honor.  What I can say is that for example just on the Kraken

20   exchange, there are different categories of users based on

21   different accounts.  And I think there's an over-

22   generalization as so we take the starter ones or the express,

23   are they more likely or less likely to not pay taxes than say

24   the Pro which are businesses and tend to generate a lot more

25   transactions.  And I --

1    **THE COURT:**  Are all Pros businesses?  Pros are both

2    businesses and individuals.

3    **MR. FONDO:**  Your Honor, Pro is business.  It can be

4    business and individuals, correct.  But usually the

5    individuals are people who tend -- it's higher net worth

6    people who tend to do more transactions.

7    **THE COURT:**  Okay.

8    **MR. FONDO:**  The other thing I would say, Your Honor, as

9    part of this analysis is, you know, that fourth factor under

10   the statute says narrow.  So again, it goes to the net

11   example.

12   So even if you can establish that there is some suspicion

13   that this particular either industry which I caution you on in

14   the -- not caution, just say I think we have to be careful

15   about because when you look at the McGee decision as well as

16   the Humble Oil decision, slightly different factually,

17   admittedly.  But they talk about why are these types of

18   individuals at this company more likely than anybody else that

19   owns an oil (indiscernible) for example, not to pay taxes.

20   And I don't think that IRS has necessarily identified that.

21   **THE COURT:**  Can I --

22   **MR. FONDO:**  But what I would also --

23   **THE COURT:**  Before you get to the narrow one, talk about

24   the Coinbase results.  So we have an example, a real world

25   example of an exchange.  It was several years ago.  So there's

27

1    that, and I'll grant you that.

2         But what we have from the Coinbase results is there was,

3    as a result of that, many, many, many taxpayers who, according

4    to Counsel, didn't report when they had to.  What about -- so

5    you're probably familiar with the Coinbase results.  Maybe you

6    aren't.  Why isn't that another data point, at least, on why

7    it makes sense to infer with respect to exchanges that there's

8    a significant portion of their customers are not reporting?

9         **MR. FONDO:**  So one, I would say, Your Honor, that was,

10   that time period took place at a nascent stage in this

11   industry when there was lots of discussion about whether, or

12   was there any obligation to pay taxes at that point.  Clearly,

13   that has changed, and sort of the regulatory oversight over

14   the industry has changed.

15        So I think in a rapidly-evolving industry, in a rapidly-

16   evolving regulatory environment, I think it is harder to make

17   that comparison when you go back to what was really the

18   beginning stages of the industry.  And so I think even the

19   IRS's numbers show that compliance has gone up over time.

20        **THE COURT:**  Okay.  Okay.  So, go on.  You were going to

21   talk about the narrow, the factor I've narrowly drawn.

22        **MR. FONDO:**  Yeah.  The other thing I would say is that

23   not only do you have the Powell factors in the narrow.  So

24   what we would argue is yes, if you bring this net through,

25   you're going to grab some people that did not pay their taxes.

1    We don't dispute that.  I'm sure they will, they will find

2    some.

3        The question is, is it narrowly tailored to the types of

4    people that may not pay their taxes versus just everybody.

5    And what I would say is I don't think they have met that

6    burden when they are sweeping in 59,000 users.  In addition,

7    under the Coopers and Livern (phonetic) case, the summons is

8    deemed unreasonable if it's overbroad and disproportionate to

9    the end sought.

10       So in that context, too, 59,000 users, how many are you

11   going to get.  How much, you know, are these low users, are

12   they big users.  You look at the numbers.  Many of the users

13   are smaller users.  What percentage of those don't pay taxes

14   verus the larger users.

15       The IRS hasn't identified that.  So they've taken

16   every --

17       **THE COURT:**  So it's not just -- let's focus on reporting

18   because paying taxes depends on the results.

19       **MR. FONDO:**  Fair enough, Your Honor.

20       **THE COURT:**  But as long as there's any gain, a dollar or

21   a million dollars, there's a reporting obligation.  So what

22   you're saying is there's no differentiation among users in

23   terms of whether or not they're likely to have transaction

24   resulting in gain?

25       **MR. FONDO:**  Correct, Your Honor.  And frankly, a gain

1    that the IRS would go after.  I mean, I don't -- you know,

2    there's a reason --

3        THE COURT:  Well, but that's up to them.  I mean, we can

4    talk about whether some of this stuff is overbroad.  But in

5    general, that's up to them, right?  I mean, if they had the

6    resources, they could go after anybody.

7        MR. FONDO:  Yes, that is up to them.  But I'm being

8    practical, too, particularly when you're looking at the

9    burden.  Like, so I think if you ask -- like, is it fair to

10   have Kraken turn over all this information on users that they

11   will not go after?  I would say no.  Now, I realize they will

12   not make --

13       THE COURT:  See, that fits for me in a different bucket.

14   I think it's fair for them to examine anyone who they have a

15   reasonable basis for believing might not be complying with the

16   Internal Revenue code.  Whether I like it or not, it's

17   permitted.

18       The question is whether or not, and it really goes to

19   legitimate purpose.  If they get all this data and they can't

20   possibly use it because it's too much, I mean, this goes to

21   the IP address history, it seems really unlikely they're going

22   to go through the IP address history of 59,000 people.  They

23   don't have the people power to do that, or other things that

24   they're asking for.

25       Does that bear on legitimate purpose?  And maybe at some

1    point we can ask the service to respond to that.  But I think

2    that they're allowed to, just as a legal matter, they're

3    allowed to, you know, investigate anyone who they reasonably

4    believe is not reporting, even if it's a small taxpayer.

5        It's, you know, they have their priorities.  And the

6    priorities don't necessary include those kinds of individuals.

7    And I think that makes sense from a policy perspective.  From

8    a legal perspective, it's up to them.

9        **MR. FONDO:**  Well, if I could address that, Your Honor.

10        **THE COURT:**  Yes.

11        **MR. FONDO:**  I think the Court just said maybe not.  And

12   what I mean by that is if you look at the <u>Humble Oil</u> decision,

13   information sought by a summons can be relevant and material,

14   which is what you've just identified, but yet so burdensome to

15   produce that enforcement should be denied.  Likewise, the

16   disproportionate standard which is related in the <u>Coopers</u>

17   matter.

18        So what I would say to you, Your Honor, is that if -- I

19   don't know what the IRS standards are, just like every federal

20   criminal district has standards about what they will and will

21   not prosecute.  I don't know what the IRS standards are.  But

22   if there are standards that they would not likely seek

23   information, and this information is burdensome, et cetera, I

24   would argue that's disproportionate.

25        **THE COURT:**  See, I don't -- well, I mean, I guess if you

1    could show that they won't be using it for a proper purpose,

2    that is to say they're just grabbing it and they're not going

3    to use it, that that would question the legitimacy of that

4    portion of the investigation.  I guess that's what -- is that

5    essentially what you're saying?

6         **MR. FONDO:**  Yes, Your Honor.

7         **THE COURT:**  Okay.

8         **MR. FONDO:**  As to your specific question.  I would still

9    argue that there is disproportionality even to the users that

10   they might go after.  But that's to address your specific

11   question.

12        **THE COURT:**  Understood.  Understood, understood.  Well,

13   maybe I should go back to -- did you want to say something

14   else?  I want to get a response from the service on this.  But

15   do you want to say something else on this general area we're

16   talking about?

17        **MR. FONDO:**  No, Your Honor.

18        **THE COURT:**  Okay.  Maybe I could hear from Counsel for

19   the Government in response to those points, and particularly

20   the last point, that there's no differentiation, no narrowing

21   to -- no differentiation between users that are likely to not

22   report from those who are not likely -- are likely to report,

23   not unlikely to report.  And that runs afoul of the

24   requirement, the disproportionality or the narrowing

25   requirements in that -- number one.

1    And number two, I'd like you to respond to the Coinbase

2    point, that that was a long time ago when this industry was at

3    the very beginning when everybody was trying to figure out

4    everything, it's a tiny fraction of the volume back then.  You

5    know, I was surprised that the, I mean, the numbers that, I

6    mean Coinbase is huge right now, a giant exchange.

7          Nonetheless, even what was allowed last time only allowed

8    -- went to 10 or 15,000 taxpayers.  But so the Coinbase point

9    that it's at the beginning stages of the industry, so the

10   results you got many, many years ago are not relevant,

11   especially considering, you know, just the evidence of

12   additional and more common reporting of trading cryptocurrency

13   assets.  Go ahead.

14          **MS. MATCHISON:**  Yes, Your Honor.  So I think, so first to

15   that narrowly tailoring, and it seems like that discussion

16   from Kraken is focused a lot on the types of people that may

17   not pay their taxes.  But that's a hard judgment for the IRS

18   to make standing in isolation with no information, right?

19   Maybe it seems reasonable to say that people that make more

20   money are less likely to report their gains because they're

21   hiding it.

22          I don't know.  They could also be more likely to hire

23   professionals that would make sure that they are consistently

24   reporting their gains and their income consistent with the

25   Internal Revenue laws.

1      **THE COURT:**  Plus, I don't know how you do that

2   differentiation without getting more information than even

3   you're asking for that I'm going to allow from them.  I mean,

4   I guess if you got the internal -- if you got their tax ID

5   numbers and identified them, you could see who's filed a

6   return and the kind of income they have filed.

7      **MS. MATCHISON:**  Well, and that's exactly why -- and we

8   can get to this, you know, certainly later.  But that's

9   exactly why the IRS has asked for the information they've

10  asked for is that they can identify a taxpayer, look to see if

11  they filed returns at all, if they did file returns, what they

12  reported, and if that -- what they reported is consistent with

13  other information that the IRS might have.

14      But, you know, I think also too that, you know, people

15  that are in any one year engaging in cryptocurrency activity

16  up to a level of $20,000, like, that's not a small amount of

17  money.  That's not a small user, right?  Like, these are

18  people that are doing real dollars.

19      And there is no -- Congress has not put any sort of de

20  minimis exception when it comes to cryptocurrency.  I know the

21  industry has urged Congress to do that.  Congress has not done

22  that.  And so even drawing the line at 20,000, there's

23  probably people out there that are not going to be detected at

24  that level, right, again acknowledging that the IRS can't go

25  after everybody, and that Kraken shouldn't have to give a

1    piece of information for every single one of its users.

2         **THE COURT:**  I see.  Okay.

3         **MS. MATCHISON:**  I don't know if -- you know, even if the

4    IRS doesn't audit every single person for which they receive

5    information, they do in essence touch every one of those

6    people.  But there's different treatment streams, right?  So

7    they might look at a person and they might say yeah, this

8    person merits an audit.  Let's put them under exam.

9         They might look at the person's return and the

10   information they have and they say you know what, this person

11   might be all right.  Let's just issue them an education letter

12   to make sure they understand their obligations that they're

13   supposed to be reporting cryptocurrency transactions as either

14   income or as real property.

15        They might issue just an education letter reminding them

16   hey, look, you failed to report that you had crypto and that's

17   part of the form now.  So in the future, you need to check the

18   box to say you actually have crypto.

19        Or alternatively, they could take no action.  If they

20   take a look at the return, if they take a look at the

21   information, they determine it looks like they've complied,

22   they take no action.  And that's exactly as they should do.

23        But the IRS uses this information, but that does not

24   necessarily mean that every person is placed under exam, nor

25   should they be.  That's not always the result of more

1    information.

2         I think it came up, you know, would the IRS really go

3    through all the IP address information.  Probably not, Your

4    Honor.  They probably wouldn't need to, right?  The IP address

5    information is one more piece of information the IRS might

6    need to determine someone's identity positively.

7         The IRS requires three pieces of information in order to

8    make a positive ID.  They don't always get enough information

9    with the basic name, date of birth, TIN, or physical address

10   that they got in Coinbase to actually make that

11   identification.

12        In addition, some of the foreign exchange information

13   they get, foreign cryptocurrency exchanges in other countries,

14   IRS receives some of that information, they use IP address

15   quite a bit.  And so if we don't have that IP address

16   information, we may be failing to connect some dots.

17        **THE COURT:**  Well, let's look at -- we'll get to the

18   details of this.  I know this is really a much more

19   generalized discussion.  But, you know, the issue for that to

20   me is not whether there is some relevance, but the degree to

21   which you need it and whether or not, you know, getting it for

22   all of these people when you'll use it in three cases is

23   disproportionate.  But --

24        **MS. MATCHISON:**  The one other point I wanted to get to is

25   the fact that, you know, Coinbase is a long time ago.  And so

1    maybe the results --

2        **THE COURT:**  Yeah.

3        **MS. MATCHISON:**  -- of, you know, a Kraken, you know, John

4    Doe summons case will not be the same as Coinbase.  I would

5    just say that even though it was, you know, closer to the

6    beginning of the Coinbase boom, you know, we've now seen a

7    boom.  There has been a larger uptick.  More people are using

8    crypto, and they're using it in more and different ways.

9        People are being paid wages in cryptocurrency.  People

10   are buying things on retail websites in cryptocurrency.  So

11   just because that was at the beginning, I think that now you

12   have more users in the marketplace, and therefore there could

13   be less compliance.  I think also too --

14       **THE COURT:**  Well, but that's -- you're not disputing the

15   point that the actual results which you said which was from

16   Coinbase we know --

17       **MS. MATCHISON:**  Right.

18       **THE COURT:**  -- that a significant percentage of those

19   people were not reporting.  We can't, from that, infer that

20   the same percentage or even a similar percentage are non-

21   reporting now because it was so long ago and in a different

22   context.

23       **MS. MATCHISON:**  Certainly, Your Honor.  But I do think

24   that there are more users now, and the market, the crypto

25   market has been more valuable.  So those factors may actually

1    indicate it could be, you know, there could be less

2    compliance.  I don't know.

3        I mean, certainly if Kraken could tell us how many of its

4    users were properly reporting, we would take that.  But that's

5    not their job.  Right?  That's not what they're doing.  That's

6    not their business model.  They're not in the business of

7    determining whether or not their users are, you know,

8    complying with their reporting obligations.

9        So we can't get that information.  And so since we can't,

10   we stand in a position that's, you know, a bit of a deficit in

11   knowledge.  And this is how we fill that gap, right, get

12   information.  We look at it and --

13       **THE COURT:**  No, I understand.

14       **MS. MATCHISON:**  Yeah.

15       **THE COURT:**  Okay.  Well, I'm going to move on to the

16   specifics now.  Definition of user, you know, I guess I'm in

17   generally inclined to go along with the definition of user.

18   But I have a couple of questions.  First one is to the United

19   States.  Is there something different about Kraken users as

20   opposed to Coinbase users that explains why you're casting a

21   wider net than what you ended up with in Coinbase?

22       **MS. MATCHISON:**  So, you know, we used a different

23   definition from the John Doe class, Your Honor.  And it wasn't

24   with the, necessarily the intention to cast a wider net.  It

25   just I think because again, market uptake and factors that

1    have changed, but the numbers wound up being different.

2        But what we did change that previously we defined it as

3    being a user with $20,000 in any one category during the years

4    at issue in either buy, send, seller, receive.

5        **THE COURT:**  Right.

6        **MS. MATCHISON:**  Well, Kraken doesn't use those terms,

7    buy, send, seller, received.  Those are kind of like

8    specialized Coinbase terms.  And so as the IRS is

9    understanding of the cryptocurrency market has evolved, it has

10   realized that when it issued summonses to Kraken and other

11   cryptocurrency businesses, which it has, it has stricken that

12   buy, send, sell, receive because it simply just doesn't apply.

13       I think also, too, the IRS's understanding has evolved

14   and it's understanding how people are using crypto and, you

15   know, how it has increased in popularity.  You know, they

16   understand that more now.  And so because of that, they

17   changed it, as well.

18       **THE COURT:**  Well, why did you change the aggregation

19   number?

20       **MS. MATCHISON:**  To reflect the fact that more users were

21   likely using cryptocurrency.  But honestly mostly it's because

22   the buy, send, sell, receive simply doesn't translate to

23   businesses outside of Coinbase.

24       **THE COURT:**  Well, but that's not about the aggregation.

25   The aggregation number, it makes no sense to say well, we

1   changed it because more people are using it.  The aggregation

2   number is designed to set a level at which you're going to

3   investigate.

4       But whether there's a million users or five, it's to set

5   a level.  And the fact that there are more users doesn't mean

6   that that level is no longer appropriate.  It just means

7   there's more people over that level, more people under that

8   level.

9       So I really don't understand why you went, changed from

10  saying it's got to be an individual transaction, one

11  transaction of at least $20,000 in any particular year,

12  whatever the transaction was.  I'm not worried about what the

13  kind of transaction is.

14      Went from that to saying if cumulatively your

15  transactions add up to $20,000 in a particular year, that's in

16  this case a difference of, I don't know, 10 or 20,000

17  taxpayers, according to the Kraken numbers I think that were

18  in one of those declarations, maybe 10 or 15,000 taxpayers.

19  So I'm wondering why, what it is about it that justifies that

20  difference.

21      MS. MATCHISON:  Well, I think a couple things.  So first

22  of all, the Coinbase definition wasn't for one transaction.

23  It was for one type of transaction.  And so a person could

24  have had multiple buys in one year.  It wasn't just that one

25  -- you had to buy at least once over $20,000.  It was if you

40

1    bought $20,000 worth.

2         So it wasn't just like one big fish kind of thing.  I

3    think also, you know, this wasn't done --

4         **THE COURT:**  Well, okay.  Just why did you go from that to

5    what there is now?

6         **MS. MATCHISON:**  I think just for simplicity's sake again

7    because we didn't want to be limiting ourselves to miss out on

8    any potential activity where people had failed to comply with

9    reporting requirements.  Right?  I think that again, not tying

10   it to buy, send, sell, receive, taking all of that out, then

11   makes it easier for any recipient of the --

12        **THE COURT:**  So you're not answering my question because

13   that doesn't make any sense in terms of where you set the

14   level.  You could say that about in Coinbase you didn't want

15   to miss out on any transactions, and so you set it at a

16   particular level.

17        **MS. MATCHISON:**  Well, I think the IRS kept it consistent

18   at the $20,000 level, Your Honor.  It just changed the type of

19   transactions that it would be considering in one year.  And

20   that really is based on the evolving understanding of the

21   IRS --

22        **THE COURT:**  No, it wasn't.  It was not just the type of

23   transactions.  It was whether or not you had to add them

24   together in any particular kind of transaction.  In this, in

25   Coinbase, you had to add them up.  You had to have an

1    individual sale, buy, send, whatever it is, et cetera, one of

2    those that was $20,000.

3        You don't have to have any of those, or any other kind of

4    transaction that is $20,000 to be subject to this subpoena.

5    You have to have, adding all of your transactions over the

6    course of the year, $20,000.

7        I'm wondering why the IRS changed its mind on what the

8    level is.  And you're not explaining to me what would justify

9    that difference other than we just want it.  Of course, you

10   could have wanted it then, but you chose not to, presumably

11   for policy reasons, and you resulted with a 99 percent

12   taxpayer identification rate.  So I'm not sure what we're

13   talking about.

14       **MS. MATCHISON:**  Well I think, you know, Your Honor, the

15   way that the Coinbase user definition was set was as a result

16   of conversations the United States had with Coinbase about

17   their user base.  So that was very much a tailor-made for the

18   Coinbase summons case.

19       That was not where the IRS started out with.  That was

20   after Coinbase sat down with the Government and kind of went

21   over the user base and the numbers.  And there was a natural

22   breaking point at that.  And so that's why the Government

23   changed the definition to reflect what we learned directly

24   from Coinbase about their user base.

25       And then moving forward, the IRS did drop that specific

1   language, and dropped the aggregation in each year, in part to

2   make it simpler and in part to match what they understood to

3   be --

4       **THE COURT:**  So what's different about this, you know,

5   Kraken's customer base from Coinbase's customer base that

6   means we shouldn't do it that way?

7       **MS. MATCHISON:**  That we shouldn't use the aggregation?

8   Is that what you mean?

9       **THE COURT:**  Yes.

10      **MS. MATCHISON:**  I think that the IRS just didn't want to

11  define it to be certain types of transactions.  They didn't

12  want to use transaction types.  So --

13      **THE COURT:**  You're not answering my question.  So you set

14  a $20,000 threshold, which is different from the one that's

15  now.  Forget about types of transactions.  The $20,000

16  threshold in the original, in Coinbase was there had to be a

17  single transaction and in a year of a particular type that was

18  $20,000, whether it was a buy or a sell or something else.

19      And now it is adding them all together, in a particular

20  type, perhaps, or something.  Why did you go from a

21  transaction to the others?  You justified the way you did it

22  in Coinbase by saying it was based on that particular user

23  base.  What's different about this user base?

24      **MS. MATCHISON:**  Yeah.  I'm sorry, Your Honor.  I've done

25  a poor job of explaining it.  In Coinbase, it wasn't a single

1    transaction that had to be over $20,000 that qualified you to

2    be a class member.  It was $20,000 worth of transaction sin

3    any one of those types.  So you could have multiple buys that

4    got you --

5         **THE COURT:**  I see.

6         **MS. MATCHISON:**  -- over the $20,000 comp, not --

7         **THE COURT:**  I see.

8         **MS. MATCHISON:**  -- just one.  You didn't need to have a

9    single one.  And I'm sorry for not making that clear in the

10   first instance.

11        **THE COURT:**  I see.  So it's $20,000 in any transaction

12   type --

13        **MS. MATCHISON:**  That's correct, Your Honor.

14        **THE COURT:**  -- in any one year.

15        **MS. MATCHISON:**  That's correct.

16        **THE COURT:**  And now it's $20,000 in any transaction type

17   in a year?  It's the same?

18        **MS. MATCHISON:**  It's a little bit -- it is still a little

19   bit different, Your Honor, in that we've removed those types.

20   And so, you know, it gets added up.

21        So if you have, you know, I don't know, Kraken doesn't

22   use these terms, but if you bought, you know, 10,000, and then

23   you sold 5,000, and then you transferred 5,000 more, that

24   would add up to 20,000 and that would get you into this class

25   which before, in Coinbase, you would have had to have, you

1      know, 20,000 in any one of those transaction types, not a

2      singular transaction but in any one of those transaction types

3      to qualify you.

4          **THE COURT:**  So the things -- so now you can add up all of

5      the transactions when before you could only add up

6      transactions in a particular area like all the buys, all the

7      purchases, all the sales, all of the something elses.

8          **MS. MATCHISON:**  Right.

9          **THE COURT:**  Okay.  And I guess I'm -- therefore, I'm

10     going back to my question.  Why?  I mean, you wanted to get

11     rid of those definitions because they didn't seem to fit every

12     kind of category.  But there are purchases.  Right?  There are

13     purchases of Coinbase, of crypto assets.

14         There are sales of crypto assets.  There are other kinds

15     of transactions which don't readily fit into purchase or

16     sales.  But there are purchases that do and there are sales

17     that do.  And so this still does lower the threshold.  And I

18     think Kraken did a -- expert did a job of describing what the

19     consequence of that is.  And my question is why lower the

20     threshold.

21         **MS. MATCHISON:**  Yes, Your Honor.  I think, you know, as I

22     explained before, first of all, the Coinbase definition was

23     settled upon after discussions with Coinbase about their base.

24     So, like, that wasn't meant to be the standard for all time

25     for --

1        **THE COURT:**  Well, I don't care whether it was.  I'm

2    asking why it's different.  What is different about the

3    Coinbase user base from those discussions that justifies this

4    now?

5        **MS. MATCHISON:**  What's different about the Coinbase user

6    base, Your Honor, was just that that was the determination the

7    IRS made based upon the evidence that was presented.  And --

8        **THE COURT:**  What was the evidence that was presented that

9    was specifically different from the evidence that's presented

10   now?

11       **MS. MATCHISON:**  Well, Your Honor, the evidence that's

12   presented now, up until, you know, the briefing that Kraken

13   has provided was that the numbers would be very consistent

14   with what Coinbase was.  So it didn't seem until only just

15   recently that these numbers would even differ.

16       **THE COURT:**  Okay.  So --

17       **MS. MATCHISON:**  And all of our discussions with --

18       **THE COURT:**  You want to --

19       **MS. MATCHISON:**  -- Kraken, we weren't aware --

20       **THE COURT:**  All right.  Now you are.

21       **MS. MATCHISON:**  Okay.

22       **THE COURT:**  Now you have the evidence.

23       **MS. MATCHISON:**  Right.

24       **THE COURT:**  What's different?  Why should I do it

25   differently?

1        **MS. MATCHISON:**  Because this is the level at which the

2    IRS has decided to investigate.

3        **THE COURT:**  No, you can't do that.  You have to justify

4    it for me because we're talking about over breadth and

5    narrowing.

6        **MS. MATCHISON:**  Right.

7        **THE COURT:**  So you have to justify it for me.  You can't

8    just say that's what we decided.

9        **MS. MATCHISON:**  Well, I think that what I've said is that

10   we decided that based upon what we understood about the

11   industry, what we learned from Coinbase, and the IRS's

12   approach to its investigation, Your Honor.

13       **THE COURT:**  So you have no specifics, not a single

14   specific about this, the users in Kraken and how they might

15   differ from the users in Coinbase or how the industry has

16   changed that result in this specific change in the threshold?

17   You have no specifics on that, right?

18       **MS. MATCHISON:**  Well, Your Honor, I believe as we've

19   explained, we've put this in our papers and as I've explained

20   is that there are more users in the market now.  And so we

21   would expect to some extent that there would be greater

22   levels.  There's more value in the cryptocurrency market now.

23   So we would expect that there are more users at a higher

24   level.  I'm not sure --

25       **THE COURT:**  That's got nothing to do with my question.

1    There are 10,000 people that were swept in by this that

2    wouldn't be swept in if we used the Coinbase definition.  Why

3    should I do that?

4         **MS. MATCHISON:**  Because --

5         **THE COURT:**  Because those are small users.  Those are

6    smaller users.  Those are people who wouldn't meet -- wouldn't

7    have, in any particular type of transaction, $20,000 in value

8    in a year.  Why should I sweep them in?

9         **MS. MATCHISON:**  Because even if they -- even if they're

10   just at the bare minimum of $20,000 in one year, Your Honor,

11   again, there's no de minimis exception for folks.  And so if

12   there's a --

13        **THE COURT:**  So you're not -- if you're going to keep

14   doing this, I'm just going to stop asking you questions.  Mine

15   is the differentiation between this situation and the Coinbase

16   situation.  What has changed?  And you keep sidestepping the

17   question.  You want to answer it, I'll give you one last

18   chance.

19        **MS. MATCHISON:**  Okay.  The best answer I have, Your

20   Honor, is just the difference in the cryptocurrency market,

21   how it's changed, how the value has changed, and how the user

22   base has expanded.  That's the best I can do for you.

23        **THE COURT:**  Okay.  The other question I had for you is

24   about foreign privacy rights.  So you say it in your briefing

25   that some of this information is designed to help you decide

48

1  which are U.S. users who might be U.S. taxpayers.  Is there a

2  declaration that says that other than -- and where is that?

3      **MS. MATCHISON:**  I believe that's in the Cincotta

4  declaration, Your Honor.  And I can find it for you.

5      **THE COURT:**  Thank you.

6      (Pause)

7      **THE COURT:**  Karen, I don't have a 10:30 calendar, do I?

8      **THE CLERK:**  No, you don't.

9      **THE COURT:**  Okay, thank you.

10      (Pause)

11      **MS. MATCHISON:**  Your Honor, that's discussed in the

12  second declaration of Karen Cincotta at Paragraph 72.

13      **THE COURT:**  And is there a docket number on that?

14      **MS. MATCHISON:**  That was -- we filed it with our -- too

15  much paper in front of me, Your Honor, I confess.

16      **THE COURT:**  Okay.

17      **MS. MATCHISON:**  One second.

18      (Pause)

19      **MS. MATCHISON:**  I want to say (indiscernible).  I'm

20  sorry, Your Honor.  21-1, Your Honor.

21      **THE COURT:**  Great.  Okay, thank you.  We'll look at that.

22  And the next question is -- hang on one second.  What about

23  potential violations of EU regulations?  What do you think

24  about that, whether there are such things, and if not, why

25  not.  And if there are, whether or not and how I should be

49

1    concerned about it.

2        **MS. MATCHISON:**  Your Honor, from the United States'

3    perspective, I think the information that the IRS has

4    requested is all information that any user of Kraken is on

5    notice that Kraken may have to disclose to the Government.

6        **THE COURT:**  Well, so those --

7        **MS. MATCHISON:**  There's no expectation of privacy in that

8    information.

9        **THE COURT:**  Well, this is not about United States

10   expectations of privacy.  This is about whether Kraken will

11   run afoul of the GDPR by providing any of this information.

12   The question is whether or not you believe that's correct or

13   incorrect, and if not, why not.  And where in the GDPR, if you

14   think it's just the notices that say that that's sufficient,

15   that what they've posted on their website is sufficient.

16       **MS. MATCHISON:**  Your Honor, I believe that Kraken might

17   be better posed to answer whether or not they believe it would

18   be in violation of their obligations under that --

19       **THE COURT:**  Well, but they're going to say yes, it might

20   be.  They've already said yes, it might be.

21       **MS. MATCHISON:**  And my response would be that all the

22   information we're seeking to get from Kraken is information

23   that their clients are aware, their users are aware they

24   collect, and that they may be forced to turn over to the

25   Government.

1          **THE COURT:**  Well, I appreciate that.  Does that mean it's

2     not a violation of the GDPR, in your opinion?  Do you know?

3          **MS. MATCHISON:**  I don't know, Your Honor.

4          **THE COURT:**  Okay.  Let's --

5          **MS. MATCHISON:**  I'm not an expert.

6          **THE COURT:**  Assuming it is --

7          **MS. MATCHISON:**  I'm assuming it's not because it's

8     information that they --

9          **THE COURT:**  So you don't --

10         **MS. MATCHISON:**  We believe --

11         **THE COURT:**  You actually don't have any -- so you don't

12    have a clue as to whether it is because you can't -- you just

13    said you don't know.  But let's assume for the moment that

14    they're correct and it is a violation of the GDPR.  Can the

15    IRS require someone to do something that's in violation of the

16    GDPR in producing information to the IRS?

17         **MS. MATCHISON:**  Your Honor, I can't answer that question.

18    I can certainly provide the Court with supplemental briefing

19    on that if it needs it.

20         **THE COURT:**  Okay.

21         **MR. FONDO:**  Your Honor, if I may address that last point?

22         **THE COURT:**  Yeah, in a second.  So why don't you address

23    -- yeah, go ahead.  You can address that last point.

24         **MR. FONDO:**  So, Your Honor, my understanding generally

25    with Government agencies is that just because the Government

1    subpoenas it or otherwise seeks it, if there are GDPR issues,

2    there are significant issues and it doesn't just -- the

3    subpoena doesn't override the GDPR issue, generally.  So I

4    can't speak specifically to every IRS situation.  But I think

5    it's a legitimate and real concern having done this before.

6         **THE COURT:**  Well, I don't understand why you say that

7    because you don't have the slightest bit of evidence that

8    that's true.  You're just going to throw it off in one

9    sentence or two sentences.  Why doesn't the -- in my

10   experience in dealing with the GDPR, that notice on the

11   website may mean it's fine.  The notice says --

12        **MR. FONDO:**  I just --

13        **THE COURT:**  -- we might have to turn it over because the

14   Court says, we might have to turn it over because there's a

15   summons or subpoena.  So why doesn't that mean that there

16   isn't any potential for a violation of the GDPR on this?

17        **MR. FONDO:**  Because I don't think providing notice that

18   says we might comply with the law is sufficient to override

19   the GDPR.

20        **THE COURT:**  Okay.  And can you point to me the

21   declaration that says that in this record?

22        **MR. FONDO:**  We do not have that, Your Honor.

23        **THE COURT:**  Right.  Okay.  Hang on one second.  On

24   narrowly tailored, I take it that Kraken is really not

25   objecting, other than sort of at the high level we've already

1    talked about which I understand, to the information contained

2    in 1-A including email addresses.  That's request number 1-A.

3         **MR. FONDO:**  Correct.  Yes.  With those limitations you're

4    correct, Your Honor.

5         **THE COURT:**  Right.  So I guess for the starter, express,

6    and for some period of time the intermediate and pro, so

7    before some period of 2019, taxpayer IDs were not collected as

8    I understand it.

9         **MR. FONDO:**  That's my understanding as well, Your Honor.

10        **THE COURT:**  And for all those accounts, it did collect

11   the date of birth, name, address, phone, email number, and

12   then I guess for some of the accounts going forward during

13   that period of time the high level accounts had the taxpayer

14   ID.

15        And my question is why in terms of identifying the

16   taxpayers, which seems to be the gist of the first three

17   requests, why isn't that sufficient?  I mean, that is you had

18   terrific results in Coinbase using that.

19        And the, you know, if there are -- if you end up with a

20   gap and then you can show we had this gap because we're

21   missing the following information, we couldn't -- as to these

22   few taxpayers, we need additional information to identify

23   them.  You can go back with another subpoena, why isn't that

24   sufficient to do 1-A and not do the rest of, I mean, we can

25   talk about 2 and 3, but why isn't the rest of 1 and then 2 and

1    3 overbroad, not sufficiently narrowed in terms of what you

2    need right now to identify the taxpayers unless and until you

3    can show that there are additional -- there are more problems,

4    there are in fact more problems than identifying rather than

5    just guessing that there might be problems.  So this is to the

6    service.

7         **MS. MATCHISON:**  Your Honor, this is somewhat based on the

8    lesson we learned from Coinbase in that there were, at the end

9    of the day, 750 Coinbase John Doe class members that the

10   service couldn't identify.

11        **THE COURT:**  Out of 12,000?

12        **MS. MATCHISON:**  Yes.  So percentage-wise, it's not a huge

13   amount, sure.  But it's still 750 users --

14        **THE COURT:**  So it was -- and what you needed was

15   additional information on those 750 taxpayers, right?

16        **MS. MATCHISON:**  That's correct.  And because --

17        **THE COURT:**  You didn't need information on the other

18   10,200 taxpayers, or 12,000 taxpayers.

19        **MS. MATCHISON:**  That's correct, Your Honor.  But because

20   we couldn't identify them, we couldn't issue a summons to the

21   taxpayer because we didn't know who they were.  And we

22   couldn't even issue a summons, a third-party summons to

23   Coinbase and provide notice to the taxpayer because we didn't

24   know who they were.

25        **THE COURT:**  Well, you could do a John Doe summons to

1    Coinbase aimed at those.  Why didn't you go back and do

2    another John Doe summons to Coinbase saying, justifying to the

3    judge well now we've done everything you've said.  We've got

4    as much information -- we still have 750 accounts that we

5    can't identify the taxpayers for.  For those accounts, we need

6    the following in order to identify because we have the

7    following problem.  With those specifics, why, how could you

8    possibly say well we therefore need it on all 12,000?

9        **MS. MATCHISON:**  You know, I think, Your Honor, part of

10   the reason is the statute of limitations comes into play, as

11   well as resource constraints.

12       **THE COURT:**  Fine, yeah.  Resource constraints, statute of

13   limitations, I understand those are important.  But it doesn't

14   seem to me that it's inhibited you before.  And it doesn't

15   seem to me there's enough showing that it's inhibiting you

16   now.

17       **MS. MATCHISON:**  Well, I mean --

18       **THE COURT:**  Plus, I've got to balance against over

19   breadth which is you're going to get lots of information about

20   people who have no additional obligations to the internal --

21   under the Internal Revenue code.

22       **MS. MATCHISON:**  I would just note for the record that

23   those 750 users from Coinbase that could not be identified

24   were responsible for 100,000, or sorry, 100 million --

25       **THE COURT:**  A hundred million, yes.

1      **MS. MATCHISON:**  A hundred million in gross proceeds.  So,

2  you know, although we can't quantify exactly what the

3  consequence was to the U.S. Treasury, there likely was one.

4      **THE COURT:**  Yeah, okay.  I appreciate that.  And this

5  time, instead of waiting, you'll get the information and

6  you'll issue a subpoena right away to get the information you

7  can't do it instead of giving up.  I mean, I don't understand

8  why you said in your brief we couldn't go back and do -- you

9  didn't say -- you didn't think of it, maybe.  But whatever it

10  is, you didn't go back and try to get more information.

11      I am strongly of the view that this step-wise approach is

12  appropriate because you're having a group summons.  And for

13  most of them, the tiny bits of information you might get from

14  the due diligence questionnaire for example, or from their IP

15  addresses and that sort of thing, is completely unnecessary

16  with respect to almost all of them.

17      So in terms of -- so I'm likely to reduce that.  Let me

18  ask you about requests four and five.  So this information

19  you're seeking in four and five is limited to records for the

20  period of the summons.  Is that right?

21      **MS. MATCHISON:**  That's correct, Your Honor.

22      **THE COURT:**  So for -- let me just get them in front of

23  me.  For four which is account activity, and five which is

24  account funding and invoices, et cetera, you only want those

25  for the period in question.

1    **MS. MATCHISON:**  Yes.

2    **THE COURT:**  And for chain splitting and the results of

3    the related transactions, the production of the transaction

4    log is sufficient for the United States?

5    **MS. MATCHISON:**  I believe that information will be

6    reflected in the transaction information.

7    **THE COURT:**  Okay.  And in terms of --

8    **MS. MATCHISON:**  Correct me if that's wrong.

9    **THE COURT:**  Oh, I don't -- that's what they said.  And

10   that's what -- well, I don't know.  What you said in your

11   brief is we'll look at that, what they've got in the

12   transaction log.

13       So in terms of the HashID and the blockchain address, the

14   service is happy to have that delivered after Kraken finishes

15   backfilling this information in the transaction log?

16   **MS. MATCHISON:**  Yes, Your Honor.

17   **THE COURT:**  Okay.  And I take it Kraken does not object,

18   other than at the high level we talked about before, to the

19   production of the transaction ledgers which apparently, from

20   your description, also include funding information.  Is that

21   right?

22   **MR. FONDO:**  Well, they include deposits, withdrawals,

23   trades, and transfers.

24   **THE COURT:**  Right.  So deposits and transfers may be

25   funding information.  But to that extent, you're not objecting

1    to it other than at the high level we talked about at the

2    beginning of this argument, to the production of --

3           MR. FONDO:  So just --

4           THE COURT:  -- transaction ledgers.

5           MR. FONDO:  So just to be clear, though, funding

6    information, the IRS has asked for a bunch of information that

7    might fall in the bucket of funding information like the

8    source of the bank, things like that.  That --

9           THE COURT:  Understood.

10          MR. FONDO:  -- we (indiscernible).

11          THE COURT:  Understood.  In connection with four and

12   five, you're not objecting to the production of transaction

13   ledgers other than on the high level we talked about before.

14          MR. FONDO:  Correct.

15          THE COURT:  Okay.  So, and then my view, and I'll give

16   you a chance to address it, is that -- and I've had, you know,

17   at least some experience in this, is the HashID and the

18   blockchain address are useful and perhaps the only way to

19   trace crypto transactions.  And the production of that, it

20   seems to me, would be extremely useful.  But I'm happy to have

21   you, if you want to argue about that, Mr. Fondo, I'm happy to

22   hear about what you want to say about that.

23          MR. FONDO:  Sure.  I would make two points, Your Honor.

24   One is that I don't think they -- they matter when you're

25   trying to chase funds.  They don't necessarily matter when you

58

1    have all this other information to determine whether there's a

2    potential tax implication in that.  So I think it's part of

3    step two.

4        The other thing I would say is we don't have that

5    capability now.  I don't know when Kraken will have it.  It's

6    based on our latest information and as we disclosed in the

7    declaration, we're talking months before it happens, and it

8    may never happen.  Nor do I know necessarily that it can be

9    transferred globally versus on an individual basis.  So I have

10   a lot of reservations about that additional information.

11       **THE COURT:**  Well, when you say they're trying to

12   backfill, what do you mean?

13       **MR. FONDO:**  Well, they're trying to be able to track that

14   information and record it with accounts.  But I'm not aware

15   that they're trying -- they're doing it in a way that will

16   allow it to be globally retrieved in a manner that is

17   connected to every single transaction and connected to every

18   single user.

19       So for example, if you go and look at a user and you say

20   we want to look at Grant Fondo's account, I think they

21   potentially, if they ever get to this point, may be able to

22   track some of my transactions and my HashIDs.  But it's very

23   different to say we need 59,000 of them applied to every

24   single user and the correct user and the correct transaction.

25       I'm not aware -- again, it's being developed.  But I'm

1    not aware that it's being built in that manner where it can be

2    retrieved in that manner.

3        **THE COURT:**  Well, okay.  And I appreciate that.  Well, I

4    tell you, you know, it is -- I think that I'm likely to order

5    it if it can be retrieved.  You know, like it's going to

6    become part of the transactional ledger will now have that

7    sort of material in it, then it's going to be retrieved for a

8    user.  So I'm likely to order that, depending on what happens.

9        I take it -- so what I will have to check on that status

10   and see what's being developed, and I probably will want some

11   more information about what's being developed and the timeline

12   and that sort of thing at some point.  But maybe we'll set a

13   status conference on this.

14       **MS. MATCHISON:**  Your Honor, I would just note that on the

15   -- I believe under the money transmitter regulations, those

16   are the FinCEN regulations that implement the BSA, the Bank

17   Secrecy Act, that that type of information should be, you

18   know, retained and producible to the Government upon demand.

19   So I would hope that it would be not too much of a burden to

20   Kraken to retrieve that information and produce it.

21       **THE COURT:**  Well, it has -- to me, it's a balance, right?

22   It's an over breadth question.  It is useful in figuring out

23   the history of a transaction, where it came from, where it

24   went to, all that kind of stuff, all of which, you know, I

25   think at some point the United States may be able to justify

60

1    needing that.

2         If it's relatively easy to do now, that more persuades me

3    that it's worth doing now as opposed to making you go through

4    the first step and then narrow it to the individual, to the

5    users that you really want to focus on because you don't have

6    enough information.  That's the question for me is about over

7    breadth and when, or whether it has to be in the second,

8    whether, you know, you're ultimately entitled to it.  It may

9    be at a different phase.  So this is really about whether I

10   included it in this phase.

11        And so I'm not -- regardless of their obligation, or in

12   view of their obligation that you mentioned, even.  So I don't

13   know that it necessarily -- so I have one other question.

14        **MR. FONDO:**  Your Honor, if I could, could I address that

15   last point because it's --

16        **THE COURT:**  Yeah.  Sure.

17        **MR. FONDO:**  So this is a business decision being made

18   that they have decided to track this information.  I'm very

19   concerned about an order that in many ways implies you have to

20   continue to do this.  If we have obligations under other

21   regulators, BSA, et cetera, of course we're going to, you

22   know, that's a different issue.

23        But I don't -- and I don't know that the BSA regulations

24   require -- let me stop there.  We're talking about 59,000.

25   I'm not talking about one-off users.  We're talking about

1    59,000 in this first wave.  So I'm concerned that any order

2    would in any way imply that they have to continue to build

3    something that does not exist because there are business --

4    there are other reasons -- whatever reasons they're doing it

5    for, it's not to comply with this subpoena, this summons.

6    And --

7         THE COURT:  No, no.  I understand that.  My question is

8    when and whether I make them produce it.  And one of the

9    Government's arguments, and I hadn't intended in this order to

10   say thou shalt develop this capability.  However, it is at

11   some point useful.  And one of my -- the question that the

12   Government raises is interesting.  Don't you have an

13   obligation to keep this information and produce it to the

14   Government and remand it under the Bank Secrecy Act.

15        MR. FONDO:  So I think it is a different scenario where

16   it is a one-off aspect versus a global aspect.

17        THE COURT:  What do you mean?  Why?

18        MR. FONDO:  Well, because usually when you get a -- and

19   again, I'm not pretending to be the world's Bank Secrecy Act

20   expert.  But usually when you get requests from the -- John

21   Doe summons is a very unusual provision.  Right?  Most of the

22   time when the Government acts, they act and they issue a

23   subpoena and they say there are three accounts we're

24   interested in.  Or we're interested in this user, and get us

25   that information.

1          I think that's very different than saying get us all of
2     it for 59,000 people.  And you most likely, particularly where
3     you have to go user by user by user by user to extract that
4     information.  It's not extractable by, like, in this global
5     way such as emails are.
6          That's my biggest concern, Your Honor.  So I don't think
7     the BSA requires you to have a setup where you have to
8     globally pull 59,000 users at the same time.  And this is not
9     the BSA.  So we're talking about the IRS, and it's a John Doe
10    summons.
11         **THE COURT:**  So let me ask Counsel for the United States
12    to cite to us the regulation that requires Kraken to maintain
13    this particular information and produce it on demand.
14         **MS. MATCHISON:**  Yes, Your Honor.  So that can be found in
15    the CFR.  And I believe it's CFR Sections 1010.100, subsection
16    (ff)(5), 1010.410, 1022.210.  These are actually also in the
17    declaration appearance, the first one that can be found at ECF
18    1-1, Paragraph 62 through 67, if that's easier.
19         **THE COURT:**  Okay.  Well, to put you at ease, I would have
20    no intention at this point of ordering it.  You're doing it
21    for your own business reasons.  I think that one of those
22    business reasons would be so that you could actually have
23    those for use by your customers and by the company.
24         And that, you know, that capability to pull that stuff
25    out, and whether I make you do it for if you have to go user

1   by user for 59, we're going to save that for another day.  But

2   we're going to keep an eye on what you're doing to do it.  And

3   just in terms of those statutes, Ms. Matchison, is what is the

4   particular information that you think they're required to

5   maintain under the Bank Secrecy Act and those regulations?

6      **MS. MATCHISON:**  So they need to retain the name and

7   address of the transmitter, the amount, the execution date,

8   any payment instructions, the recipients' financial

9   institution, the name and address of the recipient, account

10  number of the recipient, and any other specific identifier of

11  the recipient.

12      And then if the sender is not an established customer,

13  they have some additional obligations.  But basically, the

14  information, the kind of address type information that you'd

15  be looking for.

16      **THE COURT:**  Well, I understand that.  They have address

17  information for all these people.  And they got name

18  information.  This is and transaction information.  You're

19  going to get a transaction log.

20      What in the regulations specifically requires them to, in

21  addition to the information that they have and that I'm going

22  to order them to provide to you, they have to have the HashID

23  for a transaction, or the, you know, the blockchain address

24  for the participants, or for the transaction?  What -- that's

25  just showing my ignorance about the way it works, right.

1      Where's the regulation that they have to get every single

2   kind of identifying information so that those might be swept

3   in?  They certainly aren't included specifically in the

4   regulations.

5      MS. MATCHISON:  Well, right.  So two things.  First, the

6   regulations are addressed through a money transmitter which

7   they are a money transmitter, and they've been registered as a

8   money transmitter.  So that's applicable to them.  And so

9   although it doesn't say, you know, transaction ID or

10  transaction HashID or blockchain address, you know, that's the

11  closest there.  And my point on --

12     THE COURT:  Why do you think that's closest?  I mean,

13  closest in what sense?  You read me what the regulation says.

14  The regulation doesn't say every single identifying remark,

15  does it?

16     MS. MATCHISON:  No.  It --

17     THE COURT:  Everything --

18     MS. MATCHISON:  It includes name and address.  And so

19  certainly --

20     THE COURT:  Well, we've got names and addresses.

21     MS. MATCHISON:  I mean the blockchain address, Your

22  Honor, not the physical address.

23     THE COURT:  No, I appreciate that.  But we've got names

24  and addresses of the users who are engaging in the

25  transaction.  Right?  They have those.

1          **MS. MATCHISON:**  Well, the blockchain address is an

2     alphanumeric sequence that includes information about the

3     sender's and receiver's address.  That's what I'm talking

4     about.

5          **THE COURT:**  Okay.

6          **MS. MATCHISON:**  And my only point I'm raising this is

7     more to the burden arguments, just more that it's foreseeable

8     that at some point they would have to have this information at

9     hand to produce in response to a government demand than

10    anything else.  It really goes to the burden point, Your

11    Honor.

12         **THE COURT:**  Well, that may be true.  But also the burden

13    point, what that informs me about is the timing, is you know,

14    well, you're going to get a lot of information.  And the

15    significance for your investigation, which is not a violation

16    of the Bank Secrecy Act.  It is a violation of the Internal

17    Revenue code.

18         **MS. MATCHISON:**  Yeah.

19         **THE COURT:**  Maybe at a later point in the investigation

20    where you narrow it to the people who you're really concerned

21    about, and for whom that information is necessary for you to

22    evaluate whether or not there's a violation of the Internal

23    Revenue code.  So not --

24         **MS. MATCHISON:**  I mean, I do think --

25         **THE COURT:**  It's really about timing.

1        **MS. MATCHISON:**  That information that was crucial for the

2   IRS to receive, the purpose of the summons is not just to

3   identify these users or these U.S. persons who transacted in

4   cryptocurrency, but also to determine the correct federal

5   income tax liability.  And so to the extent that we need to

6   figure out where the money is coming from, not the money, the

7   cryptocurrency is coming from and where it's going, this is

8   crucial information for the IRS to have.

9        **THE COURT:**  Okay.  Well, it may not be crucial yet.  Did

10  you want to respond to that last bit, Mr. Fondo?

11       **MR. FONDO:**  Not unless you have any additional questions.

12       **THE COURT:**  No.  Okay.  Anything else anyone wants to say

13  before I take this under submission?

14       **MR. FONDO:**  Yes, Your Honor, if I may?

15       **THE COURT:**  Yeah.

16       **MR. FONDO:**  So, Your Honor, one of the concerns we have

17  here is that I know you are trying -- it sounds like you're

18  trying to do some form of enforcement, limine in some ways,

19  two step process.  What I would say, Your Honor, is that we

20  think this summons has gone beyond what is appropriate.  We

21  think it is unreasonable and unenforceable because of the over

22  breadth of it and the disproportionality of it.

23       There was an order that the Government, in their

24  declaration effectively admits that the Coinbase order worked.

25  We were able to track just about everybody in it.  It was a

1    little bit more convenient, obviously, to get some of this

2    information, of course.

3        But they also didn't use a lot of this information.  They

4    wouldn't have used a lot of this information because they were

5    only targeting certain types of users, those users that they

6    think may not have complied with the tax laws.

7        So my concern is that you have a company and other

8    companies in the future that even though there's an order that

9    worked perfectly and there's no evidence that Coinbase has

10   additional information that was somehow withheld on the 750,

11   but even if you got 99 percent, that's a pretty darn good hit

12   rate, that we have a situation where a company has to spend a

13   lot of money and time trying to narrow this and oppose it, and

14   both in engineer time and as well as employee time as well as

15   legal fees.

16       And we think that taking something that has worked really

17   well and trying to expand it dramatically like they have is

18   abusive under this situation.  And so we would ask Your Honor

19   to actually deny the petition in its entirety, which we think

20   the Court has its authority to do.

21       **THE COURT:**  Okay.  You want to respond to that,

22   Ms. Matchison, or say anything?

23       **MS. MATCHISON:**  Certainly, Your Honor.  The Government

24   doesn't believe that this should be denied in its entirety.

25   And to the extent that the Court does have issues with some of

1      the requests, I can certainly pare them back as Your Honor is

2      well aware.

3          I do think that, you know, again, the IRS did leave money

4      on the table in Coinbase.  It wasn't a perfect result.  And

5      there are $100 million in gross proceeds that the IRS couldn't

6      determine whether there was a tax consequence.  And so --

7          **THE COURT:**  Why didn't you issue a further summons in

8      that case?

9          **MS. MATCHISON:**  Your Honor, I don't have a good answer

10     for you on that right now.

11         **THE COURT:**  Okay.

12         **MS. MATCHISON:**  But I also just want to say that I do not

13     believe that this summons is a dramatic expansion.  I get it

14     that the John Doe class is larger.  But the information asked

15     for is not a dramatic expansion from Coinbase.

16         **THE COURT:**  Okay.  All right.  Thank you all.  I

17     appreciate all the information, I appreciate all the time you

18     spent this morning on this.  We'll take it under submission.

19     I don't think I'm going to require -- well, let me just look

20     at my notes and see what, if I need supplemental briefing.  I

21     guess I need some -- well, no.  I don't.  I don't think I'm

22     going to take supplemental briefing.

23         All right.  Thank you very much.

24         **MS. MATCHISON:**  Thank you, Your Honor.

25         **THE COURT:**  We'll stand in recess.

69

1        **MR. FONDO:**  Thank you, Your Honor.

2        **THE CLERK:**  Court stands in recess.

3        (Proceedings adjourned at 11:22 a.m.)

4                        ---oOo---

5

6

7                **CERTIFICATE OF TRANSCRIBER**

8        I, DIPTI PATEL, certify that the foregoing is a true and

9    correct transcript, to the best of my ability, of the above

10   pages of the official electronic sound recording provided to

11   me by the U.S. District Court for the Northern District of

12   California of the proceedings take on the date and time

13   previously stated in the above-entitled matter.

14       I further certify that I am neither counsel for, related

15   to, nor employed by any of the parties to the action in which

16   this hearing was taken.

17       I further certify that I am not financially nor otherwise

18   interested in the outcome of the action.

19

20   *Dipti Patel*

21   _____

22   DIPTI PATEL, CET-997

23   LIBERTY TRANSCRIPTS                    Date: June 16, 2023

24

25