DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON (CA Bar No. 217022)
Trial Attorney
United States Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044
Telephone:    (202) 307-6422
Fax:             (202) 307-0054
Email: Amy.T.Matchison@usdoj.gov
           Western.Taxcivil@usdoj.gov

*Attorneys for United States of America*

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Civil Number:  3:23-mc-80029-JCS |
| Petitioner, ) | |
| ) | |
| v. ) | **SECOND DECLARATION OF KAREN CINCOTTA IN SUPPORT OF UNITED STATES' PETITION TO ENFORCE INTERNAL REVENUE SERVICE SUMMONS** |
| PAYWARD VENTURES INC., d/b/a ) KRAKEN OR KRAKEN.COM, OR ITS ) PREDECESSORS, SUBSIDIARIES, ) DIVISIONS, OR AFFILIATES, ) | |
| Respondent. ) | |

I, Karen Cincotta, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a duly commissioned Internal Revenue Agent ("Revenue Agent") assigned as a Supervisory Revenue Agent in the Internal Revenue Service's ("IRS") Offshore Compliance Initiative ("OCI"). I have been a Revenue Agent since 2005 and have specialized in offshore investigations since 2009. As a Revenue Agent, I served as a Senior Revenue Agent in the Large Business and International Division of the IRS beginning in July 2011 until I accepted my current position as a Supervisory Revenue Agent in November 2019. My post of duty is in Maitland, Florida.

2.      The IRS is conducting an investigation to determine the identity and correct federal income tax liability of U.S. persons who conducted transactions in cryptocurrency for the years ended

December 31, 2016, 2017, 2018, 2019, and 2020.

3.     This is my second declaration in support of the United States' petition to enforce an Internal Revenue Service summons served on Payward Ventures, LLC d/b/a Kraken ("Kraken").

**Use of John Does Summonses in Tax Investigations**

4.     The IRS uses John Doe summonses to obtain information necessary to identify and investigate the tax liability of a specific unidentified taxpayer or group of unidentified taxpayers suspected to be tax non-compliant.

5.     Discussed herein are 55 petitions and 202 John Doe summonses where the IRS received approval from a District Court to serve a John Doe summons. The John Doe summons recipients described herein all produced records in response to their respective summonses. The data was produced in a variety of formats, including hardcopy or electronic records (e.g., CD-ROM, external data drive, microfilm, electronic files, database). None of this data is stored in a computerized system with a public-facing portal. As discussed in more detail below, the data was used to identify and investigate possible tax non-compliance of the John Doe class members. The data received was also used to develop methodologies to further identify tax non-compliance. Through the use of the John Doe summonses discussed below, the IRS received information on more than 570 million transactions. Using the information received, the IRS identified tens of thousands of United States taxpayers not in compliance with internal revenue laws.

**Use of John Doe Summonses in the IRS Offshore Credit Card Project**

6.     The IRS's Offshore Credit Card Project was an initiative aimed at identifying United States taxpayers with foreign bank accounts and investigating whether those persons had complied with internal revenue laws. Based on the knowledge that such persons commonly use credit, debit, and other payment cards linked to the offshore accounts to access and repatriate funds, the IRS used a total of 149 John Doe summonses to request information from credit card companies, merchants, and third-party credit card processors to identify United States taxpayers who may have participated in such arrangements.

#### John Doe Summonses Issued to American Express and MasterCard

7.     On October 30, 2000, the United States District Court for the Southern District of Florida (Case No. 00-3919 CIV-JORDAN) issued an order approving the service of John Doe summonses upon American Express Travel Related Services (American Express) and MasterCard International, Inc. (MasterCard I). These summonses sought all information about holders of American Express and MasterCard I payment cards issued by or through banks or other financial institutions in Antigua and Barbuda, the Bahamas, and the Cayman Islands.

8.     Pursuant to the summons, American Express and MasterCard I were required to provide, among other things, all identifying information (names, addresses, Social Security numbers or comparable information, telephone numbers) for years 1998 and 1999 on all United States citizens or residents with signature authority over such cards. In addition, American Express and MasterCard I were also required to provide these documents: account applications, correspondence, memoranda, credit investigation files, invoices, payment on account, (customer) corporate minutes and other corporate documents, powers of attorney or other representative or fiduciary agreements or powers, (customer) trust instruments and other trust documents, letters of wishes, all credit account statements, and copies of agreements between American Express/MasterCard I and the card issuer entity.  If American Express and MasterCard I could not identify the account holder, the summons required production of information on all specified United States transactions over certain dollar thresholds.

#### John Doe Summons Issued to Visa International

9.     On March 27, 2002, the United States District Court for the Northern District of California (Case No. 02-MC-0049) issued an order approving the service of a John Doe summons upon VISA International (VISA). This summons sought information about the identities of all United States taxpayers with VISA payment cards issued by banks in any of 31 offshore jurisdictions including Anguilla, Antigua and Barbuda, Aruba, Bahamas, Belize, Bermuda, British Virgin Islands, Cayman Islands, Cook Islands, Cyprus, Dominica, Gibraltar, Guernsey/Sark/Aldeney, Hong Kong, Isle of Man, Jersey, Latvia, Liechtenstein, Luxembourg, Malta, Nauru, Netherlands Antilles, Panama, Samoa, St.

Kitts & Nevis, St. Lucia, St. Vincent and the Grenadines, Singapore, Switzerland, Turks & Caicos, and Vanuatu.

10.     Pursuant to the summons, VISA was required to provide, among other things, identifying information (names, addresses, Social Security numbers or comparable information, telephone numbers) on all United States citizens or residents with signature authority over such cards. If VISA could not identify the account holder, the summons required production of all transactional information for cards issued by, through, or on behalf of banks in the specified offshore jurisdictions where there were at least two transactions in the United States during a specified period.

Second John Doe Summons Issued to MasterCard

11.     On August 20, 2002, the United States District Court for the Southern District of Florida (Case No. 02-22404-CIV-UNGARO-BENAGES) issued an order approving the service of a second John Doe summons upon MasterCard (MasterCard II). This second summons included all United States taxpayers with MasterCard II payment cards issued by banks in any of 31 offshore jurisdictions.

12.     MasterCard II was required to provide, among other things, all transactional information related to charges and purchases for cards issued by, through, or on behalf of banks in the specified 31 jurisdictions where there were at least two transactions in the United States in a specified time period.

John Doe Summonses Issued to 141 Merchants

13.     Although the IRS was able to identify certain United States taxpayers from the transactional data produced pursuant to the first John Doe summons to MasterCard I, the IRS required additional information to identify other cardholders in the data. The IRS determined that some merchants could identify persons who used a credit card to purchase goods or services from them. The IRS thus sought to issue summonses to these merchants, to identify the owner of some MasterCard payment cards produced in the first John Doe summons to MasterCard I.

14.     As part of this investigation, in 26 petitions, the IRS requested permission to serve John Doe summonses on 141 merchants. The information sought from the merchants included names and addresses associated with the transactional data previously produced by the credit card companies. Each of the 26 John Doe petitions and 141 merchant John Doe summonses requested by the IRS were

approved by the applicable United States District Court listed in the table below. The table also lists the case numbers in which orders authorizing the IRS to serve John Doe summonses were issued:

| No. | Date of Petition | Jurisdiction | Case Number |
|-----|------------------|--------------|-------------|
| 1 | August 2002 | USDC N.D. Cal. | 3:02-cv-04147-SI |
| 2 | August 2002 | USDC N.D. Ga. | 1:02-mi-00254-CAP |
| 3 | August 2002 | USDC N.D. Ill. | 1:02-cv-06178 |
| 4 | August 2002 | USDC N.J. | 2:02-cv-04211-DRD |
| 5 | August 2002 | USDC N.D. Tex | 3:02-cv-01854-L |
| 6 | August 2002 | USDC E.D. Va. | 1:02-mc-00042-TSE |
| 7 | October 2002 | USDC W.D. Wa. | 2:02-cv-01848-RSL |
| 8 | October 2002 | USDC Ariz. | 2:02-mc-00066-MHM |
| 9 | October 2002 | USDC C.D. Cal. | 2:02-cv-07965-RJK-JWJ |
| 10 | October 2002 | USDC M.D. Fla. | 6:02-mc-00100-ACC |
| 11 | October 2002 | USDC S.D. Fla. | 1:02-cv-23032-PAS |
| 12 | October 2002 | USDC Md. | 02-CV-3357 |
| 13 | October 2002 | USDC Minn. | 0:02-mc-00049-DSD-SRN |
| 14 | October 2002 | USDC E.D. Mo. | 4:02-mc-00283-JCH |
| 15 | October 2002 | USDC S.D. NY | M-18-304 |
| 16 | October 2002 | USDC S.D. Ohio | C-1-02-738 |
| 17 | October 2002 | USDC W.D. Tex. | 1:02-cv-00667-SS |
| 18 | October 2002 | USDC W.D. Va. | 3:02-mc-00002 |
| 19 | October 2003 | USDC S.D. Tex. | 4:03-cv-04054 |
| 20 | October 2003 | USDC N.D. Ok. | 4:03-mc-00028-TCK |
| 21 | October 2003 | USDC Colo. | 1:03-cv-01968-MSK |
| 22 | October 2003 | USDC W.D. Tenn. | 2:03-mc-00026-SHM |
| 23 | October 2003 | USDC E.D. Pa. | 2:03-cv-05665-EL |
| 24 | October 2003 | USDC Mass. | 03-MC-10310 |
| 25 | October 2003 | USDC E.D. Va. | 4:03-cv-00142-HCM-JEB |
| 26 | December 2003 | USDC W.D. Mi. | 1:03-mc-00140-DWM |

15.     Among the merchants summoned were airlines, hotel chains, rental car companies, and retail stores. These merchants were required to provide a broad range of information, including the names and addresses associated with the transactional data previously produced by the card issuers, and various account information provided to the merchant by the taxpayer, such as account information found in frequent flyer accounts and other member accounts held by the taxpayer with the merchant.

John Doe Summons Issued to Third Party Processors

16.     In another effort to identify United States taxpayers holding credit cards issued by offshore banks, the IRS turned its attention to United States-based third-party processors of card transactions, which often maintain records on a contract basis for card-issuing banks, including offshore

banks. Because such third-party processors of card transactions were in the United States, the IRS was able to pursue investigative avenues such as a John Doe summons to obtain the desired records. The IRS issued four John Doe summonses to third-party processors.

*John Doe Summons Issued to Credomatic of Florida*

17.    On September 11, 2003, the United States District Court for the Southern District of Florida (Case No. 03-22177 CIV-MARTINEZ) issued an order approving the service of a John Doe summons upon Credomatic of Florida, Inc. (Credomatic), a third-party processor for banks in offshore jurisdictions.

18.    Pursuant to the summons, Credomatic was required to provide all documents pertaining to MasterCard, VISA, or American Express payment cards issued by, through, or for banks in 15 specified offshore jurisdictions where a person associated with the account had a United States address or telephone number or where the account was in a list provided to Credomatic by the IRS. Such documents included records of all transactions, cardholder account statements, customer identifying information, correspondence, security records, and "know your customer" records.

*John Doe Summons Issued to First Data Corporation (2004)*

19.    On August 2, 2004, the United States District Court for the District of Colorado (Case No. 04-F-1548 (OES)) issued an order approving the service of a John Doe summons upon First Data Corporation (First Data 2004), a third-party processor for many banks in offshore jurisdictions. At that time, First Data 2004 claimed that it "maintained data for 398 million credit, debit and other accounts on behalf of 1,400 card issuing clients."

20.    Pursuant to the summons, First Data 2004 was first required to provide a list of banks or other financial institutions issuing payment cards in 32 specified offshore jurisdictions for which First Data 2004 was the third-party processor. After receiving this list, the IRS provided First Data 2004 with a list of MasterCard, VISA, and American Express payment card numbers issued banks identified by First Data 2004. First Data 2004 was then required to provide all documents related to these accounts for the period January 1, 1999, through December 31, 2003, where any person associated with the account had a United States address or telephone number, or had transactions in the United States over certain

thresholds. Information required under the summons included records of all transactions, cardholder account statements, customer identifying information, correspondence, security records, and "know your customer" records.

*John Doe Summons Issued to TecniCard, Inc.*

21.    On August 5, 2004, the United States District Court for the Southern District of Florida (Case No. 04-21986-CIV_UNGARO-BENAGES) issued an order approving the service of a John Doe summons upon TecniCard, Inc. (TecniCard), a third-party card processor for many banks in offshore jurisdictions.

22.    Pursuant to the summons, TecniCard was required to provide all documents pertaining to MasterCard or VISA payment cards issued by, through, or for banks in Belize and Grenada where a person associated with the account had a United States address or telephone number or where the account had United States activity over a certain threshold. Information required under the summons included records of all transactions, cardholder account statements, customer identifying information, security records and "know your customer" records.

*John Doe Summons Issued to Total Systems Services, Inc.*

23.    On August 16, 2004, the United States District Court for the Middle District of Georgia in (Case No. 4:04CV94-1 (CDL)) issued an order approving the service of a John Doe summons upon Total Systems Services, Inc. (TSYS Corporation) for records pertaining to cards issued by banks in 32 offshore jurisdictions. At the time, TSYS Corporation was one of the world's largest electronic payment processors of consumer credit, debit, commercial, stored value, and retail cards, representing more than 245 million cardholder accounts on file as of December 31, 2002.

24.    Pursuant to the summons, TSYS Corporation was first required to provide a list of banks or other financial institutions issuing payment cards in specified offshore jurisdictions for which TSYS Corporation was the third-party processor. After receiving this list, the IRS provided TSYS Corporation with a list of MasterCard, VISA, and American Express payment card numbers issued by banks identified by TSYS Corporation. TSYS Corporation was then required to provide all documents related to these accounts for the period January 1, 1999, through the date of compliance with the summons,

where any person associated with the account had a United States address or telephone number or had transactions in the United States over certain thresholds. Information required under the summons included records of all transactions, cardholder account statements, customer identifying information, correspondence, security records, and "know your customer" records.

Electronic Payment Systems Initiative

25.     The IRS's Electronic Payment Systems Initiative is an initiative aimed at identifying United States taxpayers who use electronic funds transfer and payment systems for tax avoidance purposes. Through this initiative, the IRS sought and obtained approval to use a John Doe summons to secure information on United States persons with offshore accounts from a United States-based electronic funds transfer business.

26.     On February 21, 2006, the United States District Court for the Northern District of California (Case No. 5:05-cv-04167-JW) issued an order approving the service of a John Doe summons upon PayPal, Inc., for records and information related to the period January 1, 1999, through December 31, 2004.

27.     PayPal was required to provide transactional information related to the account, along with information relating to the identities of the owners of payment cards identified through prior John Doe summonses, as well as information on additional United States taxpayers with PayPal accounts associated with a bank account or payment card associated with a bank located in one of 34 offshore jurisdictions.

Offshore Merchant Account Initiative

28.     The IRS's Offshore Merchant Account Initiative is an initiative aimed at identifying United States taxpayers who operate businesses and have some or all their gross income from credit, debit, and other payment card sales deposited directly into a bank account maintained outside the United States and investigating whether those persons have complied with internal revenue laws. To facilitate this investigation, the IRS used a John Doe summons to request information from a United States merchant card processing company to identify United States merchants who may have participated in arrangements suggestive of tax avoidance.

29.     On April 15, 2009, the United States District Court for the District of Colorado (Case No. 09-cv-00861-REB) signed an order approving the service of John Doe summonses upon First Data (First Data 2009).

30.     Pursuant to the summons, First Data 2009 was required to provide identifying information on all United States merchants who had established a transaction processing agreement with First Data 2009 and its subsidiaries and affiliates to process and settle debit card, credit card, charge card or other payment card transactions pursuant to an arrangement involving First Atlantic Commerce Limited, or certain other arrangements which resulted in net payments being deposited into a merchant account at a bank located outside the United States. In addition, First Data 2009 was required to provide these documents: annual account summaries reflecting account activity, documents pertaining to the opening and operations of the merchant accounts, periodic statements of account; and all documents pertaining to the referral of customers by First Data 2009 to its subsidiaries or intermediaries, including copies of agreements, desk files or other records of the relationship manager, emails, facsimiles, memorandums of telephone conversations, memorandums of activity, and other correspondence.

Offshore Private Banking Initiative

31.     The IRS's Offshore Private Banking Initiative is an initiative aimed at identifying United States taxpayers who use private banking services to avoid paying required United States taxes. IRS used John Doe summonses to request information from United States banks and other third parties to identify United States taxpayers who may have participated in such arrangements. Additionally, as part of this initiative, in cases in which an offshore bank did not have a United States branch or office, the IRS used John Doe summonses to request information from United States banks who serve as correspondent banks for the offshore bank. Correspondent banking is the provision of bank services by one bank to another bank, which allows banks to conduct business and provide services for their customers in countries where the banks have no physical presence.

*John Doe Summons to UBS AG Switzerland*

32.     On July 1, 2008, the United States District Court for the Southern District of Florida (Case No. 1:08-mc-21864-JAL) issued an order approving the service of a John Doe summons upon

UBS AG Switzerland, a bank headquartered in Switzerland with branches throughout the United States, including two in Miami, Florida.

33.     Pursuant to the summons, UBS was required to provide all documents pertaining to all United States taxpayers who maintain accounts with UBS AG in Switzerland but who had not provided to UBS (via Forms W-9) their taxpayer identification numbers and other information necessary for reporting to the Internal Revenue Service (via Forms 1099) taxable income earned from their Swiss accounts. This included customer-identifying records (passport, name, address, date of birth, taxpayer identification number), account opening documents, transactional records including periodic and wire statements, and desk files of UBS banking managers working on such accounts.

34.     UBS failed to comply with the summons, and the Department of Justice filed a Petition to Enforce on behalf of the IRS on February 19, 2009, in the United States District Court for the Southern District of Florida in Case No. 1:09-cv-20423-ASG.

35.     UBS later agreed to produce account records related to United States taxpayers.  UBS produced hundreds of thousands of pages of account records and transactional data pertaining to these taxpayers.  This information assisted the IRS in determining the tax compliance of UBS account holders.

*John Doe Summons Related to Stanford International Bank*

36.     On December 3, 2009, the United States District Court for the Northern District of Texas (Case No. 3:09-cv-02290-N) issued an order approving the service of John Doe summonses upon Ralph S. Janvey, Receiver of the assets and records of Stanford Group Company, Stanford Trust Company, Ltd., Stanford Fiduciary Investor Services, Inc., and related entities.

37.     Pursuant to the summons, the Receiver had to provide the following information: documents identifying all United States clients of Stanford Group Company or Stanford Trust Company, Ltd. (Stanford Trust (Antigua)), who had signature or other authority over any financial account at Stanford International Bank, Ltd., or held an interest in a corporation, trust, foundation, or other entity formed by or managed through Stanford  Trust (Antigua); documents pertaining to foreign entities through which accounts were held, documents identifying relationship managers, account opening

documents, customer correspondence, periodic account statements, records of transfers between accounts, etc.

### John Doe Summons Related to HSBC NRI

38.     On April 7, 2011, the United States District Court for the Northern District of California (Case No. 4:11-cb-01686-PJH) issued an order approving the service of a John Doe summons upon HSBC Bank USA, N.A. (HSBC USA).

39.     Pursuant to the summons, HSBC USA was required to provide, among other things, the following: documents identifying all United States taxpayers who, during the years 2002 through 2010, had interests in or authority over accounts maintained at Hongkong and Shanghai Banking Corporation Limited, India; documents pertaining to foreign entities through which accounts were held, documents identifying relationship managers, account opening documents, customer correspondence, periodic account statements, etc.

### John Doe Summons Related to Wegelin & Co.

40.     On January 25, 2013, the United States District Court for the Southern District of New York (Case No. 1:13-mc-00021-P1) issued an order approving the service of a John Doe summons upon UBS AG (UBS) as the correspondent bank for Wegelin & Co. (Wegelin).

41.     Pursuant to the summons, UBS was required to provide records for Wegelin's correspondent account at UBS, including bank statements, copies of deposited checks and deposit slips, copies of checks cleared through the account, wire records, information on anti-money laundering investigations related to transactions through this account, and information on other services provided by UBS to Wegelin.

### John Doe Summons Related to CIBC FirstCaribbean International Bank

42.     On April 29, 2013, the United States District Court for the Northern District of California (Case No. 3:13-cv-01938-THE) issued an order approving the service of a John Doe summons upon Wells Fargo Bank NA (Wells Fargo) as the correspondent banks for CIBC FirstCaribbean International Bank (FCIB).

43.     Wells Fargo was required to provide records for FCIB's correspondent accounts at Wells Fargo, including bank statements, copies of deposited checks and deposit slips, copies of checks cleared through the account, wire records, information on anti-money laundering investigations related to transactions through this account, and information on other services provided by Wells Fargo to FCIB.

*John Doe Summonses Related to Zürcher Kantonalbank*

44.     On November 7, 2013, the United Stated District Court for the Southern District of New York (Case No. 1:13-mc-00378-P1) issued an order approving the service of John Doe summonses upon Citibank NA (Citibank) and Bank of New York Mellon (Mellon) as United States correspondent banks for Zürcher Kantonalbank (ZKB).

45.     Citibank and Mellon were required to provide records for ZKB's correspondent accounts at Citibank and Mellon: bank statements, copies of deposited checks and deposit slips, copies of checks cleared through the account, wire records, information on anti-money laundering investigations related to transactions through this account, and information on other services provided by Citibank and Mellon to ZKB.

*John Doe Summonses Related to The Bank of N.T. Butterfield & Son Limited*

46.     On November 12, 2013, United States District Court for the Southern District of New York (Case No. 1:13-mc-00377-P1) issued an order approving the service of a John Doe summons upon five United States correspondent banks of The Bank of N.T. Butterfield & Son Limited, a.k.a. Butterfield Bank and Bank of Butterfield, its predecessors, subsidiaries, and affiliates (collectively, Butterfield), including JPMorgan Chase Bank, NA (JPMorgan); Mellon; HSBC USA, NA (HSBC USA); Bank of America, NA (Bank of America); and Citibank, NA (Citibank).

47.     JPMorgan, Mellon, HSBC USA, Bank of America, and Citibank were required to provide records for Butterfield's correspondent accounts at JPMorgan, Mellon, HSBC USA, Bank of America, and Citibank, including bank statements, copies of deposited checks and deposit slips, copies of checks cleared through the account, wire records, information on anti-money laundering investigations related to transactions through this account, and information on other services provided by the five correspondents accounts to Butterfield.

*John Doe Summonses related to Belize Bank International Ltd., Belize Bank Ltd., and Belize Corporate Services Ltd.*

48. On September 16, 2015, the United States District Court for the Southern District of Florida (Case No. 1:15-mc-23475-UU) issued an order approving the service of John Doe summonses upon Bank of America and Citibank for correspondent account information related to Belize Bank International Limited, Belize Bank Limited, or Belize Corporate Services (collectively, the Belize Entities).

49. Bank of America and Citibank were required to provide records for the Belize Entities' correspondent accounts at Bank of America and Citibank, including bank statements, copies of deposited checks and deposit slips, copies of checks cleared through the account, wire records, information on anti-money laundering investigations related to transactions through this account, and information on other services provided by Bank of America and Citibank to the Belize Entities.

<u>Offshore Services Provider Initiative</u>

50. OCI's Offshore Services Provider Initiative includes developing projects, methodologies, and techniques for identifying United States taxpayers who use the services of domestic or foreign advisors to establish offshore trusts, corporations, or other arrangements to hide ownership of assets located offshore or within the United States for tax avoidance purposes.

*John Doe Summonses related to Sovereign Management & Legal, Ltd.*

51. On December 18, 2014, the United States District Court for the Southern District of New York (Case No. 1:14-mc-00417-P1) issued an order approving the service of John Doe summonses upon Federal Express Corporation (FedEx); DHL Express (DHL); United Parcel Service, Inc. (UPS); Western Union Financial Services, Inc. (Western Union); the Federal Reserve Bank of New York (Federal Reserve); Clearing House Payments Company LLC (Clearing House); and HSBC USA to identify United States taxpayers who used the services of Sovereign Management & Legal, Ltd. (SML), an offshore corporate services provider headquartered in Panama.

52. The shipping companies (FedEx, DHL, and UPS) were required to provide information on items shipped between SML and United States addresses. Western Union was required to provide information on payments to SML for services rendered and for loading onto pre-paid debit cards.

Federal Reserve and Clearing House were required to provide information on payments to SML by wire transfer. HSBC USA was required to provide information on SML's banking relationship with HSBC Panama and the Hongkong and Shanghai Banking Corporation Limited in Hongkong, both of which used HSBC USA as a correspondent bank.

*John Doe Summons to Michael Behr, Sovereign Gold Card*

53.   On January 18, 2017, the United States District Court for the District Court for the District of Montana (Case No. 2:17-cv-00002-BMM) issued an order approving the service of a John Doe summons upon Michael Behr to identify United States taxpayers who held or had authority to use a Sovereign Gold Card through Sovereign Gold Card or SML, which offered prepaid offshore debit cards, also known as stored value cards, through Sovereign Gold Card.

54.   Michael Behr was required to provide records of all customer accounts, orders, and fund transfers, a copy of all databases related to clients, all books and records maintained in connection with those customer accounts, all correspondence with customers and SML or Sovereign Gold Card, all account or periodic statements, and all records relating to foreign entities established or related to a customer.

*John Doe summonses to the Wessell Group*

55.   On September 13, 2018, the District Court for the Southern District of Florida (Case No. 018-cv-62135-WPD) issued an order approving the service of a John Doe summons upon Kevin W. Wessell, Leslie A. Wessell, and Sophia R. Wessell for records related to financial accounts and entities of the Wessell Group's = clients, including, in part: client identifying information (client opening forms, passports, other identification documents); contact and contact history information; client payments and invoices; books, papers or other data related to services provided; and all foreign and domestic entities formed on behalf of clients. The court's order also approved the issuance of the service of a John Doe summons upon Bank of America and Wells Fargo for all documents related to Wessell Group and any related account holders including, in part: signature cards; account applications; all periodic statements; records of all wire transfers, checks deposits; all desk files or memorandum files of account executives, private bankers or relationship managers; and all correspondence.

56.     On September 20, 2018, the District Court for the Central District of California (Case No. 2:18-cv-8003-CAS-E) issued an order approving the service of a John Doe summons upon Laura Smith, a bookkeeper at the Wessell Group, for client records maintained by the Wessell group including, in part: client identifying information (client opening forms, passports, other identification documents); contact and contact history information; client payments and invoices; books, papers or other data related to services provided; and all foreign and domestic entities formed on behalf of clients. On October 12, 2018, the District Court for the Southern District of New York (Case No. 1:18-mc-00423-PKC) issued an order approving the service of a John Doe summons upon Nevis Services, Limited, for records related to financial accounts and entities of the Wessell Group's clients, including, in part: client identifying information (account opening forms, know your customer information); contact and contact history information; payments and invoices; books, papers or other data related to services provided; and all foreign and domestic entities formed.

*John Doe summonses to related to Panama Offshore Legal Services*

57.     On July 15, 2021, the United States District Court for the Southern District of New York (Case No. 1:21-mc-00424-GHW) issued an order approving the service of John Doe summonses to identify U.S. persons who used the services of the Panama Offshore Legal Services (collectively, POLS), upon FedEx, Federal Express Corporation (FedEx Ground), DHL and UPS to provide information on items shipped between POLS and United States addresses. POLS is a Panamanian law firm, which assisted its U.S.-based clients in concealing their beneficial ownership in assets and evading U.S. internal revenue laws. The court also authorized service of a John Doe summons on the Federal Reserve and Clearing House to provide information on payments to POLS by wire transfer. It also authorized service of a John Doe summons on the HSBC USA, Citibank, Wells Fargo, and Bank of America for information on POLS's banking relationship with Banco Panameño de la Vivienda, S.A. and Credicorp Bank S.A, and/or Banco General S.A. and the correspondent banking services of HSBC USA, Citibank, Wells Fargo and Bank of America.

58.     On September 2, 2021, the United States District Court for the District of Minnesota (Case no. 0:21-mc-00032-MJD) issued an order approving the service of John Doe summons upon

MoneyGram Payment Systems, Inc. for all records related to payments where any POLS entity was identified with respect to the payment, including in part: transactional records; contact information related to the identity of each party to the transfer; and all AML logs.

59.     On August 3, 2022, the United States District Court for the District of Colorado (Case no. 1:21-cv-01221-DDD) issued an order approving the service of John Doe summons to Western Union for all records related to payments where any POLS entity was identified with respect to the payment, including in part: transactional records; contact information related to the identity of each party to the transfer; and all AML logs.

### Results of the John Doe Summons in these IRS Initiatives

60.     Through the John Doe summonses in the Offshore Credit Card Project, the IRS received information on more than 100 million transactions involving more than 1.2 million unique accounts. For example, the John Doe summons to MasterCard I, discussed above, produced more than 1.7 million transaction records for more than 230,000 unique accounts. Based on these records, the IRS identified tens of thousands of United States taxpayers with tax non-compliance and developed thousands of cases for civil examinations and criminal investigations.

61.     Through the John Doe summonses in the other IRS initiatives discussed above, the IRS received information on more than 570 million transactions. For example, in connection with the John Doe summons to UBS AG Switzerland, the IRS received information on approximately 10,000 customers of UBS, along with detailed records of account opening records, know your customer records, correspondence, transaction history, periodic statements, signature cards, and power of attorney documents. As another example, in connection with the correspondent account John Doe summonses, the IRS received, among other data, millions of records of wire transfer transaction activity. The IRS has been reviewing data received from the John Doe summonses in the IRS initiatives discussed above, identifying United States taxpayers, identifying non-compliant taxpayers for examination, and, for taxpayers who are already under examination, sending the data to the revenue agent conducting the examination of that taxpayer. To date, the IRS has identified tens of thousands of United States taxpayers with tax non-compliance.

62.     The size and nature of productions received varied depending on the nature of the transactions at issue and the types of records sought. A significant distinction exists between structured data, i.e., data in a standardized format that is or can be made electronically searchable, and unstructured data, which has no standardized format. For example, while a request for records pertaining to the creation, management, and ownership of foreign entities, might produce thousands of unstructured records, including legal filings, agreements, and correspondence, a request for structured data concerning electronic financial information might yield hundreds of thousands or millions of data points with respect to tens of thousands of financial accounts.

63.     The production of 160 million transaction records is not out of line with what the IRS has received, or expects to receive, when it issues a John Doe summons for structured records of transaction data. The same can be said for the production of 59,351 user accounts.

**Use of John Doe Summonses in the IRS's Investigation into Cryptocurrency**

64.     On April 1, 2021, the United States District Court for the District of Massachusetts (Case No. 1:21-mc-91201-RGS) issued an order approving the service of a John Doe summons upon Circle Internet Financial, Inc., or its predecessors, subsidiaries, divisions, affiliates, including Poloniex LLC (collectively "Circle"), which operate digital currency exchanges. The summons calls for the production of account registration records, Know-Your-Customer ("KYC") due diligence, user correspondence, Anti-Money Laundering ("AML") system exception reports, account transaction data, and records of account funding for users with $20,000 in total transactions in any one year during the 2016-2020 period.

65.     On August 15, 2022, the United States District Court for the Central District of California (Case No. 2:22-cv-05715-ODW-KS) issued an order approving the service of a John Doe Summons upon SFOX to identify U.S. persons who had accounts with Ox Labs Inc., d/b/a/ SFOX (SFOX) , which operates as a cryptocurrency prime dealer and trading platform. The summons calls for the production of account registration records, KYC due diligence, user correspondence, AML system exception reports, account transaction data, records of account funding, and information pertaining to SFOX user accounts

with M.Y. Safra, SFB ("M.Y. Safra")(discussed below), for users with $20,000 in total transactions in any one year during the 2016-2021 period.

66.     On September 22, 2022, the United States District Court for the Southern District of New York (Case No. 1:22-mc-00213-PGG) issued an order approving the service of a John Doe summons upon M.Y. Safra, a bank SFOX partnered with to provide SFOX users with access bank accounts. The summons calls for, with respect to certain account holders associated with SFOX, account registration/application records, KYC due diligence reports, records of account activity, periodic account statements, records of account funding, and AML exception reports.

**Discussions with Kraken**

67.     On September 24, 2021, Kraken (through its outside counsel) represented that 14,924 account holders met the requirements of the John Doe class, including 2,935 account holders with the equivalent of $100,000 in value of cryptocurrency transactions.

68.     Despite repeated requests, Kraken refused to provide the number of account holders that met the requirements of the class definition used in *United States v. Coinbase*, Case No. 17-cv-01431-JSC, 2017 WL 5890052, (N.D. Cal. Nov. 28, 2017), i.e., accounts with at least the equivalent of $20,000 in any one transaction type (buy, sell, send, or receive) during the relevant period, which in this case is January 1, 2016 to December 31, 2020.

69.     By letter dated November 12, 2021, Kraken informed the IRS that, while chain-splitting or similar events are depicted in transaction data records merely as a regular deposit or transfer transaction, it could potentially identify the moment in time Kraken began supporting a new cryptocurrency created because of a chain-splitting hard fork.

70.     The IRS has offered to have its Information Technology ("IT") employees on calls with Kraken to help develop queries for or otherwise assist with the production of the summoned information. The IRS has also suggested that Kraken allow its IT employees to participate in calls with the IRS for such discussions. But Kraken did not make their IT employees available or request IRS IT employee assistance.

**John Doe Summons Data Storage**

71.     The IRS does not use the Enterprise Case Management System for the storage of information received through John Doe Summonses.

**Summons Requests and Lessons Learned from *Coinbase***

72.     The John Doe summons requests a user's United States-based address, telephone number, email address, internet protocol address, or associated bank or financial account information. In my experience as a Revenue Agent, although not conclusive, such U.S. connections suggest that the account holder may be a United States person. Without the collection of tax residency information by Kraken, limitation of the class by such U.S. connections is designed to capture the account holders that are most likely to be subject to U.S. tax. One United States connection by itself is insufficient to determine whether the user is a U.S. person. Conversely, one or multiple foreign connections may not be enough to conclude that the account holder is not a U.S. person. For example, email internet domains and IP addresses are insufficient by themselves to determine whether an accountholder is U.S. person. Many email service providers offer email services to residents of multiple countries. Also, IP addresses may be masked or manipulated using Virtual Privacy Networks (VPNs).

73.     The summons request for telephone number, email address, history of all changes to the personal information in the account, and user history for IP addresses are based on lessons learned from *Coinbase*. Because of the difficulty the IRS encountered in identifying all the summoned Coinbase users these additional pieces of basic identifying information are necessary.

74.     One key to determining whether there has been tax compliance is establishing, without question, the account holder's identity within the IRS's own computer systems. This means linking a particular account holder to a particular name and taxpayer identification number within the IRS's internal databases. This is because the IRS cannot begin an examination of a taxpayer without first positively identifying that taxpayer. To do so, the IRS employs several methods, including matching identifying information from external sources with IRS internal sources and databases.  Generally, the IRS tries to have at least three specific data points that match to positively link information to a

taxpayer. Being able to reconcile multiple different pieces of identifying information against the IRS's internal records is necessary when verifying an account user's identity.

75.     In reviewing the information provided in response to the John Doe summons issued to Coinbase, the IRS ran into several problems when trying to positively identify the account holders.

76.     The information provided by Coinbase lacked taxpayer ID numbers for approximately 10% of the users (over 1,300 taxpayers). There were also over 150 instances where the account data did not include a name and approximately 170 instances where the name was a pseudonym rather than an actual name. There were over 500 instances where no date of birth information was provided and roughly 650 instances where no physical address information was provided.

77.     Some of the account information was missing because it had not necessarily been collected for some of the oldest accounts. In these situations, basic identity information such as name, taxpayer ID number, date of birth, and physical address was insufficient to positively identify the actual taxpayer account holder.

78.     The failure in these instances was almost entirely because the account information provided lacked a taxpayer ID number. Where there was no taxpayer ID number and other information was also missing, it was nearly impossible for the IRS to positively identify the relevant taxpayer. Kraken offers its user several levels of service: for starter, intermediate, and pro, Kraken gathers the user's email address, full name, date of birth, phone number, and physical address. Yet Kraken does not require a taxpayer ID number for the starter account level. For Kraken users at the starter level, the IRS expects it will need additional identifying information to compensate for the missing taxpayer IDs.

79.     None of the account levels place any restrictions on trading volume or value. This means that an individual with a starter account can trade cryptocurrency in unlimited amounts (and generate significant amounts of taxable gain) without needing to provide a taxpayer ID number.

80.     Since Coinbase completed its production of information to the IRS in August 2018, the IRS has spent a significant amount of time and resources to identify approximately 535 additional taxpayers from this data, but more than 750 individual taxpayers are still unknown to the IRS. The IRS continues to work on identifying additional taxpayers.

81.     The transaction information with respect to the more than 750 still unidentified taxpayers reveals that those taxpayers realized more than $100,000,000 in gross proceeds from the sale of cryptocurrency during the years covered by the Coinbase John Does summons which the IRS has been unable to link to any identifiable taxpayers.

82.     The Coinbase data production included over 170 instances in which a pseudonym rather than an actual name was provided. Such pseudonyms include what appear to be entity names, user initials, numbers, and words that are not names (for example: "no one," "Highland Farmhand," "Sparrow," "My Wallet," and "TheStubbornPainter.") [1] In my experience, users often employ a pseudonym in lieu of their real name so that they can remain anonymous.

83.     The IRS defined the class in *Coinbase* based on its understanding of how Coinbase did business and based upon its user base. What the IRS learned during discussions with Coinbase was that most of its users engaged in low volume, low dollar transactions. This understanding of its user base and how it did business was the reason the IRS changed the class definition in *Coinbase* to accounts with at least the equivalent of $20,000 in any one transaction type (buy, sell, send, or receive). The summons to Coinbase also called for the production of information for 2013-2015.

84.     The summons to Kraken differs in that the IRS has defined the class to be users with $20,000 in total transactions in any one year during the 2016-2020 period. This definition it intended to eliminate users that are engaging in low volume, low dollar transactions but also reflect the reality that the cryptocurrency market has changed in size and scope since 2015.

85.     The cryptocurrency marketplace during 2016-2020 included more types of cryptocurrencies, more user uptake, and for the most part exponential growth, as compared to 2013-2015.

86.     Also, the IRS's understanding of how taxpayers are using cryptocurrency has evolved. More businesses and other entities started accepting cryptocurrency as a form of payment during the period as well as more taxpayers accepting cryptocurrency as compensation.

---

[1] To avoid potential identification of specific taxpayers, the examples are illustrative of types of pseudonyms used rather than the actual pseudonyms observed in the Coinbase data.

87.     After the Coinbase summons, the IRS learned that not all cryptocurrency exchanges label transactions using the descriptions used in the Coinbase summons, buy, sell, send, or receive. Exchanges may also label transactions as deposits, withdrawals, credits, debits, trades, or transfers. Accordingly, the summons in this case no longer references the labels for certain transaction types.

88.     In *Coinbase*, the IRS agreed to a carve out from the user class for users that had "bought and held." What this reflected was the IRS's understanding at the time that users that bought cryptocurrency during the period and held it wouldn't experience a taxable event.

89.     The IRS has learned, however, that because of the way certain cryptocurrency events are reflected in a user's transaction history, its carve out for those that "bought and held" was flawed.

90.     Receipt of cryptocurrency, without a corresponding sale, can be taxable.  For example, a taxpayer's receipt of new cryptocurrency in connection with a "hard fork" is taxable. *See generally* Rev. Rul. 2019-24. A hard fork occurs when the distributed ledger technology used by a cryptocurrency undergoes a protocol change that results in a permanent diversion from the existing distributed ledger. A hard fork may create a new cryptocurrency, which is then recorded on a new distributed ledger, while transactions involving the legacy cryptocurrency remain recorded on the legacy distributed ledger. This type of hard fork is known as a "chain-split." Sometimes, a hard fork coincides with a distribution of the new cryptocurrency, known as an "air drop," to holders of the legacy cryptocurrency. Receipt of the new cryptocurrency via an air drop following a hard fork results in taxable income to the recipient.

91.     Cryptocurrency can be used in lending transactions that generate taxable interest income. Users can deposit their cryptocurrency into a pool of assets, known as a lending pool. Borrowers take loans from the pool by posting cryptocurrency collateral, drawing cryptocurrency from the lending pool, and paying taxable interest to the lenders. A carve out for users that "bought and held" would fail to capture these users.

92.     Also, a taxpayer's gain or loss upon the disposition of virtual currency will generally be the difference between adjusted basis in the virtual currency and the amount received in exchange for the virtual currency, which should be reported on the tax return. *See* 26 U.S.C. § 1001; IRS *Frequently Asked Questions on Virtual Currency Transactions*, *supra*, Q7. Basis, for virtual currency purposes, is

generally determined by the cost or amount spent to acquire cryptocurrency, adjusted for fees, commissions, and other acquisitions costs. *See* 26 U.S.C. § 1012; IRS *Frequently Asked Questions on Virtual Currency Transactions*, *supra,* Q8. When reporting gains and losses from the sale of virtual currency, a taxpayer may use different methods for calculating that gain or loss. A taxpayer may use the specific identification method (which pairs the sale of a specific unit of virtual currency against a specific acquisition) or the so-called "first-in-first-out" (FIFO) accounting method (which simply pairs the sale of a unit of virtual currency against the oldest-acquired unit chronologically). IRS *Frequently Asked Questions on Virtual Currency Transactions*, *supra,* Q39 – Q41.  Although these approaches provide taxpayers with flexibility in how they calculate gains or losses on the sale of virtual currency units, they do not allow the IRS to make a "taxable gain" determination by simply reviewing an account holder's transaction information in isolation. Instead, the IRS must first positively identify an account holder and then determine whether that individual filed a tax return for the relevant tax year, whether that return reported virtual currency transactions, and, if so, whether what was reported, or the approach taken in reporting the information, complies with the internal revenue laws.

93.     To determine whether a taxpayer's reporting of virtual currency complies with internal revenue laws, the IRS must know the correct adjusted basis for the units of virtual currency. This requires historical account information. If a taxpayer uses the FIFO accounting method, to determine which units of virtual currency were sold in a given year, the IRS must review a record of when prior units by a taxpayer were sold and match that information against records of when all units owned by the taxpayer were acquired. Likewise, if a taxpayer uses the specific identification method, the IRS must review historical records to determine whether the taxpayer has identified a specific virtual currency unit as sold to avoid the double counting of basis.

94.     What this means is that if a taxpayer bought $20,000 of cryptocurrency in 2016 and held it until 2017 (when the cryptocurrency market experienced a downturn), at which point it was sold or exchanged, the IRS needs the transaction information from 2016 in addition to the transaction information for 2017 to determine whether the taxpayer has properly determined any potential gain or more likely loss. If the taxpayer sold that cryptocurrency in 2017 for less than $20,000, he would have

experienced a loss. Under the *Coinbase* class definition the IRS would not receive this user's information because in 2016 he bought and held and in 2017 he transacted below the dollar threshold. Yet, a complete understanding of this taxpayer's transaction reveals that he experienced a taxable event, and his information should be captured in the summons response.

95.     Each transaction recorded on the blockchain is identified by a transaction hash (ID).  The transaction hash (ID) can be used to retrieve and view the details of a transaction. Transaction hash information and blockchain addresses can be used to trace transactions between sending and receiving addresses, which can be used to identify other locations that a taxpayer may hold virtual currency or to determine whether cryptocurrency was transferred by one taxpayer to another in a potentially taxable transaction. Unlike traditional investment accounts where an account holder is buying and selling securities entirely within that account, cryptocurrency exchanges generally permit users to deposit and withdraw the cryptocurrency units themselves which allows users to shift property among multiple accounts for profit-maximization or other reasons.

96.     The need to identify the existence of other accounts owned by a user and to trace the movement of cryptocurrency to those accounts makes calculating a taxpayer's gain for tax compliance purposes extremely difficult. The IRS needs to know this information to identify what other places the user is holding cryptocurrency so it can gather as much information as possible to make a determination regarding the user's tax compliance.

97.     To evaluate this information to determine the proper tax characterization of the transactions and whether a user is in tax compliance, the IRS needs this transactional information, including the date and time of the transaction, cryptocurrency involved, amount of cryptocurrency involved, U.S. dollar value, transaction hash (ID), and blockchain addresses.

98.     Transaction hash (ID) and blockchain addresses were not requested in the John Doe summons issued to Coinbase, because, at the time such requests were formulated, the IRS's knowledge of cryptocurrency technology and the data needed to effectively trace cryptocurrency transactions was still developing. Without transaction hash (ID) and blockchain address information, the IRS's ability to

trace transactions was limited. Analytical software the IRS uses is less effective in tracing transactions without transaction hash (ID) or blockchain addresses.

99.    The IRS is only seeking records of account activity (request 4) for the period covered by the John Doe Summons, January 1, 2016, to December 31, 2020.

100.    The IRS is only seeking records of account funding (request 5) for the period covered by the John Doe Summons, January 1, 2016, to December 31, 2020.

101.    The IRS does not seek AML exception reports (or triggers as Kraken calls them) and investigative records to request user correspondence. Although user correspondence may be described in the trigger and contained in the investigative records, receipt of the user correspondence is not the purpose of the request. Instead, the identification of the accounts with irregular activity that triggered the need for an AML investigation and the factual basis for the resolution of the investigation is the purpose of the request. Review of the need for the investigation and the factual basis for resolving the investigation may shine light upon whether activity in the account is indicative of tax noncompliance.

102.    In my experience as a Revenue Agent, I have been involved in tax examinations where the financial status of the taxpayer is difficult to determine. This is more common in cryptocurrency examinations because users of cryptocurrency tend to be younger taxpayers that often have non-traditional income sources.

103.    Kraken permits users to fund their accounts with either fiat currency or with cryptocurrency. Understanding how the user's account was funded and where it was funded from can provide valuable insight for the IRS when determining whether an individual is in compliance with the internal revenue laws.

104.    In my experience, information on how a user funds their cryptocurrency account can also be used to uncover related taxpayers or nominee situations. For example, the IRS conducted examinations of multiple seemingly unrelated taxpayers. Upon receiving summons information from cryptocurrency exchanges, the IRS was able to identify cross-linked bank accounts—that is, bank accounts of one taxpayer linked to another taxpayer's cryptocurrency exchange account and vice versa.

Learning this information changed how the IRS approached the separate examinations and changed how the IRS approached any tax adjustments in the examinations.

105.    Knowing the source of funds when initially reviewing a taxpayer's account information can provide important insight into determining whether an individual is in tax compliance. A taxpayer with minimal reported income and numerous linked funding sources is more likely to not be in compliance with the internal revenue laws.

106.    Also, a taxpayer with funding sources that are not in his own name is more likely to not be in compliance.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 5th day of May 2023, in Destin, Florida.

_____
KAREN CINCOTTA
Supervisory Internal Revenue Agent
Internal Revenue Service

Second Declaration of Karen Cincotta
in Support of Petition to Enforce
Internal Revenue Service Summons         26