GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 Marshall Street
Redwood City, CA  94063
Tel.: +1 650 752 3100
Fax: +1 650 853 1038

AMANDA H. RUSSO (SBN 319617)
*ARusso@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Floor
Los Angeles, CA  90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Respondent
PAYWARD VENTURES, INC., d/b/a
KRAKEN OR KRAKEN.COM

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:23-MC-80029-JCS |
| Plaintiff, | **RESPONDENT PAYWARD VENTURES, INC.'S OPPOSITION TO PETITION TO ENFORCE INTERNAL REVENUE SERVICE SUMMONS** |
| v. | |
| PAYWARD VENTURES, INC., d/b/a KRAKEN OR KRAKEN.COM, OR ITS PREDECESSORS, SUBSIDIARIES, DIVISIONS, OR AFFILIATES, | Date:       May 19, 2023<br>Time:       9:30 a.m.<br>Courtroom: F (15th Floor)<br>Judge:      Hon. Joseph C. Spero |
| Respondent. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND AND PROCEDURAL HISTORY ....................................................... 2

    I.      Overview of Kraken and Its Operations ................................................ 2

    II.     Kraken's Storage of Relevant Data ....................................................... 2

    III.    The IRS Sought an *Ex Parte* Order to Serve a Sweeping John Doe Summons, but This Court Determined the Summons Was Too Broad and Must be Narrowed ......... 3

    IV.    After Issuance of a "Narrowed" Summons, Kraken Tries to Negotiate Scope ........... 4

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

    I.      THE IRS FAILS TO SHOW WHY ITS OVERREACHING AND BURDENSOME REQUESTS SHOULD BE ENFORCED ................... 6

          A.    The Summons' Definition of User Makes It Broader Than Necessary to Achieve the Government's Investigative Purpose. ............................................. 7

          B.    The IRS's Request No. 1 for User Identity Information Goes Beyond *Coinbase* And Is Irrelevant, Overbroad, and Burdensome ............................... 11

          C.    The IRS's Request No. 2 for KYC Data Goes Beyond *Coinbase*, Is Irrelevant to Any IRS Purpose, and Is Unduly Burdensome .................................... 17

          D.    Request No. 3 for Exception Reports and Investigation Records Similarly Goes Beyond Coinbase, Is Irrelevant to the IRS's Purposes, and Unduly Burdensome ............................................................. 19

          E.    Request No. 4 for Account Activity Is Overbroad and Unduly Burdensome .. 22

          F.    The IRS's Request No. 5 for Account Funding Records Is Irrelevant, Broader Than Necessary for Its Purposes, and Burdensome ......................................... 23

    II.     THE PETITION SHOULD BE DENIED IN ITS ENTIRETY ................................. 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*David H. Tedder & Assocs., Inc. v. U.S.*,
    77 F.3d 1166 (9th Cir. 1996)...................................................................................18

*In re John Does*,
    No. CV-N-88-319-ECR, 1990 WL 264130 (D. Nev. Oct. 1, 1990) ........................10

*In re Tax Liabilities of John Does*,
    688 F.2d 144 (2d Cir. 1982)......................................................................................9

*Standing Akimbo, LLC v. U.S.*,
    955 F.3d 1146 (10th Cir. 2020)................................................................................17

*U.S. v. Bisceglia*,
    420 U.S. 141 (1975)...........................................................................................1, 5, 7

*U.S. v. Coinbase, Inc.*,
    No. 17-cv-1431, 2017 WL 5890052 (N.D. Cal. Nov. 28, 2017) ..................... *passim*

*U.S. v. Coopers & Lybrand*,
    550 F.2d 615 (10th Cir. 1977)..................................................................6, 16, 18, 21

*U.S. v. Davey*,
    543 F.2d 996 (2d Cir. 1976)..............................................................................15, 17

*U.S. v. Goldman*,
    453 F. Supp. 508 (C.D. Cal. 1978)............................................................................9

*U.S. v. Goldman*,
    637 F.2d 664 (9th Cir. 1980)....................................................................................18

*U.S. v. LaSalle Nat'l Bank*,
    437 U.S. 298 (1978)...................................................................................................5

*U.S. v. Matras*,
    487 F.2d 1271 (8th Cir. 1973)..................................................................................20

*U.S. v. Monumental Life Ins. Co.*,
    440 F.3d 729 (6th Cir. 2006)............................................................................ *passim*

*U.S. v. Powell*,
    379 U.S. 48 (1964)..................................................................................................5, 6

*U.S. v. Theodore*,
    479 F.2d 749 (4th Cir. 1973)......................................................................................6

*Zietzke v. U.S.*,
   No. 19-CV-03761-HSG(SK), 2020 WL 264394 (N.D. Cal. Jan. 17, 2020) .................13, 22, 23

**Statutes**

26 U.S.C. § 7602 ......................................................................................................................1, 5, 6

26 U.S.C. § 7609(f) ......................................................................................................... *passim*

26 U.S.C. § 6501(a) ...........................................................................................................15

**Other Authorities**

EU General Data Protection Regulation .......................................................................10

**INTRODUCTION**

More than five years ago, this Court admonished the IRS for trying to obtain too much information through a "John Doe" summons issued under 26 U.S.C. § 7602. The Court drastically narrowed the scope of that summons and permitted the IRS to seek only basic personal information and transaction records for Coinbase's users. *U.S. v. Coinbase, Inc.*, No. 17-cv-1431, 2017 WL 5890052 (N.D. Cal. Nov. 28, 2017). Now, the IRS asks this Court to ignore *Coinbase* and permit it to obtain from Payward Ventures, Inc. ("Kraken") even more categories of information than before, for the sake of convenience. It also asks this Court to impose upon Kraken, a third party, the massive burden of producing all this information—no matter how difficult to retrieve or unnecessary to its investigation—for nearly *60,000 users*. Kraken opposes this request.

The IRS previously asked Coinbase, another digital asset exchange, to produce a wide swath of information about thousands of its users, so that the IRS could investigate its hunch that some users might have underreported their taxes. The Court let the IRS move forward with a summons, but only after eliminating or significantly narrowing several of its overreaching requests that were not tailored to its investigative purpose. The IRS tried to justify its expansive summons by arguing that it would save the Government a second trip to the courthouse to obtain additional information. But this Court found that justification insufficient, even under the deferential standards of § 7602, especially given the substantial burdens imposed on Coinbase and concerns that came with a massive production of potentially irrelevant information. The Court's bottom-line holding was that the IRS could not seek an expansive number of documents about thousands of users, on the *possibility* that some of them might not have been paying taxes. The Court permitted the IRS to obtain only basic information that might help it identify potentially reportable gains.

Rather than abide by *Coinbase*'s ground rules, the IRS doubles down, making even more expansive requests and relying on a thinner rationale. Not only does it ask for several of the same categories of information that were rejected in *Coinbase*, it wants more—and for a much bigger universe of users. Such a Summons is far "broader than necessary to achieve" the IRS's purpose of investigating potentially underreported taxable gains. *U.S. v. Bisceglia*, 420 U.S. 141 (1975).

Section 7602 allows the IRS to either go a mile wide and an inch deep (collecting basic

information on many users), or an inch wide and a mile deep (collecting lots of information about a small subset of users).  It certainly does not permit a summons to go a mile wide *and* a mile deep, seeking nearly everything under the sun for nearly 60,000 users.  Kraken should not be required to undertake the enormous burdens imposed by the IRS's unjustified treasure hunt.  This Court should deny the Petition in its entirety.

## BACKGROUND AND PROCEDURAL HISTORY

### I.       Overview of Kraken and Its Operations

Kraken is a U.S.-based online cryptocurrency exchange platform founded in 2011.  Decl. of Todd Siemers ("Siemers Decl.") ¶ 4.  Kraken offers its services to both U.S. and international users in more than 190 countries.  *Id*.  Users can open an account with Kraken at various levels: Starter, Express, Intermediate, or Pro.  *Id.* ¶ 5.  During the 2016-2020 time period, all account levels required certain identity information, including first and last name, birthdate, address, phone number, and email address.  *Id*.  Intermediate and Pro accounts, which allow for higher-value withdrawals and transactions, require additional verification to confirm user identity and address through the upload of an identification document (e.g., a passport or driver's license) and proof of residence.  *Id.* ¶¶ 5-6.  Pro accounts are also required to complete a Know-Your-Customer ("KYC") Questionnaire, which, among other things, asks about the account holder's occupation, source of income, and intended use of the account.  *Id.* ¶ 6.  Starter, Express, and Intermediate accounts are for individuals only; while Pro accounts can also be used by businesses.  *Id.* ¶ 7.

### II.      Kraken's Storage of Relevant Data

The IRS seeks a variety of categories of data from Kraken.  While easy to ask for this information, much of it is not easy to get.  Some data sought by the IRS is searchable and retrievable on a large scale or "global" basis, making it relatively manageable to produce, but other categories can only be obtained by manual review on an account-by-account basis or by requiring Kraken to devise and implement data engineering solutions that would take weeks or months to complete.

Kraken stores current basic personal information for all users in a data "warehouse" or in a connected encrypted database, and has tools that permit this data to be globally queried and pulled based on a search of identified accounts.  *Id.* ¶ 12.  Similarly, Kraken maintains a corresponding

"ledger" for each account, which logs transactional activity, including deposits, withdrawals, trades, and transfers.  *Id.* ¶ 28.  This information too is globally retrievable for many users at a time. *Id.*  In contrast, historical changes to personal or account information, payment funding methods us, and IP addresses used by a user to access their account are not stored in the data warehouse or currently capable of global search and retrieval.  *Id.* ¶¶ 13-18, 19-20, 22-23, 31.  As a result, absent the successful design of new searching tools, Kraken cannot pull up this information for a broad group of users without an individual, user-by-user review.  *Id.*  The same is true for other information, such as blockchain addresses and transaction hash (ID), which are not reflected in transaction ledgers on a transaction-level basis.  *Id.* ¶ 31.  Kraken's systems are not natively designed to handle a global query or collection of such information.  *Id.*  While Kraken is currently working to backfill transaction hashes and blockchain addresses into its transaction data, that work is ongoing—as such, Kraken is unable to provide these data on a transaction-level basis.  *Id.*  Other user records, including KYC Questionnaires and AML records, are also not maintained in the same manner as basic user information or transactional information or any way to allow for global inquiry or retrieval.  *Id.* ¶¶ 24, 26-27.  These records would also have to be individually searched and retrieved, by user.  *Id.*  Plus, the AML logs for each account, which include not only various actions taken in connection with an account, but also changes in user information, are encrypted, so Kraken would have to decrypt them to analyze and produce relevant information.  *Id.* ¶¶ 14-15, 17, 26-27.

## III.   The IRS Sought an *Ex Parte* Order to Serve a Sweeping John Doe Summons, but This Court Determined the Summons Was Too Broad and Must be Narrowed

More than two years ago, the Government filed an *ex parte* petition for leave to serve a John Doe Summons on Kraken.  *See* Mar. 30, 2021 *Ex Parte* Petition for Leave to Serve "John Doe" Summons, *In Re Tax Liability of John Does* ("*Kraken I*"), No. 21-cv-02201-JCS, ECF No. 1; *see also* Decl. of Karen Cincotta ("First Cincotta Decl.") at ¶ 80, *Kraken I*, ECF No. 1-2.  While the Government argued that the summons was narrowly tailored, this Court held otherwise.  It expressed concern that the IRS requests were too broad and found IRS Agent Karen Cincotta's supporting declaration insufficient (i.e., based on "conclusory assertions") to support that breadth. *See Kraken I*, 2021 WL 1222862, at *1 (N.D. Cal. Mar. 31, 2021).  The Court noted that the IRS's

1  prior attempt to obtain "similarly broad categories of information" from Coinbase had been rejected

2  and ordered the IRS to show cause why its petition should not be denied for failing to meet 26

3  U.S.C. § 7609(f)'s "narrowly tailored" requirement.  *Id.* at *1-2.

### IV.    After Issuance of a "Narrowed" Summons, Kraken Tries to Negotiate Scope

5          Following the Court's Order, the IRS filed a purported "narrowed" Summons, relying on a

6  second declaration by Ms. Cincotta ("Second Cincotta Decl.").  *See* Govt.'s Response to Order to

7  Show Cause, *Kraken I*, ECF No. 8.  But, in reality, little had changed; it removed only one request

8  and made slight changes to two others.[1]  The Court allowed the IRS to serve this summons, but

9  recognized there may be "further disputes as to the scope of the summons [which] would benefit

10  from adversarial briefing."  *Kraken I*, 2021 WL 2314968 at *1 (N.D. Cal. May 5, 2021).

11          After serving the Summons on Kraken, the two sides had a number of discussions regarding

12  its scope.  *See* Fondo Decl. ¶ 4-5.  Kraken expended significant time and resources to provide

13  information to the IRS about its platform and raised concerns about the overbreadth of the requests.

14  *Id.*  Kraken emphasized its concern that the requests far exceeded what was ordered in *Coinbase*.[2]

15  *Id.* ¶ 6.[3]  It also noted the considerable burdens associated with fulfilling the requests, especially

16  since the information is not easily retrieved, and concerns about protecting user privacy.  *Id.*  After

17  months of negotiation, the parties reached an impasse.  *Id.* ¶ 7.  Over a year after the parties' last

18  discussion, the IRS initiated the instant proceeding on February 3, 2023, without notice.  *Id.* ¶ 8.

19          The points of contention regarding the Summons' scope are as follows:

| Summons Provision | Issue |
|---|---|
| **Definition of "User":** "[E]ach Kraken user for which your records show any United States-based address, telephone number, email domain, internet protocol address, or associated bank or financial account information, produce the following records, for any combination of accounts with at least the equivalent of $20,000 in value of transactions (regardless of type) in cryptocurrency in any one year, for the | Kraken objects to this definition because it expands the scope of covered users far beyond what was sought in *Coinbase*, which encompassed those with "at least the equivalent of $20,000 *in any one transaction type* (buy, sell, send, or receive) in any one year . . . ." *Coinbase* at *6 (emphasis added). |

---

[1] *Compare* Ex. A to First Cincotta Decl., *Kraken I*, ECF No. 1-3, *with* Ex. B to Second Cincotta Decl., *Kraken I*, ECF No. 8-2.
[2] While *Coinbase* is not binding on this Court, it is highly instructive given the factual similarities to this case and the District Court's consideration of nearly identical (but even narrower) requests.
[3] *See* Ex. A to Fondo Decl. for a comparison of IRS requests in *Coinbase* with requests to Kraken.

| | |
|---|---|
| period January 1, 2016 through December 31, 2020 unless otherwise stated[.]" | |
| **Request No. 1:** "Account registration records," including "User profile, User preferences, or account application information," including: name (and pseudonym, user ID), date of birth, taxpayer ID, physical address, telephone number, email address; history of all changes to personal information since the inception of the account; complete user IP address history; and complete user payment methods regardless of date | Kraken opposes the request for "User profile, User preferences, or account application information" beyond a user's name, date of birth, taxpayer ID (where available), address, telephone number (where available), and email address. Kraken also opposes the request for a history of all changes to personal information since the inception of a user account; complete user IP address history; and complete user payment methods regardless of date. |
| **Request No. 2:** Know-Your-Customer due diligence questionnaire information | Kraken opposes this request in its entirety. |
| **Request No. 3:** AML exception reports and all investigation records of exceptions | Kraken opposes this request in its entirety. |
| **Request No. 4:** All records of activity in User accounts | Kraken opposes this request to the extent it seeks records beyond transactional ledgers reflecting user deposit, withdrawal, trade, and transfer activity during the relevant timeframe. In particular, it opposes the request for transaction hash (ID) and blockchain addresses, as these data are not maintained in Kraken's transaction ledgers. |
| **Request No. 5:** All account funding records, and "any and all invoices billing statements, receipts, or other documents memorializing and describing such transactions." | Kraken opposes this request to the extent it seeks records beyond transactional ledgers reflecting user deposit, withdrawal, trade, and transfer activity during the relevant timeframe. |

## **LEGAL STANDARD**

The IRS has no inherent authority to pry unfettered into the affairs of U.S. taxpayers. *U.S. v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 n.18 (1978). It may issue a John Doe summons under 26 U.S.C. § 7602, but only when a "legitimate investigative purpose" exists. *Bisceglia*, 420 U.S. at 146. That means the summons cannot be used to "conduct 'fishing expeditions' into the private affairs" of taxpayers. *Id.* at 150-51. A summons is enforceable only when the IRS demonstrates that (i) its investigation is conducted for "a legitimate purpose"; (ii) "the inquiry may be relevant to the purpose"; (iii) "the information sought is not already" possessed by the IRS; and (iv) it has followed the required "administrative steps." *U.S. v. Powell*, 379 U.S. 48, 57-58 (1964). Critically here, "[a] summons will be deemed unreasonable and unenforceable if it is overboard and

disproportionate to the ends sought." *U.S. v. Coopers & Lybrand*, 550 F.2d 615, 621 (10th Cir. 1977).  Indeed, the statute itself requires that the information requested be "narrowly tailored" to pertain to a taxpayer's noncompliance with tax laws.  *See* 26 U.S.C. § 7609(f).  As a result, a summons must be "no broader than necessary to achieve its purpose." *Coinbase* at *6 (quoting *Bisceglia*, 420 U.S. at 151).  Even if the Government facially meets its burden, that only gives rise to a rebuttable presumption of good faith; a summons may still be defeated if it is in bad faith or an abuse of process.  *Powell*, 379 U.S. at 58.  Judicial protection "against the sweeping or irrelevant order is particularly appropriate" where a summons is directed to a third party.  *U.S. v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973); *see also U.S. v. Monumental Life Ins. Co.*, 440 F.3d 729, 735 (6th Cir. 2006) ("[A] third party to the IRS's investigation . . . deserves greater protection against a burdensome summons.").  And "where, as here, the Government seeks records for thousands of account holders through a John Doe summons, the courts must ensure that the Government is not collecting thousands and thousands of personal records unnecessarily." *Coinbase* at *7.

## ARGUMENT

## I.   THE IRS FAILS TO SHOW WHY ITS OVERREACHING AND BURDENSOME REQUESTS SHOULD BE ENFORCED

One judge of this Court has already admonished the IRS for stretching too far with a similar John Doe summons to a cryptocurrency exchange—yet the scope of that summons, which the Court ultimately narrowed, pales in comparison to the breadth of what the IRS seeks here.  In *Coinbase*, the Court allowed the Government to obtain, as to 14,000 users, basic "identity and transaction records … to investigate whether the holder had taxable gains that were not properly declared." *Id.* at *6.  It rebuffed the IRS's ask for "account opening records, copies of passport or driver's licenses, all wallet addresses, all public keys for all accounts/wallets/vaults, records of Know-Your-Customer diligence, agreements or instructions granting a third-party access, control, or transaction approval authority, and correspondence between Coinbase and the account holder." *Id.*  The need for that information was far too speculative even under § 7602, as the IRS could not establish a particularized need.  *See id.*  Only *if* the IRS determined a user had a potentially taxable gain, and, *if* there was doubt as to user identity, would additional documents be relevant.  *See id.*

The IRS requests here are much broader; but, as in *Coinbase*, the IRS has utterly failed to establish why the expanded universe of documents it seeks is remotely relevant, particularly at this stage.  The IRS seeks almost every document that Kraken may have for nearly 60,000 users, more than four times the number in *Coinbase*, without establishing whether any of them may even *potentially* have a tax liability, all so the IRS can skip the step of later asking for more information as to a very small subset of users.  Moreover, the IRS's requests would impose a burden on Kraken that is exponentially greater than Coinbase's—not just because of the number of users, but the wider, yet needless, universe of documents that the IRS seeks here.  Whether the IRS likes it or not, the burden on the respondent is important in determining whether a summons is "no broader than necessary to achieve its purpose."  *Bisceglia*, 420 U.S. at 151; *see also Coinbase*, at \*6 (rejecting burdensome requests because the information sought was "broader than necessary").

As *Coinbase* explains, the Government's desire to "not need to return to court to ask for [documents] if and when needed" is not a good enough justification to saddle Kraken with an incredibly onerous set of requests or to invade the personal and financial privacy of tens of thousands of users.  *Id.* at \*7.  To the contrary, the issuance of follow-up summonses specific to taxpayers of particular interest is "a process preferable to a John Doe summons." *Id.*

## A.   The Summons' Definition of User Makes It Broader Than Necessary to Achieve the Government's Investigative Purpose.

The problems with the Summons start with its definition of "User," which, in relevant part, is: "each Kraken user . . . with at least the equivalent of $20,000 *in value of transactions (regardless of type)* in cryptocurrency in any one year for the period January 1, 2016 through December 31, 2020[.]" Ex. A to Third Cincotta Decl. (emphasis added).  This definition—far broader than the one in *Coinbase*, could not even *potentially* inform the Government's investigation of taxpayers, as it (1) improperly blends together all transactions, (2) embraces users who may have had no taxable gain, and (3) extends so far as to cover non-U.S. individuals.  Even if the IRS could somehow overcome these hurdles, the incredible burden created by this expansive definition of User demonstrates that the Summons is far broader than necessary.

1

        **1.**      **The Definition of "User" Exceeds the Definition Used in *Coinbase*,**

2

                **Which the Court Barely Approved**

3            Without any explanation, the Summons demands a materially broader search for "Users"

4  than the Court allowed in *Coinbase*.  There, the Court approved a narrowed summons that limited

5  the covered "Users" to those "with at least the equivalent of $20,000 in *any one transaction type*

6  (buy, sell, send, or receive) in any one year … [but] does not include users … who only bought and

7  held bitcoin during the [at-issue] period…" *Id.* at *2, *5. Here, however, the IRS expands the scope

8  of covered users far beyond that definition.  Now, it expands a "User" to be based on (a) an

9  *aggregate* threshold of at least $20,000 in cryptocurrency transactions "*regardless of type*" for any

10  one year between 2016 and 2020, and (b) does not exclude users who only bought and held

11  cryptocurrency.  In other words, a "User" includes anyone who engaged in *any* cryptocurrency

12  transaction (whether buying, sending, selling, receiving, depositing, withdrawing, transferring, etc.)

13  where the *combined value* of those transactions was $20,000 or more in any one year.  This change

14  without explanation to "combined value" increases the number of users by over 17,000, from

15  42,017 to 59,331.  Siemers Decl., at ¶ 12.

16            The $20,000-per-transaction-type definition of User in *Coinbase* already pushed that

17  summons to its limits, with the Court expressing concern that this meant the potential collection of

18  "thousands and thousands of personal records unnecessarily." *Coinbase* at *7.  The definition of

19  "User" here far exceeds the breaking point.  Consider how many users—who may transact in small

20  amounts and have no taxable gain whatsoever—might be swept in by this capacious definition.

21  Say a Kraken user buys $10,000 in Bitcoin.  The user then decides to split up his holdings, so he

22  sells $5,000 in Bitcoin and buys $5,000 of Ether.  That user would be swept into this Summons,

23  while excluded from the *Coinbase* summons—which already captured a significant (but much

24  lower) number of users that gave the Court pause.  The IRS provides no justification whatsoever—

25  not in any of its *three* supporting declarations—for its expansion of "User" here.

26        **2.**      **The Expansive Definition of "User" Encompasses Non-Taxable Events**

27            The term "User" also does not exclude those who engaged in only non-taxable events.  The

28  narrowed *Coinbase* Summons expressly excluded users "*who only bought and held bitcoin during*

1    the [subject time] period[.]" *Id.* at *2 (emphasis added).  This makes sense since this would not

2    give rise to a taxable event.  There is no legitimate basis for the IRS's purported "need" to

3    investigate users who only make *deposits* or *purchases* (buy-hold crypto) or *withdrawals*.  But there

4    is no similar exclusion here, and the IRS provides no explanation for that.  While it concedes that

5    "[t]he purchase of cryptocurrency is not inherently taxable," it claims to need "purchase price

6    information" to *calculate* a taxable gain.  Third Cincotta Decl. ¶ 138.  Though that may be true,

7    *Coinbase* makes clear that the documents the IRS may obtain are only ones that might help discern

8    a potentially unreported taxable gain—users who simply purchased does not help achieve that.

9        The same is true with deposit and withdrawal activity.  A deposit alone shows nothing and

10    would encompass all the people who buy and simply hold cryptocurrency.  The IRS vaguely asserts

11    that deposits and withdrawals are a "clear indicator that the user is holding cryptocurrency in other

12    places," and thus "needs" this information "so it can gather as much information as possible" to

13    determine a user's tax compliance.  *Id.* ¶¶ 142.  But that is no different than the type of fishing

14    expeditions that are not allowed under § 7609(f).  *See generally* In *re Tax Liabilities of John Does*,

15    688 F.2d 144, 149 (2d Cir. 1982) (Sections 7609(f) and (h) provide a prior restraint on the IRS's

16    power to serve John Doe summonses, mainly "to preclude the IRS from using such summonses to

17    engage in possible 'fishing expeditions.'").

18        The IRS also argues that deposits or withdrawals "*may be* taxable transactions themselves."

19    *Id.* ¶ 143 (emphasis added).  It speculates that a deposit could reflect compensation or a similar

20    taxable income payment, such as for goods and services, and that a withdrawal could represent a

21    "taxable disposition" if sent to a third party.  *Id.*  But this is yet another example of a "conclusory"

22    assertion that cannot justify enforcement of this more expansive Summons.  *U.S. v. Goldman*, 453

23    F. Supp. 508, 512 (C.D. Cal. 1978) ("Mere idle hope or generalized speculation is not enough.").

24    And, again, it fails to explain why that information is necessary to identify taxpayers at *this* stage.

25        **3.**    **The Broad Reach of the Term "User" Raises Foreign Privacy Concerns**

26        Given Kraken's worldwide operations, the overbreadth of the Summons' definition of

27    "User" also leads to the potential collection of data for users with no nexus to the U.S.—whom the

28    IRS has no interest in auditing—and creates a significant concern about Kraken's ability to comply

with foreign privacy laws.  Here, a covered "User" is any user that Kraken's "records show has "any United States-based address, telephone number, email domain,[4] internet protocol address, or associated bank or financial account information."  Ex. A to Third Cincotta Decl. at 7.  Given *how* "User" is defined, it is possible that certain non-U.S. citizens who at some point during the five-year timeframe either lived in the U.S., had a U.S. phone number, or simply used a computer in the U.S. would get swept up in the search.  This would not be the "narrowly tailored" Summons that federal law requires.  Further, that this request would likely require collection from EU users impairs Kraken's ability to comply with the EU General Data Protection Regulation ("GDPR").  The GDPR generally prohibits the disclosure of personal data to non-EU countries unless formally recognized by the European Commission as having adequate levels of data protection, which the U.S. currently is not.  Regulation (EU) 2016/679, Article 3 at 45-49.

### 4. The Expansive Definition of "User" Imposes a Significant Burden on Kraken and Privacy Concerns for its Users

"Whether or not a request is burdensome is a test of whether such a summons would be enforced and even though information sought by a summons is relevant and material, it may still be so burdensome to produce that enforcement could be denied." *In re John Does*, No. CV-N-88-319-ECR, 1990 WL 264130, at *5 (D. Nev. Oct. 1, 1990).  As currently defined, the term "User" captures the accounts of 59,331 users—more than four times the users in *Coinbase*.  Siemers Decl. ¶ 10.  And, as explained above, the Summons seeks documents that were not sought in *Coinbase*.  That means Kraken must account for both more users *and* more documents per user if the Summons were enforced in its entirety.  Indeed, Kraken estimates that full compliance could take months or even years.  *Id.*  This burden is unjustified, particularly given that the IRS is unlikely to actually audit all of these "additional" Users or any significant portion of them.[5]

Further, given the sweeping reach of the term "User," the IRS seeks wide swaths of information, which improperly invades the privacy of Kraken's users.  This presents significant

---

[4] The request to identify U.S. Users by "email domain" also is vague; email domains are not readily distinguishable by country.  The IRS does not explain how Kraken would do this.
[5] If the transaction value threshold was increased to $50,000 or $100,000, the number of accounts would be reduced to 38,329 and 26,082, respectively—still double or triple *Coinbase*, but much more reasonable figures.  Siemers Decl. ¶ 10.

risks to Kraken and its users.  Transferring troves of sensitive personal and financial data (the vast majority of which will be irrelevant) to the IRS increases the risk of loss or theft.  Unfortunately, this happens, even to the government.[6]  The slight value in additional users covered by this broad definition is outweighed by the privacy risks here.

## B.   The IRS's Request No. 1 for User Identity Information Goes Beyond *Coinbase* And Is Irrelevant, Overbroad, and Burdensome

Request No. 1 should be rejected insofar as it exceeds the scope of *Coinbase*, is irrelevant, not narrowly tailored, and unduly burdensome.  Under the guise of "necessity," the request seeks far more than permitted in *Coinbase*, including: user "pseudonym" or "user ID"; telephone number; email address; "[h]istory of all changes to the personal information identified above since the inception of the account"; "[c]omplete User history for internet protocol addresses used to access the account"; and "[c]omplete User payment methods (e.g., linked bank or credit card accounts) regardless of date."  Ex. A to Third Cincotta Decl.  But the IRS needs only basic user information to determine a taxpayer's identity:  name, birthdate, taxpayer ID, and address.[7]

### 1.   Request No. 1 Exceeds *Coinbase* and Is an Abuse of Process

The IRS's expansive request for user information disregards the unambiguous holding in Coinbase:  the IRS can obtain basic information needed to identify individuals with potentially unreported gains, and then follow up on that with narrow requests covering that limited group.  Instead, the IRS renews its failed arguments from *Coinbase*.

In *Coinbase*, the summons at issue included a similarly broad request for: "[a]ccount/wallet/vault registration records for each account/wallet/vault owned or controlled by the user . . . limited to name, address, tax identification number, date of birth, account opening records, copies of passport or driver's license, all wallet addresses, and all public keys for all

---

[6] A Treasury Inspector General report found that the IRS did not meet all of the security requirements for its cloud-based systems and failed to timely implement mitigation and corrective actions to mitigate security risks.  *See The Enterprise Case Management System Did Not Consistently Meet Cloud Security Requirements* TREASURY INSPECTOR GEN. FOR TAX ADMIN. (Mar. 27, 2023), *https://www.oversight.gov/sites/default/files/oig-reports/TIGTA/202320018fr.pdf* (attached as Ex. B to Fondo Decl.).
[7] Should the Court deny its opposition to the Summons in its entirety (§ II, *infra*), Kraken does not raise a burden argument as to the request for basic user information (name, address, birthdate, and, where available, taxpayer ID), or for email addresses and, where available, phone numbers as further data references, subject to the appropriate limiting of a "User" to conform to *Coinbase*.

accounts/wallets/vaults." *Coinbase* at *2.  The IRS, as it does here, claimed that it "need[ed] these records to verify an account holder's identity" and to determine if the holder had others make transactions on their behalf. *Id.* at *6.  The Court disagreed.  It expressly identified limited personal identification measures that it deemed necessary to determine if a taxable gain was reported: "name, date of birth, taxpayer identification and address." *Id.*  The Court found this more than sufficient to assist in identifying taxpayers.  It was not enough that the IRS asserted a need for additional records to "verify" a user's identity.  *Id.*  Further identity information would only become necessary if the IRS determined there was a potential taxable gain and still has doubt as to a taxpayer's identity.  If not, "these additional records will not shed any light on a legitimate investigation." *Id.*

Ignoring the Court's admonition in *Coinbase*, the IRS nonetheless seeks to enforce its expansive Summons, requesting extraneous identity information.  Specifically, it seeks any user pseudonym[8] or user ID, historical personal information changes, IP addresses, and user payment methods.  These categories exceed the basic user information *Coinbase* held was relevant for IRS's initial investigative purposes.  And the IRS provides no legitimate explanation for why its claimed need for this additional information would be any greater or different here than in *Coinbase*.  If "more detailed records" are needed, the IRS can seek information directly from the taxpayer or from Kraken.  Production of such information at this point would serve only to provide unfettered access to the private financial and personal information of thousands of otherwise law-abiding users that the IRS has no interest in auditing.  Accordingly, Request No. 1 should be rejected insofar as it exceeds *Coinbase*.

### 2.      Requests for Historical User Information Changes, IP Addresses, and Payment Methods Are Overbroad and Irrelevant

The IRS's requests for historical user information in Request No. 1(b)-(d) are unreasonable and unenforceable as they are overbroad and disproportionate to the end sought here.

Here, the requests for historical user information changes, payment methods, and IP addresses are overbroad; each of these sub-requests is indefinite as to time and unbounded by the purported time and value limitations set forth in the definition of "User."  For instance, Request

---

[8] The request for "pseudonyms" is also vague, and it is unclear what is actually requested.

No. 1(b) seeks the history of all changes to personal information "since the inception of the account." Similarly, Request No. 1(c) seeks "[c]omplete User history" for IP addresses, and Request No. 1(d) seeks User payment methods "regardless of date." Other courts have held similar requests that were unlimited in time and not directly related to the tax years in dispute to be irrelevant and overbroad. *See, e.g.*, *Zietzke v. U.S.*, No. 19-CV-03761-HSG(SK), 2020 WL 264394, at *9 (N.D. Cal. Jan. 17, 2020), *report and recommendation adopted*, 2020 WL 6585882 (N.D. Cal. Nov. 10, 2020) (request was overbroad and irrelevant to investigation purpose without date range limitation); *see also Monumental Life Ins. Co.*, 440 F.3d at 736 (generally agreeing with magistrate judge's conclusion that request seeking information "during the period beginning July 1, 1991 through September 30, 1999 [was] particularly irrelevant because the IRS was only investigating [defendant's] tax liability between 1994 and 1997") (internal quotations omitted). For this reason alone, the requests are broader than necessary to achieve any IRS investigatory purpose.

Moreover, the requests for additional information beyond basic identity information simply boil down to "nice to haves." The IRS only suggests that it *may not* be able to verify the identity of a taxpayer without identity information beyond name, date of birth, address, and taxpayer identification. In doing so, it relies on two *speculative* and *conclusory assumptions* about why basic information "does not always go far enough" in establishing taxpayer identity. *First*, Ms. Cincotta asserts, without providing any factual basis, that "[i]t is not uncommon for taxpayers to use aliases, false addresses or post office boxes, fictitious entity names, or other means to disguise their true identities." Third Cincotta Decl. ¶ 42; *see also* ¶¶ 92-95. Based on that unsupported assertion, she concludes "[t]hat makes basic information such as name, address, date of birth, and taxpayer ID number insufficient." *Id.* But this puts the cart before the horse. The IRS provides no other discussion or evidence on this point—much less any legitimate bases to suggest *Kraken's* users have supplied false information or how expanding the request solves that problem. The IRS appears to simply ask the Court to take its conclusions at face value. In any event, for Intermediate and Pro level accounts, users are required to provide verification information to confirm identity and address. So, the fear that those users are somehow falsifying information to disguise account ownership is baseless. Even if some small subset of users provided fictitious information, that does

not justify the production of all this additional information, as to all 59,331 users.  Ultimately, the IRS is entitled to additional identity information only "*if* there is potentially a taxable gain and *if* there is some doubt as to the taxpayer's identity." *Coinbase* at *6.  The IRS has made no such determination yet.

*Second*, Ms. Cincotta speculates that an issue *may* arise with *missing* user data, solely based on the IRS's experience with Coinbase.  Indeed, her declaration dedicates a number of paragraphs to what basic information was missing in Coinbase's data and how that impacted the IRS's investigation.  Third Cincotta Decl. ¶¶ 43-51.  But this merely assumes—without reasonable basis—that Kraken's data will suffer from the same deficiencies or create the same difficulties for the IRS.  That assumption should be rejected.  During the timeframe of the information requested in Coinbase, Coinbase indicated to the IRS that certain account information for its oldest accounts may be missing because it did not necessarily collect all of that information at that time.  *Id.* ¶ 46.  Not so for Kraken.  Kraken required the same information for each user at its different account levels during the relevant timeframe: name, date of birth, address, email address, and phone number.  Taxpayer ID numbers were also collected for all Intermediate and Pro level accounts.[9]

Even given Coinbase's purported missing user data, additional follow-up information in that case was only needed for a very small percentage of its users (~10%).  And after the follow-up, only 5% of users were still not identifiable.  Since Kraken has collected even more user identity data (such as email addresses and phone numbers), and has verification checks for certain accounts, the number of unknown but knowable taxpayers almost certainly would be less than 5%.  The IRS nonetheless asks for the production of additional data for tens of thousands of users—which is wholly unnecessary to identify the very small number of users for whom it might be needed.

Ultimately, the IRS fails to justify a need for further identity information when all of the basic identity data *is* provided.  It does not come close to providing a sufficient explanation as to how the other requested identity information (historical user profile changes, IP address, or user payment methods) would even assist the IRS in identifying taxpayers when certain information is

---

[9] Ms. Cincotta asserts that identification difficulties occurred mostly when taxpayer ID was missing.  *Id.* ¶ 47.  But she then qualifies that assertion by suggesting that issues arose when a taxpayer ID was missing and "*other* information was also missing." *Id.* (emphasis added).

missing.  For example, assume the IRS had a user's name, address, and birthdate, but was missing a taxpayer ID—being able to track an IP address to a general geographic area will not enhance its ability to identify a user, and there is a particular privacy interest in information that is *not* voluntarily disclosed and would provides one's location information.  While perhaps convenient to confirm identity, it is not needed to identify a user in the first place.  *See generally U.S. v. Davey*, 543 F.2d 996, 1000 (2d Cir. 1976) ("[I]f the subject matter of requested records is not otherwise relevant, convenience will not make it so.").  This is even more true with the suggestion of the use of false identifying information—nothing suggests that users seeking to hide their identity are likely to be identified through the IRS's additional information requests.

Its other suggestions as to why this information may be helpful are unavailing.  First, the IRS suggests that IP address information is a good way to search data from other exchanges and link transactional records from foreign exchanges to determine compliance.  *Id.*  ¶¶ 108, 112, 118.  This is far beyond the basic identity information the Court in Coinbase determined was needed for the sole purpose of identifying taxpayers.  And it is unreasonable to insinuate that the IRS plans to go through IP address histories for almost 60,000 users and cross compare those with IP addresses used in transaction records from other exchanges.  Second, the only asserted basis for changes to user information is that Kraken's data may not match IRS's data for taxpayers.  *Id.* ¶ 110.  But this only speculates there *may be* some discrepancy and does not account for the existence of multiple user data points that could be used for identification.  Third, the IRS asserts account funding sources can provide insight into tax compliance, as it permits identification of cross-linked bank accounts.  *Id.* ¶ 121-22.  But the IRS assumes without basis that a user with lots of linked accounts and no tax reporting is somehow unlikely to be compliant.  And this information too is unnecessary to determine identity or a potentially taxable gain in the first instance.  The IRS speculates this could also point them to *alternative* taxpayers associated with the accounts.  But that would exceed the scope of IRS's investigative purpose here.  And the IRS cannot legitimately claim to need this information *now* due to statute of limitations concerns under 26 U.S.C. § 6501(a) (*Id.* ¶ 125), when it waited over a year since its last discussion with Kraken to enforce its Summons.

The IRS fails to show why this request for additional user information is not premature and

broader than necessary, and simply suggests it would be convenient to have.  That is insufficient: "mere convenience does not make an item producible[.]"  *Coopers & Lybrand*, 550 F.2d at 621.

**3.     Request No. 1(b)-(d) Would Be Unduly Burdensome**

Request No. 1(b)-(d) also seeks irrelevant user data that would impose undue burden on Kraken.  While current basic user information is capable of query and collection on a global basis from Kraken's systems (Siemers Decl. ¶ 13), the remaining requested information is not.

More specifically, with respect to historical changes to user information, Kraken does not store this data in any organized way on its system or have mechanisms in place to identify or pull what substantive changes have been made.  *Id.* ¶ 14-17.  Based on current estimates, Kraken anticipates it would take two full days of data analyst time just to collect and pull *current* user profile data.  *Id.*  If forced to comply, Kraken would have to go into the account logs for each account to determine (i) whether any changes were made, and (2) if so, what those substantive changes were.  *Id.* ¶ 19.  Not to mention these logs are encrypted and would need to be decrypted to analyze and review.  Given that this is not data that it formally records, Kraken anticipates that this sort of review and collection would take approximately 5,000 hours of work.  *Id.*

Similarly, Kraken does not maintain a historical record of all user payment methods, and its systems are not natively designed to globally query or collect this information.  *Id.* ¶ 20.  In order to pull all bank accounts associated with the 59,331 accounts covered by the Summons, Kraken would have to design a new search query to do so.  *Id.*  It estimates that creating such a query and extracting this information on an account-level basis would take approximately two full data analyst days.  *Id.* ¶ 21.  To pull this information on a transaction-level basis, it would require at least several weeks of work by a larger team of data engineers, analysts, and core back-end engineers.  *Id.* ¶ 22.

The same is true of IP addresses, which are not stored in the same way as other basic personal information.  *Id.* ¶ 23.  While IP addresses associated with a user's account are captured in an account activity log, Kraken cannot globally pull historical IP addresses for each account and would have to design a new query to do so.  *Id.*  Kraken estimates that it would take approximately three full data engineering days and two full data analyst days to identify historical IP addresses for each User account.  *Id.*  Even then, IP address information is not linked to user transactions, so

1    Kraken would be limited to producing it on an account-level basis.  *Id.*  A transaction-level query

2    and collection would require at least several weeks of work by a larger Kraken team.  *Id.* ¶ 24.

3        Moreover, Kraken further opposes these requests as they require Kraken to develop queries

4    or tools to generate the requested information—which does not otherwise exist in the format

5    requested.  The IRS cannot compel the preparation or production of records that do not already

6    exist.  *See Standing Akimbo, LLC v. U.S.*, 955 F.3d 1146, 1164 (10th Cir. 2020); *Davey*, 543 F.2d

7    at 1000 ("7602 does not require preparation or production of records not yet in existence").

8    **C.    The IRS's Request No. 2 for KYC Data Goes Beyond *Coinbase*, Is Irrelevant to**
9    **Any IRS Purpose, and Is Unduly Burdensome**

10       **1.    Request No. 2 Exceeds *Coinbase* and Is an Abuse of Process**

11       Request No. 2 for KYC Questionnaire information should be denied because it was already

12   expressly rejected in *Coinbase*.  Specifically, this request seeks information from User-completed

13   KYC Questionnaires relating to "employment, net worth, and source of wealth for individual

14   Users" and "for business Users, . . . legal name, business address, country, website, contact

15   information, industry, goods and services, government-issued business registration or tax-

16   identification number, and source of funds[.]"  Ex. A to Third Cincotta Decl.  In considering a

17   similar request, *Coinbase* rejected the argument that this data is relevant at this stage.  The Court

18   cautioned that "[e]specially where, as here, the Government seeks records for thousands of account

19   holders through a John Doe summons, the courts must ensure that the Government is not collecting

20   thousands and thousands of personal records unnecessarily."  *Coinbase* at *7.  Accordingly, it held

21   that KYC records were "broader than necessary" to determine identity and unreported taxable

22   gains.  The same is true here.  "[F]or many or even most of the account holders [KYC diligence

23   and other records] may never be relevant."  *Id.*  And, as discussed below, the IRS fails to establish

24   any need for this information *now*.  Its attempt to revive this request is plainly an abuse of process.

25       Again, the IRS had little issue identifying 90% of taxpayers in *Coinbase* without this

26   information, and with less identifying data than Kraken maintains.  If the IRS "later determines that

27   it needs more detailed records on a taxpayer," it may issue a second summons to the taxpayer or

28   Kraken with *notice*—an approach *Coinbase* acknowledged was preferable to a John Doe Summons

in any event. *Id.* *7.  While the IRS may not *prefer* to go through that additional effort for whatever

relatively small number of users may require it, this is not about the IRS's convenience (or laziness).

As in *Coinbase*, the IRS's desire to avoid returning to court does not justify overreaching requests

and is concerning in the precedent it could set as to the IRS, and even other regulatory agencies.

## 2.     Request for KYC Information Is Irrelevant and Overbroad

The IRS fails to show why its request for KYC Questionnaire information is relevant and

not broader than necessary.  The IRS must show it has a "realistic expectation rather than an idle

hope that something may be discovered." *U.S. v. Goldman*, 637 F.2d 664, 667 (9th Cir. 1980); *see

also David H. Tedder & Assocs., Inc. v. U.S.*, 77 F.3d 1166, 1168–69 (9th Cir. 1996).  It has not.

Contrary to the IRS's assertion, KYC data beyond basic user profile information is not

necessary to its purposes and is premature at this stage.  While it claims that KYC data would be

helpful in identifying certain "large[] movement" or high volume users, that argument is speculative

and jumps the gun.  As explained above, the IRS must first ask for only the information needed to

identify potential taxable gains before asking for more.  *Coinbase* at *6.  The IRS has flunked step

one.  And it fails to establish what this extra information could do that the basic user information

and transactional data could not.  Administrative convenience, to which the IRS alludes as

justification (Third Cincotta Decl. ¶¶ 129-30), is insufficient here.  *See, e.g.*, *Coopers & Lybrand*,

550 F.2d at 621.  This is a clear example of government overreach.

By requesting KYC information now, the IRS seeks to solve a problem that does not yet

and may never exist.  This highly personal information will not reveal potential tax liabilities for

the IRS to go after.  Take, for example, its request for "employment, net worth and source of

wealth" data.  Third Cincotta Decl. ¶ 127.  This has no bearing on potential tax liabilities from

cryptocurrency transactions.  Nor would net worth and source of wealth shed light on any particular

tax year in dispute.  And the IRS makes no effort to explain how it would.  Instead, the only potential

use of this information would be to help *confirm* already known data or once there are doubts as to

who exactly is responsible for a potential tax liability.[10]  At this juncture, there is no basis to seek

---

[10] Any argument that this information is necessary to initially identify a taxpayer is undercut by the IRS's own declaration.  It acknowledges that only Pro accounts require a KYC Questionnaire, yet it does not claim to need this information to identify users at other account levels where it is absent.

1    this information for thousands of users, including those whose identities and tax liabilities may

2    never be in question.  The IRS merely *hopes* to discover details about these users that *may* help its

3    investigation.  This is not the "narrowly tailored" request 26 U.S.C. § 7609(f) requires.

### 3.    Request No. 2 Would Impose a Significant Burden

5    Request No. 2 would impose a significant burden on Kraken.  The identification and

6    collection of KYC Questionnaires for each "User" is manually intensive, time-consuming, and

7    would cause significant interruption to Kraken's business.  Siemers Decl. ¶ 26.  Unlike basic

8    personal information and transactional ledgers, this KYC data must be pulled on an account-by-

9    account basis for all Users for which that information exists.  *Id.* ¶ 25.  Kraken's systems are not

10   natively designed to handle such a global query into or retrieval of this account-supporting

11   documentation.  *Id.*  While the IRS indicates the request is limited to the users' "responses to the

12   employment, net worth and source of wealth questions" (Third Cincotta Decl. ¶ 127), that assertion

13   fails to appreciate that Kraken must nonetheless conduct the same manual account-by-account

14   process to analyze the actual questionnaires.  *Id.*  Kraken estimates this task would likely require

15   several weeks and possibly months of work by a team of data engineers, analysts, and core back-

16   end engineers.  *Id.* ¶ 26.  This burden far outweighs any claimed benefit to IRS—*particularly* since

17   this data is of no relevance to taxpayer identification in the first instance.

### D.    Request No. 3 for Exception Reports and Investigation Records Similarly Goes Beyond Coinbase, Is Irrelevant to the IRS's Purposes, and Unduly Burdensome

### 1.    AML Records Go Farther Than What *Coinbase* Permitted

21   Request No. 3 for AML "exception reports" and "investigation records" goes far beyond

22   what was permitted in *Coinbase*.  Tellingly, the IRS made the exact same request in its initial

23   summons in *Coinbase*.  *Id.* at *1.  But its subsequently narrowed summons, which was ultimately

24   considered in *Coinbase*, did not include that request.  By voluntarily removing this request, the IRS

25   tacitly acknowledged that AML records were not needed for its investigative purpose.  *Coinbase*

26   effectively confirmed that: only requests for basic user information and certain transactional data

27   were relevant, particularly in light of the large number of users covered in the summons.  *Id.* at *6.

28   AML data falls within neither bucket.  And, again, before the IRS can seek additional information

1   outside of those buckets, it must determine that a user has a potentially reportable taxable gain.  The

2   IRS again fails to satisfy this crucial first step.  Yet, it seeks to try again—without explanation as

3   to why it *now* needs this information.  This effort to evade *Coinbase* should be denied.

4           **2.     The IRS Fails to Show How AML Exception Reports and Investigation**
5                   **Records Are Relevant to Any Investigative Need and Overbroad**

6           The IRS fails to—and cannot—establish that its request for AML exception reports and

7   investigation records is relevant and narrowly tailored to its investigation, particularly at this stage.

8           Ms. Cincotta first nebulously claims that exception reports would "allow[] the IRS to

9   leverage the industry expertise" of Kraken as to what activities are "abnormal or suspicious"—

10  which she asserts can be combined with (unspecified) "other information available to the IRS" to

11  determine taxpayer compliance.   Third Cincotta Decl. ¶¶ 132-35.   This is nothing more than

12  conclusory  rhetoric.   First, the purpose of a John Doe Summons is not to allow the IRS to use

13  private business expertise and funds to expand its reach.  Second, the IRS fails to explain how the

14  existence of an "exception report" or investigation records would even indicate a purpose to escape

15  any tax liability.  The IRS appears to simply *assume*, without basis, that users associated with AML

16  records may not be paying their taxes.  But there could be any number of reasons that a user's

17  account may get flagged under Kraken's AML system.  Siemers Decl. ¶ 27.  These include, among

18  other things, if a user makes too many log-in attempts, due to receipt of legal process, when there

19  is a change in account verification levels, or for confirmation of OFAC-related checks.  *Id.*  The

20  existence of AML records for a user does not *per se* suggest any actual or potential failure to comply

21  with tax reporting obligations.  And the Government's conclusory and generalized statements do

22  not make it so.  *See Monumental Life Ins., Co.*, 440 F.3d. at 736 ("mere assertion of relevance" in

23  close cases "will not necessarily satisfy the government's burden" (quoting *Goldman*, 637 F.2d at

24  667)).  What the IRS really appears to do is ask Kraken to conduct its investigation for it.  Not only

25  is it engaged in a fishing expedition, but it wants Kraken to do the fishing.  That is not what a John

26  Doe summons is for; a third party should be required only to produce what is relevant and necessary

27  to the IRS investigation, not to be conscripted into the IRS's service.  *See U.S. v. Matras*, 487 F.2d

28  1271, 1275 (8th Cir. 1973) ("[T]he government should not, for the mere sake of its convenience,

1  impose unnecessary burdens on a taxpayer in conducting an audit or investigation for tax liability,

2  particularly where, as here, there is no indication of a purpose to escape any tax liability.").

3      The only other claimed basis the IRS provides is the conclusory assertion that AML

4  investigative information typically "contains information provided by the user explaining the nature

5  of the questionable activity."  Third Cincotta Decl. at ¶ 134.  Ms. Cincotta vaguely claims that user

6  explanations for certain transactions could hypothetically check out to be reasonable or consistent

7  with the user's tax returns—in which case the IRS could "avoid unnecessarily examining" that user.

8  *Id.* ¶ 135.  But this reasoning is speculative and premature.  One must necessarily assume the IRS

9  has already identified a user and potentially taxable gains.  Regardless, the purported need for user-

10  provided explanations effectively recasts a request for user correspondence that *Coinbase* expressly

11  rejected.  *Id.* at *6 (user correspondence "is not even potentially relevant" without a taxable gain).

12      Moreover, the request for AML records is also manifestly overbroad and far reaching

13  because it is not confined to any relevant time period and is unbounded by any transaction type or

14  amount, like with the KYC data.  Consequently, even assuming some minimal benefit is afforded

15  by the time and value limitations in the definition of User" to other requests—that is absent here.

16      Ultimately, this request for AML records—regardless of how immaterial, irrelevant or

17  inconsequential the information to its investigation—simply constitutes a "fishing expedition" and

18  an ill-advised expansion of the IRS's investigative powers.  The John Doe Summons should not be

19  used to simply rubberstamp its scorched-earth investigative tactics.  *See Coopers & Lybrand*, 550

20  F.2d at 619 ("IRS does not, as it appears to assume on this appeal, have carte blanche discovery.").

21          **3.  Complying with Request No. 3 Would Be Unduly Burdensome**

22      The significant burden imposed by this request further counsels against enforcement.  As

23  with KYC Questionnaires, Kraken's AML records are not maintained in a way to allow for global

24  search or retrieval across identified "Users." Siemers Decl. ¶ 28.  Instead, Kraken would have to

25  go into each of the 59,331 accounts to manually analyze and collect this information.  *Id.* And

26  because this data is encrypted, it would first have to be decrypted.  *Id.*  This would be extremely

27  time-consuming and cause major disruption to its business.  *Id.*  Searching for and producing

28  relevant information would require several thousand hours of work.  *See, e.g.*, *id.* ¶¶ 19, 33.

1

**E.      Request No. 4 for Account Activity Is Overbroad and Unduly Burdensome**

2          Request No. 4 for all records of user account activity cannot be enforced unless substantially

3   narrowed as it is overbroad and not narrowly tailored to IRS's investigative purpose.  Specifically,

4   it seeks all transactional activity in a user's account *irrespective of time* and encompasses certain

5   information (such as transaction hash and blockchain addresses) that have no bearing on a taxable

6   gain.  Not only is it broader than necessary, but it would be unduly burdensome given its breadth.[11]

7          *First*, Request No. 4 is overbroad with respect to time as it seeks transactional data that falls

8   outside of the relevant timeframe of the Summons.  As noted above, a "User" is limited to those

9   who conducted transactions through Kraken between January 1, 2016 and December 31, 2020.

10  Request No. 4 is not so confined.  Instead, it effectively demands production of all transactional

11  records for covered "Users" that Kraken has *ever* had.  This is far too broad.  Here, the IRS's alleged

12  purpose is to investigate the failure to pay taxes on cryptocurrency transactions by Kraken users

13  between 2016-2020.   Transactional information before and after that time frame is necessarily

14  irrelevant unless it has some bearing on determining tax implications of relevant years.  *See, e.g.*,

15  *Zietzke*, 2020 WL 264394, at *9; *Monumental Life Ins. Co.*, 440 F.3d at 736.  The IRS fails to show

16  otherwise.  Given the absence of a date range limitation, this request is overboard.

17         *Second*, Request No. 4(c) for records reflecting "transaction hash (ID)" and "blockchain

18  addresses" is irrelevant to and overbroad for the IRS's purposes.  The IRS did not ask for transaction

19  hashes in *Coinbase* and does not justify the need for that information here.  As for blockchain

20  addresses, the IRS similarly sought "[a]ll wallet addresses" as part of its requested user identity

21  information in *Coinbase*, but this was rejected.  *Id.* at *7.  The Court expressly held it to be irrelevant

22  and broader than necessary for the IRS's purposes.  *Id.* at *6.  The Court should hold similarly here.

23         *Third*, complying with the IRS's fulsome request for transactional information would

24  impose a significant burden on Kraken if not substantially narrowed.  As noted above, if left

25  unconstrained by date, Kraken would be forced to produce voluminous transaction records that are

26  irrelevant to any investigation into the relevant tax years.  Indeed, because it is unlimited in time,

27

28
_____

[11] Should the court reject Kraken's opposition to the Summons in its entirety (§ II, *infra*), Kraken
does not raise a burden argument as to the production of its transactional ledgers for identified
users, reflecting deposit, withdrawal, and transfer activity, subject to the appropriate narrowing of
the scope of a "User," the time frame, and transactional activities at issue (as discussed herein).

Kraken would be required to collect and produce records since an account's inception all the way through the present.  Moreover, a number of sub-requests seek transactional data that is either not available or could not be obtained without substantial burden.  With respect to 4(b) and 4(d), Kraken's transactional data would reflect all executed transactions, but "chainsplitting event[s]" are not specifically demarcated as those particular events.  Siemers Decl. ¶ 30.  With respect to 4(c), "transaction hash (ID)" and "blockchain addresses" for transfers will not be reflected in the transactional ledger.  *Id.* ¶ 31.  Kraken cannot provide complete and accurate data regarding the transaction hashes and blockchain addresses on a transaction-by-transaction basis.  *Id.*  To comply with this request, it would have to develop searching tools above and beyond what it employs in the normal course of business.  *Id.*  And because blockchain addresses are not part of a transactional ledger, such data would have to be pulled on an account-level basis, which would be a time consuming and expensive process.  *Id.*  While Kraken is currently working to backfill transaction hashes or blockchain addresses into its transaction data, that work is ongoing, and Kraken is not able to verify its completeness or accuracy. *Id.*  Kraken does not expect to be able to provide this data completely and accurately for at least several months, if not longer.  *Id.*  Complying with these requests would be unduly burdensome.

## F.   The IRS's Request No. 5 for Account Funding Records Is Irrelevant, Broader Than Necessary for Its Purposes, and Burdensome

The final request seeks "all records of account funding," as well as "invoices, billing statements, receipts, or other documents memorializing and describing such transactions." To be sure, the transactional ledgers Kraken maintains for each account include deposit, withdrawal, and transfer activity and necessarily reflect account funding.  However, insofar as this request seeks records beyond those ledgers, it as overbroad, irrelevant, and would impose an unnecessary burden.

*First*, the request is overbroad as it is unlimited in time and not confined by the time period set forth in the "User" definition.  As with the other indefinite requests, the lack of any date limitations should preclude enforcement.  Without being tied to information relevant to the tax years in dispute, the request is broader than necessary for the IRS's investigation. *See, e.g.*, *Zietzke*, 2020 WL 264394, at *9; *Monumental Life Ins. Co.*, 440 F.3d at 736.

*Second*, account funding records, associated invoices and the like are irrelevant and broader than necessary.  Basic transactional data should be enough to establish whether a potentially reportable gain exists and who is responsible for that gain.  *See Coinbase* at *7.  The John Doe Summons does not permit the IRS to seek broad swaths of records about all users simply because it wants to make the "most informed" decision on compliance as to some.  Regardless, the detailed records sought here will only substantiate what is already reflected in Kraken's transactional ledgers.  If anything, the IRS's desire to reverse engineer transactions to determine gain and liability will only make its job harder—while Kraken pays the price of that redundant exercise.

*Third*, the breadth of the request would impose an unnecessary burden on Kraken.  Kraken does not keep record of account funding in the same manner in which user profile or transactional data is stored.  Siemers Decl. at ¶ 32.  And its systems are not natively designed to handle a global query into or collection of this information across identified users.  *Id.* To extract account funding activity, Kraken would have to design a new search query to collect that data on an account-level basis.  *Id.*  It anticipates would take approximately two full data analyst days to develop a tool and extract the data.  *Id.*  As for invoices, billing statements, receipts, and similar documents, Kraken does not send invoices, billing statements, or receipts to its users.  *Id.*  ¶ 33.  Any documents that may be captured by this request would be individual account records and not globally searchable or extractable.  *Id.*  Collection of these documents, to extent they exist, would be a very time-consuming and likely require a manual review and decryption of each of the 59,331 accounts, which could lead to thousands of hours of work.  *Id.*  This burden is unjustified.[12]

## II.     THE PETITION SHOULD BE DENIED IN ITS ENTIRETY

As shown above, the Summons requests are all riddled with the same problems:  they demand information the IRS is not authorized to obtain, are premature, violate user privacy, and will saddle Kraken with an enormous burden, for very little benefit.  Under *Coinbase* and well-established principles governing § 7609(f), these far reaching requests should not be enforced.

While the Court could hack away at the IRS's improper Summons and leave it bearing a thousand cuts, this Court should exercise its discretion to deny the IRS's Petition in its entirety.  If

---

[12] *See supra* note 11.

*Coinbase* reaffirms any principle, it is that the IRS cannot issue a summons that goes a mile wide and a mile deep in the first instance.  The Summons here plainly demonstrates the IRS's continued failure to recognize that principle.

Indeed, the IRS's purported need is far weaker than its asserted need in *Coinbase*, and certainly does not support the capacious requests made in the Summons.  The IRS still relies on the same general premise that cryptocurrency transactions are underreported.  But its basis for that assertion lies in articles and reports from more than a decade ago (2011 to 2013), and an informal, scientifically unreliable user survey conducted post-2016 from the Motley Fool.  Third Cincotta Decl. ¶¶ 33, 37.  To the contrary, the IRS's own data show that we are no longer in an era where only 800 to 900 returns are reporting cryptocurrency-related gains.  *See id.* ¶¶ 37 (842,888 taxpayers reported Bitcoin on their returns).  Undoubtedly, the IRS will assert in its reply that if the Summons is overbroad, the Court, at most, should simply narrow the scope of the Summons rather than reject it.  But while the Court may narrow the Summons in its discretion, this approach should not be permitted.  Given the stunning overbreadth of the Summons and the poor foundation to support it, and the IRS's apparent failure to respect the lessons taught by *Coinbase*, this Court should deny the Petition in its entirety, rather than trying to remedy the numerous faults with the Summons.

<u>**CONCLUSION**</u>

For the foregoing reasons, Kraken respectfully requests that the Court deny the IRS's Petition to Enforce its Summons.

Respectfully submitted,

Dated: April 21, 2023

By: */s/ Grant P. Fondo*

GRANT P. FONDO (SBN 181530)
*GFondo@goodwinlaw.com*
AMANDA H. RUSSO (SBN 319617)
*ARusso@goodwinlaw.com*
**GOODWIN PROCTER LLP**

Attorneys for Respondent
PAYWARD VENTURES, INC., d/b/a
KRAKEN OR KRAKEN.COM