1   GRANT P. FONDO (SBN 181530)
    *GFondo@goodwinlaw.com*
2   **GOODWIN PROCTER LLP**
    601 Marshall Street
3   Redwood City, CA  94063
    Tel.: +1 650 752 3100
4   Fax: +1 650 853 1038

5   AMANDA H. RUSSO (SBN 319617)
    *ARusso@goodwinlaw.com*
6   **GOODWIN PROCTER LLP**
    601 S. Figueroa Street, 41st Floor
7   Los Angeles, CA  90017
    Tel.: +1 213 426 2500
8   Fax: +1 213 623 1673

9   Attorneys for Respondent
    PAYWARD VENTURES, INC., d/b/a
10  KRAKEN OR KRAKEN.COM

11

12                UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                 SAN FRANCISCO DIVISION

15

16  UNITED STATES OF AMERICA,                  Case No. 3:23-MC-80029-JCS

17            Plaintiff,                        **DECLARATION OF TODD SIEMERS**
                                                **IN SUPPORT OF PAYWARD**
18      v.                                      **VENTURES, INC.'S OPPOSITION TO**
                                                **PETITION TO ENFORCE INTERNAL**
19  PAYWARD VENTURES, INC., d/b/a               **REVENUE SERVICE SUMMONS**
    KRAKEN OR KRAKEN.COM, OR ITS
20  PREDECESSORS, SUBSIDIARIES,                 Date:      May 19, 2023
    DIVISIONS, OR AFFILIATES,                   Time:      9:30 a.m.
21                                              Courtroom: F (15th Floor)
            Respondent.                         Judge:     Hon. Joseph C. Spero
22

23

24

25

26

27

28

DECLARATION OF TODD SIEMERS IN SUPPORT OF
OPPOSITION TO PETITION TO ENFORCE                        Case No. 3:23-MC-80029-JCS

1                             **DECLARATION OF TODD SIEMERS**

2         I, Todd Siemers, do hereby declare and state as follows:

3         1.       I am employed at Payward, Inc., which does business as Kraken ("Kraken") and is

4 the parent company of Payward Ventures, Inc.  I have personal knowledge of the facts set forth in

5 this declaration and, if called as a witness, could and would competently testify to them.

6         2.       I have been a Kraken employee for over four-and-a-half years.  My current title is

7 Staff Data Engineer, and I have worked in the Data Engineering Department during my entire

8 tenure at Kraken.

9         3.       In my role at Kraken, I have developed extensive knowledge regarding the

10 information Kraken has in its records, including with respect to user personal information and

11 transactional activity, how that information is stored and maintained at Kraken, as well as how

12 that information can be searched, queried, and retrieved.

13         4.       Kraken was founded in 2011 and is a United States-based online digital asset

14 exchange platform available to the public. Kraken offers its services to both U.S. and

15 international users in more than 190 countries.

16         5.       To use Kraken's exchange services, a user must first open an account. Kraken

17 currently offers several different levels of accounts: Starter, Express, Intermediate, and Pro. In

18 general, Starter and Express accounts offer more limited services and thus require lower levels of

19 verification by the user. Intermediate and Pro accounts, on the other hand, permit a wider variety

20 of funding methods and transaction types and have higher withdrawal and transaction limits.

21 Consequently, Intermediate and Pro account users are required to provide additional verification.

22 During the 2016 to 2020 timeframe, all account levels required the user to input certain identity

23 information, including first and last name, date of birth, address, email address, and phone

24 number.

25         6.       To register for either an Intermediate or Pro account, the user is required to

26 confirm their identity and physical address by uploading an identification document (such as a

27 passport or driver's license) and proof of residence. Pro account holders are additionally required

28

DECLARATION OF TODD SIEMERS IN SUPPORT OF
OPPOSITION TO PETITION TO ENFORCE                         Case No. 3:23-MC-80029-JCS

1    to complete a Know-Your-Customer Questionnaire, which, among other things, asks questions

2    about the account holder's occupation, source of income, and intended use of the account.

3         7.       Starter, Express, and Intermediate accounts are available only to individuals, while

4    the Pro account can be held by either an individual or a business.

5         8.       As part of my duties at Kraken, I was asked to review the information requests

6    included in the "John Doe" summons (the "Summons") served on Kraken by the IRS to

7    determine the amount of human and systems resources that Kraken would have to expend to

8    comply. Other members of the Data Engineering team assisted me with this review. Members of

9    our Compliance Data team also assisted me in estimating the number of Kraken account holders

10   that would be covered by the Summons, and I have reviewed the queries used to arrive at these

11   estimates. As a general matter, the human and systems resources estimates I have provided herein

12   are my best estimates based on my knowledge and experience. However, in my experience, data

13   engineering and data analysis efforts regularly encounter unexpected obstacles, particularly when

14   working with legacy or historical data sources and creating and implementing data collection

15   tools that have not been previously used or tested.

16        9.       We performed searches of Kraken's database to determine the number of account

17   holders[1] with a current address in the United States who had engaged in cryptocurrency

18   transactions with a combined total of at least $20,000 in value, regardless of transaction type

19   (whether deposit, withdrawal, trade, margin, or sale), in any one calendar year between January 1,

20   2016 and December 31, 2020.  Because the Summons does not expressly exclude account holders

21   that only engaged in digital currency purchases, this search included accounts in which the only

22   transactions during this period were purchases (buy-only accounts).[2]

23

---

24   [1] Excluded from this search were internal or test accounts controlled by Kraken and its employees
     for their own internal operational use.

25
     [2] Our estimates of the number of accounts covered by the Summons are a good faith effort to
26   interpret the language of the IRS's definition of "User" and apply a corresponding methodology
     to Kraken's data. However, the meaning of the language, "accounts with at least the equivalent of
27   $20,000 in value of transactions (regardless of type) in cryptocurrency" is not entirely clear.
     Kraken may need to modify its methodology or estimates as it continues to assess the Summons
28   and any data collected in response to it.

DECLARATION OF TODD SIEMERS IN SUPPORT OF
OPPOSITION TO PETITION TO ENFORCE                              Case No. 3:23-MC-80029-JCS

1          10.     Based on these searches, we determined that there are approximately 59,331

2    unique Kraken accounts that are covered by the Summons. Based on our searches, we also

3    determined that during the period of 2016 through 2020, there were approximately 160 million

4    cryptocurrency transactions conducted by these 59,351 Kraken accounts. If the transaction

5    threshold were increased to $50,000, the total number of unique Kraken accounts would be

6    approximately 38,329. If the transaction threshold were increased to $100,000, the total number

7    of unique Kraken accounts would be approximately 26,082.

8          11.     We also performed searches of Kraken's database to determine the number of

9    account holders with a current address in the United States who had engaged in cryptocurrency

10    transactions with a combined total of at least $20,000 in value *in any one transaction type* (i.e.,

11    buys, sells, deposits, or withdrawals) in any one calendar year between January 1, 2016 and

12    December 31, 2020.  Again, this search included accounts in which the only transactions during

13    this period were purchases (buy-only accounts).[3]

14          12.     Based on these searches, we determined that that approximately 42,017 unique

15    Kraken accounts would be included using these criteria. If the transaction threshold were

16    increased to $50,000, the total number of unique Kraken accounts would be approximately

17    25,251. If the transaction threshold were increased to $100,000, the total number of unique

18    Kraken accounts would be approximately 16,192.

19          13.     I understand that the IRS requests the production of all user identity information,

20    including both current and historical information, for the covered accounts.  Current basic

21    personal information that users provide to Kraken, including name, date of birth, address, email

22    address, phone number, and, where available, taxpayer ID number, is stored and maintained

23    either in Kraken's secure data "warehouse" or in a connected encrypted database, and Kraken has

24    tools that permit this data to be globally queried and pulled based on a search of accounts covered

25    by the Summons.  To provide current user profile data in response to the Summons, I estimate

26

27    [3] Similar to above, these are good faith estimates of the number of accounts that would be
covered by this modified definition of "User." However, Kraken may need to modify its

28    methodology or estimates as it continues to assess any data collected.

DECLARATION OF TODD SIEMERS IN SUPPORT OF
OPPOSITION TO PETITION TO ENFORCE                    Case No. 3:23-MC-80029-JCS

1    that it will take approximately two full days of data analyst time to collect and pull such data.

2    This process may take additional time due to the data privacy restrictions that Kraken has in place

3    to protect the personal information of its account holders.  This does not include attorney time to

4    review and coordinate the production.

5           14.     On the other hand, *historical* personal and account information are not kept in

6    Kraken's data warehouse. These data are not organized or preserved in the same manner as

7    current user information and are not data fields that Kraken can query on a global basis in the

8    ordinary course of its business.  Kraken's data warehouse does not include data fields for

9    previously used names, addresses, telephone numbers, emails addresses, or taxpayer ID numbers.

10   Kraken also does not store pseudonyms.

11          15.     The only way for Kraken to obtain the historical personal information for an

12   account holder would be by accessing the separate anti-money laundering (AML) log for each

13   individual account. However, this would present several major challenges.

14          16.     Kraken's AML logs track a variety of actions taken in connection with an account,

15   not just changes in personal information. For example, these logs track security-related actions,

16   Suspicious Activity Report ("SAR") filings, actions taken in response to receipt of legal process,

17   changes in account verification levels, rejected or recalled deposits, and confirmation of OFAC-

18   related checks.

19          17.     Kraken has no tools or mechanisms in place to identify or pull the information

20   related to changes in personal information from the AML logs. Searching for, collecting, and

21   producing this information would be extremely time-consuming and impose a significant burden

22   on Kraken.  First, were Kraken required to determine the full population of "Users" using

23   historical residence information, Kraken would have to identify all accounts that had a previous

24   indication of U.S. residency, even if their current account address is not in the United States.

25   Thus, Kraken would have to analyze the AML logs for every single Kraken user, which would be

26   millions of accounts.

27          18.     In addition, Kraken's AML logs are encrypted, so they cannot simply be searched

28   globally for residency information. Kraken would have to decrypt each AML log to determine if

DECLARATION OF TODD SIEMERS IN SUPPORT OF
OPPOSITION TO PETITION TO ENFORCE                                 Case No. 3:23-MC-80029-JCS

1   it contained any historical U.S. residency information. It would not be feasible for Kraken to do

2   this for all its account holders to determine whether they had "any United States-based address,

3   telephone number, [or] email domain," as is included in the Summons' definition of "User".

4         19.    Even if Kraken were required to analyze the AML logs only for the 59,331

5   accounts that meet the IRS's definition of User to determine (i) whether any changes were made

6   to the account holder's personal information, and (ii) if so, what those substantive changes were,

7   it would be extremely time consuming.  Based on my experience, it is reasonable to assume it

8   would take approximately five minutes per log for a Kraken employee to decrypt the log, review

9   it for historical residency information, and collect that information. Thus, for 59,331 logs, it

10   would require approximately 5,000 hours of work. In addition, historical changes to personal data

11   have not been stored by Kraken in its AML logs for the entire period covered by the Summons, so

12   the data collected would be incomplete. Since this is not data that Kraken formally maintains, I do

13   not know how accurate the information retrieved would be or if we would successfully be able to

14   collect historical personal information for all accounts.

15         20.    I understand the IRS is also requesting production of complete user payment

16   methods, such as linked bank or credit card accounts.  Linked payment account are not stored in

17   the same manner as basic user information, and Kraken's systems are not natively designed to

18   handle a global query into or collection of such information.  To pull all payment accounts

19   associated with the 59,331 accounts covered by the Summons, Kraken would have to design a

20   new search query to do so.  In addition, the query would likely not be able to identify the financial

21   institution associated with the payment account, but rather only the account number associated

22   with the payment.

23         21.    In addition, the transaction history ledgers that Kraken maintains for each account

24   do not include linked payment methods on a transaction-by-transaction basis for each deposit or

25   withdrawal.  Thus, Kraken would be limited to producing payment methods on an account-by-

26   account basis. Based upon my knowledge of Kraken's systems, I estimate that creating such a

27   query and extracting the requested payment information on an account-by-account basis would

28

DECLARATION OF TODD SIEMERS IN SUPPORT OF
OPPOSITION TO PETITION TO ENFORCE           Case No. 3:23-MC-80029-JCS

1   require at least two days of work by one full-time data analyst.  This does not include attorney

2   time to review and coordinate the production.

3          22.      Were Kraken required to attempt to collect and provide payment methods on a

4   transaction-by-transaction basis, I estimate that it would require at least several weeks of work by

5   a larger team of data engineers, data analysts, and core back-end engineers. Since this is not data

6   that Kraken maintains, I do not know how accurate the information retrieved would be or if these

7   efforts would be successful.

8          23.      I understand that the IRS is also requesting a complete history of IP addresses that

9   each user has used to access their account.  As with historical changes to personal information

10  and payment methods, Kraken does not store IP addresses in the same way it stores other basic

11  personal information for a user.  While the IP addresses associated with each user login and

12  various account actions are captured in an account activity log, Kraken does not have a process in

13  place to globally pull all historical IP addresses used by large number of accounts. To pull a

14  record of the IP addresses that have been associated with accounts covered by the Summons,

15  Kraken would have to separately design a query.  In addition, like linked payment methods, the

16  transaction history ledgers that Kraken maintains for each account do not include linked IP

17  addresses on a transaction-by-transaction basis.  Thus, Kraken would be limited to producing IP

18  addresses on an account-by-account basis. Based upon my knowledge of Kraken's systems, I

19  estimate that this would require at least three days of work from one full time data engineer, plus

20  two days of work from one full time data analyst.  This does not include attorney time to review

21  and coordinate the production.

22         24.      Were Kraken required to attempt to collect and provide IP addresses on a

23  transaction-by-transaction basis, I estimate that it would require at least several weeks of work by

24  a larger team of data engineers, data analysts, and core back-end engineers. Since this is not data

25  that Kraken maintains, I do not know how accurate the information retrieved would be or if these

26  efforts would be successful. In addition, older data from within the timeframe covered by the

27  Summons would likely be less accurate and reliable due to historical changes in how Kraken has

28  captured this data.

DECLARATION OF TODD SIEMERS IN SUPPORT OF
OPPOSITION TO PETITION TO ENFORCE                                    Case No. 3:23-MC-80029-JCS

1      25.     I understand that the IRS is requesting information relating to Kraken's Know-

2   Your-Customer ("KYC") due diligence questionnaires, including information relating to the

3   employment, net worth, and source of wealth of users covered by the Summons.  Initially, Kraken

4   does not collect KYC questionnaires for Starter, Express, or Intermediate accounts; it only does

5   so for Pro accounts. Thus, this information is unavailable for most Kraken accounts. In addition,

6   the information provided by users in response to due diligence questionnaires is not stored in

7   Kraken's data warehouse. Kraken does not keep such information in a manner that allows for

8   global inquiry or retrieval across any identified users. Rather, due diligence questionnaire

9   responses are stored in either the AML logs for each account or in separate "tickets" that are

10   created by Kraken's client engagement tracking system. Collecting information provided by users

11   in response to due diligence questionnaires would require a manual, account-by-account review

12   of the Pro accounts covered by the IRS Summons.  While the IRS appears to only be requesting

13   certain information from the KYC questionnaires, Kraken cannot search individual data fields of

14   these questionnaires, so it would nonetheless have to look at each questionnaire to respond.

15      26.     Responding to this request which would be very time consuming, cause significant

16   interruption to Kraken's business, and burdensome.  Based on my knowledge of Kraken's

17   systems, I do not know how complete or accurate the information retrieved would be, and I

18   estimate that this is a task that would likely require several weeks and possibly months of work by

19   a team of data engineers, data analysts, and core back-end engineers.  This does not include

20   attorney time to review and coordinate the production.

21      27.     I understand that the IRS is also requesting production of Kraken's AML

22   "exception reports" and "records of investigation of such exceptions."  Kraken does not have

23   documents called AML "exception reports" and so cannot produce any such records.  As

24   previously stated, Kraken does maintain an AML log for each account.  However, there are

25   numerous reasons, including minor or technical issues, that entries are generated in these logs.

26   For example, these logs track security-related actions, Suspicious Activity Report ("SAR")

27   filings, actions taken in response to receipt of legal process, changes in account verification

28   levels, rejected or recalled deposits, and confirmation of OFAC-related checks.

DECLARATION OF TODD SIEMERS IN SUPPORT OF
OPPOSITION TO PETITION TO ENFORCE                                   Case No. 3:23-MC-80029-JCS

1          28.      To the extent the IRS's request seeks Kraken records associated with events that

2  trigger its AML system, and any associated investigation into material issues, determining

3  whether accounts have associated AML records and retrieving those documents would be very

4  time consuming and burdensome.  As stated above, AML records are not kept in a manner that

5  allows for global inquiry or retrieval across any identified users.  This would require a manual,

6  account-by-account review of the AML logs for each of the 59,331 accounts covered by the

7  Summons.  This AML data is also encrypted and would require decryption on an account-by-

8  account basis similar to the process described in Paragraph 19.  This process would cause

9  significant interruption to Kraken's business and direct valuable engineering time away from

10  operational priorities.

11         29.      I understand that the IRS is also requesting production of account transactional

12  activity for each of the 59,331 accounts covered by the Summons, which would cover

13  approximately 160 million transactions.  Kraken maintains a corresponding transaction history

14  "ledger" for each account, which logs transactional activity in the account, including deposits,

15  withdrawals, trades, and transfers.  These ledgers are stored and maintained in Kraken's data

16  warehouse and can be globally pulled for accounts subject to the Summons.  Based on my

17  knowledge of Kraken's systems, I estimate this would likely require at least one day of work for

18  one full time data analyst and two days of work for one full time data engineer to search and

19  extract transactional data.  This does not include attorney time to review and coordinate the

20  production.

21         30.      I understand that the IRS is specifically requesting information from all executed

22  transactions, specifically "lending, borrowing, or margin position" data, along with data relating

23  to the receipt of cryptocurrency resulting from a "chainsplitting event such as a hard fork or

24  promotional event."  Kraken's transactional ledgers for each account include any deposits,

25  withdrawals, or transfers of cryptocurrency conducted by the account, which would reflect any

26  lending, borrowing or margin position that resulted in a completed transaction. It would also

27  capture transactions resulting from chainsplitting events such as forks or "airdrops" that resulted

28  in digital assets being credited to the account. However, chainsplitting events are not specifically

DocuSign Envelope ID: B64750D0-2254-4A56-AF09-A5A8CC7A51AE

1   identified as such in the transaction ledgers. For example, depending on the details of the

2   chainsplitting event and how that event was handled by Kraken, corresponding transactions may

3   be captured as deposits, transfers, or adjustments to the account.

4          31.     I understand that the IRS is requesting data related to "transaction hash (ID)" and

5   "blockchain addresses" for cryptocurrency transactions.  Like payments methods, the transaction

6   history ledgers that Kraken maintains for each account do not include the transaction hash or

7   blockchain addresses on a transaction-by-transaction basis. Thus, Kraken's systems are not

8   natively designed to handle a global query or collection of such information.  Kraken is currently

9   working to backfill transaction hashes or blockchain addresses into its transaction data, but that

10  work is ongoing. At this time, Kraken cannot provide complete and accurate data regarding the

11  transaction hashes and blockchain addresses on a transaction-by-transaction basis.  Kraken does

12  not expect to be able to provide this data completely and accurately for at least several months, if

13  not longer.

14         32.     I understand that the IRS is also requesting production of all records of account

15  funding.  As noted above, deposits, withdrawals, or transfers to and from an account are reflected

16  in the transactional ledgers associated with each account.  Beyond that, the search for and

17  retrieval of any account funding data would be similar to the process for responding to the request

18  for complete user payment methods.  Kraken does not maintain a record of all account funding in

19  the same way standard transactional data is stored in the ordinary course of business, and its

20  systems are not natively designed to handle a global query into this information on a transaction-

21  by-transaction basis.  Kraken would be required to design a search query to collect account

22  funding data on an account-level basis.  Based on my knowledge of Kraken's systems, I estimate

23  it would take a at least two days of work for a full-time data analyst to develop a tool and to

24  search, retrieve, and extract the information.

25         33.     I understand that the IRS also requests any invoices, billing statements, receipts, or

26  other similar documents relating to account funding transactions.  It is unclear the full extent of

27  what documents the IRS is seeking based on these descriptions. Based on my knowledge and

28  experience at Kraken, Kraken does not send invoices, billing statements, or receipts to its users.

DECLARATION OF TODD SIEMERS IN SUPPORT OF
OPPOSITION TO PETITION TO ENFORCE                                    Case No. 3:23-MC-80029-JCS

1   Any documents that may be captured by this request are individual records and not globally

2   searchable data. Collection of these documents, to extent they exist, would be a very time-

3   consuming and likely require a manual review of each of the 59,331 accounts covered by the IRS

4   summons. It is difficult to estimate the burden of this request since it is unclear the universe of

5   documents being sought. But as previously stated, even if only a few minutes were required per

6   account to conduct a manual review, this would lead to thousands of hours of work.

7        ///

8        ///

9        ///

10       ///

11

12       I declare under penalty of perjury under the laws of the United States of America that the

13   foregoing is true and correct.  Executed this 21st day of April, 2023 in the State of Virginia.

14

DocuSigned by:

*Todd Siemers*

15   D10493B193A94C6... Todd Siemers

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF TODD SIEMERS IN SUPPORT OF
OPPOSITION TO PETITION TO ENFORCE                               Case No. 3:23-MC-80029-JCS